No. 2025-1792

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

LIGADO NETWORKS, LLC,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

On Appeal from the United States Court of Federal Claims,
Case No. 23-1797, Senior Judge Edward J. Damich

## DEFENDANT-APPELLANT'S OPENING BRIEF

BRETT A. SHUMATE
*Assistant Attorney General*

PATRICA M. McCARTHY
*Director*

NATHANAEL B. YALE
BORISLAV KUSHNIR
*Attorneys, Commercial Litigation Branch*
*Civil Division, U.S. Department of Justice*
*P.O. Box 480, Ben Franklin Station*
*Washington, DC 20044*
*(202) 616-0464*

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court.  The Government is also not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND STATEMENT OF THE ISSUES .................................... 1

STATEMENT OF JURISDICTION ......................................................... 5

STATEMENT OF THE CASE .............................................................. 6

    I.     Statutory and Regulatory Background on Spectrum Licenses .................... 6

    II.     Ligado's Administrative Proceedings before The FCC ............................. 8

    III.     Congress Enacts The 2021 National Defense Authorization Act ........... 12

    IV.     Course of Proceedings in The Trial Court ..................................... 14

        A.   Ligado Files Its Complaint ...................................................... 14

        B.   The Trial Court's Decision ...................................................... 17

SUMMARY OF THE ARGUMENT ..................................................... 20

    I.     Standard of Review ................................................................. 22

    II.     Legal Background on Fifth Amendment Takings Claims ........................ 23

    III.     The Trial Court Erred in Holding That It Possessed Tucker Act
        Jurisdiction Notwithstanding The Communications Act's
        Comprehensive Remedial Scheme ............................................... 26

    IV.     The Trial Court Erred in Holding That Ligado Possesses A Cognizable
        Property Interest for Takings Purposes ......................................... 32

        A.   The Trial Court Erred in Determining Ligado's License to Be
            Cognizable Property under The Fifth Amendment ............................ 33

        B.   The Trial Court Erred in Considering The License's Conditions ....... 41

    V.     The Trial Court Erred in Determining That Ligado Stated A Viable
        Takings Claim because The Government Acted Unlawfully .................... 43

VI.    The Trial Court Erred in Determining That Ligado Could State A
Cognizable Physical Takings Claim .............................................................. 47

CONCLUSION ............................................................................................................ 50

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Acceptance Ins. Cos. Inc. v. United States,*
   503 F.3d 1328 (Fed. Cir. 2007) ................................................................26

*Acceptance Ins. Cos. v. United States,*
   583 F.3d 849 (Fed. Cir. 2009) ..........................................................38, 48

*Alpine PCS, Inc. v. United States,*
   878 F.3d 1086 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 78 (2018) ...........*passim*

*Am. Bankers Ass'n v. United States,*
   932 F.3d 1375 (Fed. Cir. 2019) ..........................................................25, 37

*Am. Pelagic Fishing Co., L.P. v. United States,*
   379 F.3d 1363 (Fed. Cir. 2004) ..........................................................24, 33

*Ark. Game & Fish Comm'n v. United States,*
   568 U.S. 23 (2012) ................................................................................24

*Armstrong v. United States,*
   364 U.S. 40 (1960) ................................................................................24

*Banks v. United States,*
   741 F.3d 1268 (Fed. Cir. 2014) ..........................................................23

*Bd. of Regents of State Colleges v. Roth,*
   408 U.S. 564 (1972) ..............................................................................25

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ..............................................................................23

*Biltmore Forest Broad. FM, Inc. v. United States,*
   555 F.3d 1375 (Fed. Cir. 2009) ..........................................................22

*Branch v. United States,*
   69 F.3d 1571 (Fed. Cir. 1995) ............................................................48

*Cambridge v. United States,*
  558 F.3d 1331 (Fed. Cir. 2009) ............................................................... 23

*Campbell v. United States,*
  932 F.3d 1331 (Fed. Cir. 2019) ............................................................... 44

*Cedar Point Nursery v. Hassid,*
  594 U.S. 139 (2021) ............................................................... 25, 41, 47

*Concrete Pipe & Prods. Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.,*
  508 U.S. 602 (1993) ............................................................... 49

*Connolly v. Pension Benefit Guaranty Corp.,*
  475 U.S. 211 (1986) ............................................................... 49

*Conti v. United States,*
  291 F.3d 1334 (Fed. Cir. 2002) ............................................................... *passim*

*Darby Development Co., Inc. v. United States,*
  112 F.4th 1017 (Fed. Cir. 2024) ............................................................... 45, 46, 47

*Del-Rio Drilling Programs, Inc. v. United States,*
  146 F.3d 1358 (Fed. Cir. 1998) ............................................................... 19, 44, 45

*FCC v. Sanders Bros. Radio Station,*
  309 U.S. 470 (1940) ............................................................... 3, 34

*Fishermen's Finest, Inc. v. United States,*
  59 F.4th 1269 (Fed. Cir. 2023) ............................................................... *passim*

*Folden v. United States,*
  379 F.3d 1344 (Fed. Cir. 2004) ............................................................... 23, 27, 28

*Hearts Bluff Game Ranch, Inc. v. United States,*
  669 F.3d 1326 (Fed. Cir. 2012) ............................................................... 37

*Hooe v. United States,*
  218 U.S. 322 (1910) ............................................................... 43

*Horne v. Dep't of Agric.,*
  576 U.S. 350 (2015) ............................................................... 47, 48, 50

*In re Atlantic Business & Community Development Corp.,*
    994 F.2d 1069 (3d Cir. 1993) ........................................................... 40

*In re NextWave Personal Comms., Inc.,*
    200 F.3d 43 (2d Cir. 1999) ............................................................... 34

*Jentoft v. United States,*
    450 F.3d 1342 (Fed. Cir. 2006) ....................................................... 26

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005) ................................................................... 44, 47

*Lion Raisins, Inc. v. United States,*
    416 F.3d 1356 (Fed. Cir. 2005) ............................................ 44, 45, 47

*Love Terminal Partners, L.P. v. United States,*
    889 F.3d 1331 (Fed. Cir. 2018) ....................................................... 25

*Lucas v. South Carolina Coastal Council,*
    505 U.S. 1003 (1992) ................................................................. 16, 41

*Maritans v. United States,*
    342 F.3d 1344 (Fed. Cir. 2003) ....................................................... 33

*Me. Cmty. Health Options v. United States,*
    590 U.S. 296 (2020) ....................................................................... 27

*Members of Peanut Quota Holders Ass'n, Inc. v. United States,*
    421 F.3d 1323 (Fed. Cir. 2005) ................................................. 24, 33

*Mitchell Arms, Inc. v. United States,*
    7 F.3d 212 (Fed. Cir. 1993) ........................................................... 37

*Mitchell v. United States,*
    267 U.S. 341 (1925) ....................................................................... 43

*Mobile Relay Assocs. v. FCC,*
    457 F.3d 1 (D.C. Cir. 2006) ..................................................... *passim*

*Moody v. United States,*
    931 F.3d 1136 (Fed. Cir. 2019) ........................................................44

*P & R Temmer v. FCC,*
    743 F.2d 918 (D.C. Cir. 1984) ........................................................42

*Penn Central Transportation Co. v. City of New York,*
    438 U.S. 104 (1978) ................................................................ 16, 26

*Rith Energy, Inc. v. United States,*
    247 F.3d 1355 (Fed. Cir. 2001) ...............................................44, 45, 47

*Rith Energy, Inc. v. United States,*
    270 F.3d 1347 (Fed. Cir. 2001) ................................................ 44, 45

*Ruckelshaus v. Monsanto,*
    467 U.S. 986 (1984) ....................................................................49

*Sandwich Isles Commc'ns, Inc. v. United States,*
    992 F.3d 1355 (Fed. Cir. 2021), *cert. denied,* 142 S. Ct. 2647 (2022) ....................*passim*

*Shearin v. United States,*
    992 F.2d 1195 (Fed. Cir. 1993) ........................................................23

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ....................................................................39

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
    535 U.S. 302 (2002) ....................................................................25

*Taylor v. United States,*
    959 F.3d 1081 (Fed. Cir. 2020) ........................................................43

*United States v. Bormes,*
    568 U.S. 6 (2012) ......................................................................26

*United States v. Fuller,*
    409 U.S. 488 (1973) ....................................................................33

*United States v. Pewee Coal Co.,*
    341 U.S. 114 (1951) ....................................................................48

*Vereda, Ltda. v. United States*,
   271 F.3d 1367 (Fed. Cir. 2001) ......................................................................27

**Statutes**

28 U.S.C. § 1292(d) ................................................................................2, 5, 20

28 U.S.C. § 1491(a) ........................................................................................26

28 U.S.C. § 2342(1) ........................................................................................28

47 U.S.C. § 151 .................................................................................................6

47 U.S.C. § 301 ........................................................................................*passim*

47 U.S.C. § 304 .....................................................................................3, 7, 34

47 U.S.C. § 305(a) ............................................................................................6

47 U.S.C. § 307(c) ............................................................................................7

47 U.S.C. § 309(a) ............................................................................................6

47 U.S.C. § 310(d) ....................................................................................7, 37

47 U.S.C. § 312 .....................................................................................3, 7, 35

47 U.S.C. § 316 .................................................................................................3

47 U.S.C. § 316(a) ................................................................................7, 35, 36

47 U.S.C. § 402(a) ....................................................................................*passim*

47 U.S.C. § 402(b) ....................................................................................7, 29

47 U.S.C. § 902(b) ............................................................................................6

William M. Thornberry National Defense Authorization Act for Fiscal Year 2021,
  Pub. L. 116-283, §§ 1661-1664, 134 Stat. 3388, 4073-76 (2021) ...........................*passim*


**Regulations**

47 C.F.R. § 1.947 .........................................................................................................3

47 C.F.R. § 1.953 .........................................................................................................3

47 C.F.R. § 1.955 .........................................................................................................3

47 C.F.R. § 25.117 ......................................................................................................31

47 C.F.R. § 25.149 ........................................................................................................8


**Administrative Authorities**

*Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application,*
  Order and Authorization, 35 FCC Rcd. 3772 (2020) ..............................................*passim*

*Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application,*
  Order Denying Motion For Stay, 36 FCC Rcd. 1262, 2021 WL 8083764 (Jan. 19.
  2021) ..........................................................................................................................12


**Other Authorities**

U.S. Const. Amend. V. ...............................................................................................*passim*

National Academies of Sciences, Engineering, and Medicine,
  *Analysis of Potential Interference Issues Related to FCC Order 20-48,*
  *available at*: https://nap.nationalacademies.org/catalog/26611/analysis-of-potential-
  interference-issues-related-to-fcc-order-20-48 (last visited August 19, 2025)............13

## INTRODUCTION AND STATEMENT OF THE ISSUES

Plaintiff-respondent, Ligado Networks LLC (Ligado), seeks in this case to transform a regulatory dispute before the Federal Communications Commission (FCC or Commission) into a Fifth Amendment takings suit against the Federal Government in the United States Court of Federal Claims (trial court). Ligado filed applications with the FCC to modify its existing Mobile Satellite Services license so that it could operate a wireless terrestrial network within L-Band spectrum. On April 22, 2020, the FCC granted Ligado a modified license (the April 2020 Order)[1] subject to several conditions designed to address concerns raised by Federal agencies, including the Department of Defense (DoD) and the National Telecommunications and Information Administration (NTIA), that Ligado's operation within L-Band spectrum could harmfully interfere with the Global Positioning Systems, or GPS, that operates in nearby spectrum bands.

On October 12, 2023, Ligado filed this multi-billion dollar suit in the trial court alleging that the Government, acting primarily through DoD, NTIA, and Congress, had effected a Fifth Amendment taking by unlawfully preventing Ligado from using the licensed spectrum. In a November 18, 2024, Opinion and Order, the trial court granted-in-part and denied-in-part the Government's motion to dismiss. The trial court dismissed Ligado's legislative takings claim but denied the Government's

---

[1] *In the Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, Order and Authorization, 35 FCC Rcd. 3772 (2020).

motion to dismiss Ligado's physical, *per se* regulatory, and regulatory takings claims. On February 28, 2025, the trial court amended its order to reflect that this case satisfies the criteria for interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2). On May 20, 2025, this Court granted the Government's petition for permission to file an interlocutory appeal.

In denying-in-part the Government's motion to dismiss, the trial court committed several reversible errors. To start, the trial court incorrectly held that it possessed jurisdiction to entertain Ligado's takings claims. Through the Communications Act, Congress established a comprehensive remedial scheme that displaces the trial court's Tucker Act jurisdiction, including for takings claims that arise out of FCC licensing decisions. *See Sandwich Isles Comm'ns, Inc. v. United States*, 992 F.3d 1355, 1361-65 (Fed. Cir. 2021); *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1096-98 (Fed. Cir. 2018). The Communications Act sets out an exclusive administrative and judicial review framework for claims arising out of such decisions. Ligado's complaint directly implicates the April 2020 Order, including the FCC's authority to impose terms and conditions on Ligado's modified license, which is exactly the type of action that Congress channeled through the Communications Act's comprehensive scheme. The trial court erred in holding that the FCC was not the proper forum to address Ligado's complaint.

2

The trial court also erred in holding that Ligado's FCC license was a cognizable property interest for takings purposes. On this front, Ligado simply cannot establish a cognizable property interest in its FCC license because "[t]he policy of the [Communications] Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license." *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 475 (1940). To be sure, licensees generally enjoy the right to use the licensed spectrum as they wish consistent with the terms imposed by the Government. But license holders do not own the spectrum, and the Government maintains the authority to modify or revoke the license as permitted by the Communications Act and Code of Federal Regulations (for example, if the licensee does not meet the conditions of the license or violates other FCC regulations). 47 U.S.C. §§ 301, 304, 312, 316; 47 C.F.R. §§ 1.947, 1.953, 1.955. Not surprisingly, no court has held that an FCC license is property for takings purposes. In fact, the United States Court of Appeals for the District of Columbia Circuit, correctly held that FCC licenses are not property under the Takings Clause. *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11-12 (D.C. Cir. 2006).

In reaching a contrary decision, the trial court did not conduct a structured property interest analysis of the kind adopted by this Court in cases involving Federal licenses, *see Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1275-79 (Fed. Cir. 2023). Instead, in determining that Ligado had alleged a cognizable property interest,

3

the trial court primarily relied on the fact that this Court had never previously held that an FCC license is not cognizable property, that *Mobile Relay* did not apply because here, DoD, not the FCC, allegedly infringed upon the license; and its determination that Ligado purportedly lacked an "adequate remedy" at the FCC. The trial court plainly erred in relying on these conclusions. The takings claims in *Alpine* and *Sandwich Isles* were dismissed on threshold jurisdictional grounds without the need to reach the issue of whether an FCC license constitutes a cognizable property interest. The trial court identified no precedent supporting its rationale that the existence of a cognizable property interest in the first instance depends on which Federal agency is alleged to have effected the taking. And the trial court's novel "adequate remedy" standard is simply not germane to the property interest analysis.

The trial court committed two additional errors. Its decision is premised on the notion that a plaintiff can state a viable takings claim *because* the Government acted unlawfully, a determination that contradicts several decisions from this Court. Finally, the trial court's finding that an FCC license can be the subject of a physical takings claim is also erroneous. Congress has made clear that no person can have an ownership interest in the spectrum itself nor any other "right, beyond the terms, conditions, and periods of the license." 47 U.S.C. § 301. Thus, to the extent Ligado possesses any cognizable property interest here at all to support its takings claims

4

(which it does not), such interest can only be in its FCC license, an intangible asset that cannot be physically occupied or invaded.  Accordingly, the issues on appeal are:

1.    Whether the trial court erred in holding that it possesses jurisdiction to entertain Ligado's takings claims despite the Communications Act's comprehensive remedial scheme.

2.    Whether the trial court erred in holding that Ligado's FCC license constitutes a cognizable property interest for takings purposes.

3.    Whether a plaintiff such as Ligado pleads a plausible takings claim when it alleges that a taking occurred because the Government acted unlawfully.

4.    Whether the trial court erred in holding that FCC-licensed spectrum can be the subject of a physical takings claim.

## STATEMENT OF JURISDICTION

This Court possesses jurisdiction pursuant to 28 U.S.C. § 1292(d).  On November 18, 2024, the trial court issued the interlocutory order that is subject to appeal.  Appx1-13.  On February 28, 2025, the trial court granted the Government's motion to certify the order for interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2), Appx14, and on May 20, 2025, this Court granted the Government's petition for permission to appeal.  Appx15-16.

## STATEMENT OF THE CASE

**I.    Statutory and Regulatory Background on Spectrum Licenses**

The Federal Government regulates the use of electromagnetic spectrum for various radio communication services in the United States, including Mobile Satellite Service (MSS), Radionavigation-Satellite Service (RNSS) (where GPS operates), and terrestrial-based service, including the ancillary terrestrial component for MSS (where cellular voice services and broadband internet services operate). The Federal Communications Act of 1934 authorizes the FCC and NTIA, located within the Department of Commerce (Commerce), to regulate spectrum use. The FCC has authority over non-Federal Government use of spectrum. *See* 47 U.S.C. § 151 *et. seq.* NTIA manages the Federal Government's use of spectrum, such as for GPS. *See id.* §§ 151, 301, 305(a), 902(b)(2)(A).

In enacting the Communications Act, Congress established a comprehensive scheme for licensing and regulating the use of non-Federal spectrum. *See* 47 U.S.C. § 301. The Act authorizes the FCC to grant licenses to private parties when the Commission finds that the "public convenience, interest, or necessity will be served thereby," *id.* § 307(a); *see id.* § 309(a). The Act, however, specifically provides only for the "use of" the electromagnetic spectrum by FCC licensees, "but not the ownership thereof" so that Congress "maintain[s] the control of the United States over all the channels of radio transmission." *Id.* § 301. Congress further provided that no license

6

"shall be construed to create any right, beyond the terms, conditions, and periods of the license." *Id.*

The FCC issues licenses for "limited periods of time." *Id.* §301, *see id.* § 307(c). Licensees can only transfer FCC licenses "upon application to the [FCC] and upon finding by the [FCC] that the public interest, convenience, and necessity will be served thereby." *Id.* § 310(d). The FCC is authorized to modify the terms of any license at any time "if in the judgment of the [FCC] such action will promote the public interest, convenience and necessity." *Id.* § 316(a)(1); *see also id.* § 304 (license applicant must "waiv[e] any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise"); *id.* § 312 (identifying circumstances for revocation of a license).

The Communications Act further provides a comprehensive scheme for judicial review of FCC orders and decisions. Appeals from FCC decisions and orders must be brought to the D.C. Circuit in several specified circumstances, including by any applicant for a modification of a license whose application is denied by the FCC, or by any other person who is aggrieved by an FCC order granting an application to modify a license. *Id.* § 402(b). FCC orders and decisions that do not fall within the purview of section 402(b) may be appealed to the regional circuit courts of appeals. *Id.* § 402(a).

7

In addition, as relevant to this case, the FCC issued regulations in 2003 to allow MSS licensees, including Ligado, to seek FCC authorization to operate ancillary-terrestrial component (ATC) stations, or terrestrial wireless operations, in the same frequencies for which an existing license authorizes satellite MSS operations, and for the purposes of filling in gaps in service that are difficult to serve with MSS, such as in urban settings where buildings can block MSS signals. *See* 47 C.F.R. § 25.149.

## II.   Ligado's Administrative Proceedings before The FCC

There is an extensive administrative history of Ligado seeking authorization for various terrestrial wireless operations. For more than two decades, Ligado[2] has held an FCC license authorizing it to provide satellite MSS services in the 1525-1559 MHz and 1626.5-1660.5 MHz spectrum bands, located in what is commonly referred to as the L-Band. *See* April 2020 Order, 35 FCC Rcd. at 3773-74. Parts of this licensed spectrum border spectrum bands in which critical GPS services operate, including those operated by the Federal Government. In 2004, in accordance with regulatory changes, *see* 47 C.F.R. § 25.149, the FCC granted Ligado's license modification application for authority to conduct ATC operations (*i.e.*, terrestrial wireless operations) in its MSS-licensed spectrum provided that Ligado complied with certain conditions. *See* April 2020 Order, 35 FCC Rcd. at 3774-75.

---

[2] This brief uses "Ligado" to include several of its predecessors-in-interest, including LightSquared Subsidiary LLC.

In November 2010, Ligado requested that the FCC further modify its previously issued ATC authorization to accommodate Ligado's plans to implement a nationwide 4G satellite/terrestrial network under its ATC authority. *Id.* at 3775-76. In January 2011, the FCC granted Ligado a waiver of certain Commission ATC rules, provided that Ligado address various concerns that the network would cause harmful interference with GPS. *See id.* Ligado never implemented this terrestrial network because it never resolved the harmful interference concerns raised by NTIA and others. *See id.* at 3774-77. NTIA similarly opposed Ligado's September and October 2012 license modification applications on harmful interference grounds. *Id.* at 3777-78.

In December 2015, Ligado filed new applications to modify its proposed terrestrial wireless operations to conduct terrestrial operations in three specific L-band segments. *Id.* at 3778-79. In May 2018, following a public comment period in which concerns about the harmful interference implications of Ligado's plan were raised, Ligado amended its 2015 license modification applications by proposing several restrictive conditions, including a reduction in base station power and specific measures to mitigate concerns about potential harmful interference to Federal Government operations. *Id.* at 3780-82. In response, NTIA notified the FCC in December 2019 that, based on its own assessment of the potential impact of Ligado's proposed terrestrial operations (including through the most recent technical studies),

9

it could not recommend approval of the applications. *Id.* at 3782-83. In April 2020, NTIA informed the FCC that its concerns about the harmful interference from Ligado's proposed ATC operations had not been resolved. *Id.*

Nevertheless, in April 2020 and over NTIA's objections, the FCC conditionally granted Ligado's amended license modification applications seeking ATC authority. April 2020 Order at 3783. The FCC found that the "harmful interference concerns relating to GPS are effectively resolved based on the parameters of Ligado's amended modification applications, the test/data analyses presented in the record, and the *conditions* imposed" in the order. *Id.* at 3841-42 (emphasis added). These conditions included the following requirements: that Ligado provide a "guard-band" of its licensed spectrum to separate its terrestrial base-station transmissions from neighboring operations; that Ligado reduce the base-station power levels from its initial proposal; and, before Ligado can start its terrestrial operations, that Ligado engage in a comprehensive information exchange and coordination program with relevant Government agencies. *Id.* at 3836-41.

With respect to this latter requirement, the April 2020 Order directed Ligado to cooperate directly with any Federal agency with GPS devices that may be adversely affected by "(1) providing base station location information and technical operating parameters to federal agencies prior to commencing operations in the 1526-1536 MHz band; (2) working with the affected agency to identify the devices that could be

10

affected; (3) working with the affected agency to evaluate whether there would be harmful interference from Ligado's operations; [] (4) developing a program to repair or replace any such devices that is consistent with that agency's programmatic needs, as well as applicable statutes and regulations relating to the ability of those agencies to accept this type of support;" and (5) providing quarterly reports to the FCC concerning Ligado's progress satisfying these conditions. *Id.* at 3838-3840. To date, Ligado has not informed the FCC that it has satisfied the conditions imposed by the April 2020 Order.[3]

On May 22, 2020, NTIA—on behalf of the Executive Branch—petitioned the FCC to reconsider and rescind its approval of Ligado's applications. *In The Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, NTIA Petition for Reconsideration or Clarification (May 22, 2020) (Recon. Pet.), *available at*: https://www.fcc.gov/ecfs/document/105221130705320/1 (last visited Aug. 19, 2025).[4] In the petition, NTIA stated that the FCC's April 2020 Order "gave inordinate weight to Ligado-funded tests and unproven metrics" while incorrectly dismissing the evidence provided by the Government that national security

---

[3] *See* Docket, *In The Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, No. 12-340, available at https://www.fcc.gov/ecfs/search/docket-detail/12-340 (last visited Aug. 19, 2025).

[4] In the FCC proceeding, seven other petitions for reconsideration of the April 2020 Order were filed by private companies and associations, and each remains pending as of the date of this brief.

would be harmed if the FCC's April 2020 Order were allowed to stand.  Recon. Pet. at 9.  NTIA's petition remains pending before the FCC.[5]

### III.    Congress Enacts The 2021 National Defense Authorization Act

As further background, on January 1, 2021, Congress stepped in to address national security concerns arising from the license granted to Ligado in the April 2020 Order.  Congress did so through the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (2021 NDAA), Pub. L. 116-283, §§ 1661-1664, 134 Stat. 3388, 4073-76 (2021).

Section 1661 of the 2021 NDAA provides that no DoD funds "may be obligated or expended to retrofit any [GPS] device or system, or network that uses [GPS], in order to mitigate harmful interference from commercial terrestrial operations" within the spectrum bands of Ligado's license.  2021 NDAA § 1661.  Section 1662 directs that DoD "may not enter into a contract" with "an entity that engages in commercial terrestrial operations using [the spectrum bands of Ligado's license] unless the Secretary [of Defense] has certified" that "such operations do not cause harmful interference to a [GPS] device of the Department of Defense."  *Id.* §

---

[5] On May 22, 2020, NTIA also petitioned the FCC for a stay of the April 2020 Order pending resolution of the petition for reconsideration; the FCC denied the stay request in January 2021.  *See In The Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, Order Denying Motion For Stay, 36 FCC Rcd. 1262, 2021 WL 8083764, at *1 (Jan. 19. 2021).

1662. Section 1663 required DoD to contract with the National Academies of Sciences, Engineering, and Medicine (National Academies) to conduct an independent technical review of the April 2020 order, including an "[a]ssessment of the potential for harmful interference to mobile satellite services" operated by DoD and others. *Id.* § 1663. Finally, section 1664 provides that none of the funds authorized by the 2021 NDAA may be obligated or expended to comply with the April 2020 Order until the Secretary of Defense submits to the congressional defense committees an estimate of the costs associated with harmful interference resulting from the order to DoD's GPS devices and certifies that the estimate is accurate. *Id.* § 1664.[6]

---

[6] In accordance with the 2021 NDAA, in September 2022, the National Academies issued its congressionally mandated report concerning the April 2020 Order. National Academies of Sciences, Engineering, and Medicine, *Analysis of Potential Interference Issues Related to FCC Order 20-48* (The National Academies Press 2022), *available at*: https://nap.nationalacademies.org/catalog/26611/analysis-of-potential-interference-issues-related-to-fcc-order-20-48 (last visited Aug. 19, 2025). The report concluded that DoD's concerns regarding harmful interference had not been resolved, and that "[t]he terrestrial network authorized by FCC Order 20-48 will create unacceptable harmful interference for DoD missions." Report at 6. The report found that most commercially produced GPS receivers will not experience significant harmful interference from Ligado's emissions as authorized by the FCC. *Id.* at 5. However, the National Academies found that high-precision receivers would be the most vulnerable class of receivers, with the largest proportion of units tested that would "experience significant harmful interference from Ligado operations." *Id.* The report stressed that the "mitigation techniques and other regulatory provisions in FCC Order 20-48 are insufficient to protect national security missions." *Id.* at 6.

IV.    **Course of Proceedings in The Trial Court**

A.    **Ligado Files Its Complaint**

On October 12, 2023, Ligado filed its complaint alleging a single overarching takings theory—that the Government has engaged in an "unlawful scheme" to prevent Ligado from using its FCC-licensed spectrum for terrestrial services. Appx22-23 (Compl. ¶ 1).  Ligado alleges "on information and belief" that, after issuance of the April 2020 Order, it learned that "[DoD] was using and continues to use Ligado's exclusively licensed spectrum for its own purposes."  Appx38; Appx41 (Compl. ¶¶ 41, 47); *see* Appx38-41 (Compl. ¶¶ 42-47).  More specifically, Ligado alleges that DoD systems have continuously used Ligado's licensed-spectrum since at least the issuance of the April 2020 Order by: "(1) transmitting or receiving signals in Ligado's allocated spectrum that prevent Ligado from transmitting or receiving its own signals in its exclusively licensed spectrum; and/or (2) receiving signals adjacent to Ligado's allocated spectrum in a manner that requires that Ligado's allocated spectrum be a 'dead zone' for terrestrial services so as to avoid harmful interference with [DoD's] systems."  Appx41 (Compl. ¶ 47); *see* Appx73-76 (Compl. ¶¶ 122-130).

Ligado further alleges that, to unlawfully "conceal" DoD's use of its spectrum, DoD and Commerce have "adopted a strategy of deceit and misinformation," advancing pretextual claims of harmful interference with GPS.  Appx42 (Compl. ¶ 48);  Ligado contends that, after the FCC issued the April 2020 Order, DoD and

14

Commerce prevented Ligado from using its licensed spectrum by, among other things, filing the petition for reconsideration and stay motion with the FCC.  Appx53-54 (Compl. ¶¶ 76, 79-80).  Ligado also alleges that various Government agencies have refused to comply with the conditions of the FCC's April 2020 Order, and that this "stonewalling" "has further stymied Ligado's ability to use its FCC license and ATC authority."  Appx54-57 (Compl. ¶¶ 79-86).

Ligado alleges that having "lost" before the FCC, DoD officials provided false or misleading testimony to Congress so that DoD could "continue to use Ligado's exclusively licensed spectrum without compensation."  Appx57-60 (Compl. ¶¶ 87-91).  According to Ligado, this supposed misinformation resulted in Congress passing the 2021 NDAA that "was specifically designed to target Ligado."  Appx63-64 (Compl. ¶¶ 96-101).  Ligado contends that in passing the 2021 NDAA, "Congress gave [DoD] what it wanted: an excuse to frustrate Ligado's development efforts, rather than implement the April 2020 FCC Order, and the continued ability to use Ligado's authorized spectrum without compensating Ligado."  Appx66 (Compl. ¶ 105). Ligado also alleges that DoD has unlawfully failed to make the certifications required under the 2021 NDAA, including that DoD GPS receivers would not experience harmful interference caused by Ligado's use of its license.  Appx67-69 (Compl. ¶¶ 108-112).  Ligado alleges that DoD "is abusing the regulatory and legislative process to cover up

its own use of Ligado's authorized spectrum and to prevent Ligado's use of its ATC authority." Appx68-69 (Compl. ¶ 112).

In its complaint, Ligado asserts four separate takings claims. *First*, Ligado alleges that the Government "has effected a *per se* physical taking" by "operating DoD's previously undisclosed systems in Ligado's allocated spectrum." Appx79-80 (Compl. ¶ 140). *Second*, Ligado alleges that the Government has effected a *per se* regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), by "completely depriv[ing] Ligado of all economic value in the use of its exclusively allocated and licensed spectrum for terrestrial services." Appx81-82 (Compl. ¶ 145); *see* Appx81-83 (Compl. ¶¶ 144-147). Ligado alleges that the Government has deprived it of economic benefit by engaging in unlawful conduct including a failure to engage in the regulatory process apparently designed to delay the FCC's action on Ligado's applications, a failure to implement the terms of the April 2020 Order, and providing false, misleading, and incomplete information concerning harmful interference. Appx81-82 (Compl. ¶ 145). *Third*, based on the same alleged Governmental actions as its *Lucas* claim, Ligado alleges a regulatory taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978). Appx83-85 (Compl. ¶¶ 148-153). *Fourth*, Ligado alleges that Congress effected a legislative taking of its terrestrial-use licensed spectrum by passing the 2021 NDAA, which,

16

according to Ligado, "deprived [it] of the very rights afforded by the FCC just months earlier." Appx86 (Compl. ¶ 158).[7]

### B.    The Trial Court's Decision

The Government moved to dismiss Ligado's complaint. On November 18, 2024, the trial court granted in part and denied in part our motion. Appx1-13.

The trial court first determined that it possesses jurisdiction to entertain Ligado's takings claims. Although the trial court recognized that this Court has made clear that claims implicating the Communications Act displace Tucker Act jurisdiction, it held that this precedent was inapplicable here because Ligado "does not challenge the validity or propriety of the FCC order concerned." Appx7. Instead, according to the trial court, "Ligado seeks damages against the Government for allegedly not complying with the [April 2020 Order] and taking Plaintiff's licensed spectrum." Appx8.

Next, the trial court held that Ligado had alleged a cognizable property interest for takings purposes. The trial court first determined that no case from this Court addresses whether an FCC license can constitute a cognizable property interest and found that the D.C. Circuit's decision on this question in *Mobile Relay Associates v.*

---

[7] Ligado seeks compensation for the taking of its license, which it appears to value at approximately $40 billion, as well attorney fees and costs. Appx82, Appx84-85, Appx89 (Compl. ¶¶ 146, 152, prayer for relief); *see* Appx17.

*FCC,* 457 F.3d 1, 12 (D.C. Cir. 2006), could be distinguished because it involved "an action by the FCC in limiting a license," rather than a physical intrusion and occupation of a licensee's spectrum by a separate Government entity. Appx8-9. The trial court therefore concluded—without identifying any precedent that the property inquiry turns on the agency conducting the alleged taking—that an FCC license may not be private property vis-à-vis the FCC but may be private property vis-à-vis another federal agency like DoD. *Id.* Next, without analyzing why an FCC license constitutes a property interest in the first instance or examining the language of the Communications Act or the traditional hallmarks of private property as applied to FCC licenses, the trial court conflated the jurisdictional and property interest inquiries by addressing, as part of its property interest analysis, whether the FCC could "provide an adequate remedy for Ligado." Appx9. Although the trial court did not explain how an adequate remedy relates to the question of whether Ligado has alleged a cognizable property interest, the trial court found that "it is not clear on whether the FCC can be an adequate remedy." Appx10.

The trial court also rejected our argument that the failure to satisfy the conditions of the license precluded the existence of a property interest. The trial court determined that the only condition of "significance" is the one requiring Ligado to coordinate with Government agencies and noted that Ligado has alleged a failure of the Government agencies to meet this condition. Appx10. According to the trial

18

court, "the FCC's conditions basically require or depend on cooperation with [DoD] to work out a modus operandi with [DoD], which cooperation (according to Ligado) has been frustrated by [DoD]." Appx12.

With respect to our argument that Ligado failed to allege authorized Government action sufficient for takings purposes, the trial court cited *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998), and summarily concluded that the Government's actions were authorized because they fell within the scope of the agencies' duties. Appx10-11. But the trial court also acknowledged that the substance of Ligado's takings theory rests on the notion that DoD's conduct might effect a taking *because* that conduct was allegedly unlawful. *See* Appx7 ("[Ligado] argues that various Government actors have not complied with the Order, preventing [Ligado] from using its license."); *id.* at 8 ("Ligado seeks damages against the Government for allegedly not complying with the Order and taking [Ligado's] licensed spectrum.").

The trial court never specifically addressed our argument that Ligado had failed to state a physical takings claim. The trial court did, however, remark that spectrum "is a physical phenomenon," and appeared to deem Ligado's allegations that DoD was "occupying" the spectrum to be sufficient to state a physical takings claim. Appx8-9.

19

Finally, the trial court held that Ligado could not state a claim for a legislative taking based on the 2021 NDAA. The trial court found that "[j]ust as the FCC can terminate a license without effecting a taking, so Congress's limitations on the license, even if they effectively terminate it, cannot be challenged as a taking." Appx12. In other words, according to the trial court, Ligado's license is "not property vis-à-vis Congress." Appx12.[8]

Following the trial court's order, we filed a motion to certify the order for interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2). The trial court granted the motion on February 28, 2025, and, on May 20, 2025, this Court granted our subsequent petition for permission to appeal. Appx14-16.

## SUMMARY OF THE ARGUMENT

The trial court committed several reversible errors. First, the trial court incorrectly held that it possesses jurisdiction to entertain Ligado's takings claims. As this Court has recognized on multiple occasions, by enacting the Communications Act, Congress established a comprehensive remedial scheme that displaces the trial court's Tucker Act jurisdiction, including for takings claims that arise out of FCC licensing decisions. Ligado's complaint directly implicates an FCC licensing decision, including the FCC's statutory authority to impose terms and conditions on Ligado's

---

[8] The trial court never specifically addressed our arguments that Ligado had not stated a regulatory takings claim or a *per se* regulatory takings claim.

modified license, which is exactly the kind of action that Congress has channeled through the statute's comprehensive scheme. The trial court therefore erred in failing to find that the Communications Act displaced the trial court's Tucker Act jurisdiction over Ligado's takings claims.

Second, the trial court erred in finding that Ligado's FCC license is a cognizable property interest for takings purposes. Given the unambiguous terms of the Communications Act, no court (before the trial court in this case) has held that an FCC license is property for takings purposes. Indeed, the United States Court of Appeals for the District of Columbia Circuit has held that FCC licenses are not property under the Takings Clause. *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11-12 (D.C. Cir. 2006). And in reaching a contrary holding, the trial court did not engage in the sort of analysis this Court routinely endorses for determining whether a Federal license can constitute property for takings purposes, *see Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1275-79 (Fed. Cir. 2023). Instead, the trial court primarily relied on a series of inapposite determinations—that this Court did not previously reach the cognizable property interest issue in *Sandwich Isles* and *Alpine*; that the *Mobile Relay* holding did not control because the Department of Defense, not the FCC, allegedly infringed upon Ligado's spectrum license; and that Ligado purportedly did not have an "adequate remedy" at the FCC. None of these determinations support the trial court's property interest holding. This Court dismissed the takings claims in *Alpine*

21

and *Sandwich Isles* on jurisdictional grounds and therefore did not reach the issue of whether an FCC license constitutes a cognizable property interest. The trial court identified no precedent supporting its conclusion that the existence of a cognizable property interest in a Federal license depends on which Federal agency is alleged to have effected the taking. Moreover, the trial court's far afield "adequate remedy" inquiry is simply not germane to determining whether an FCC license is cognizable property for takings purposes.

Third, the trial court's decision is premised on the notion that a plaintiff can state a viable takings claim because the Government acted unlawfully, a determination that conflicts with a long line of decisions from this Court.

Finally, the trial court erred when it found that an FCC license can be the subject of a physical takings claim. Even if the Court were to conclude that Ligado has alleged a cognizable property interest, Congress has made clear that no person can have a property interest in the spectrum itself. As a result, any purported property interest that Ligado possesses is necessarily confined to its FCC license, which is an intangible asset that may only properly trigger a regulatory takings analysis.

The trial court's decision should be reversed.

## I.    <u>Standard of Review</u>

The Court reviews "whether the Court of Federal Claims possesses subject matter jurisdiction de novo." *Biltmore Forest Broad. FM, Inc. v. United States*, 555 F.3d

1375, 1380 (Fed. Cir. 2009) (citation omitted).  As a general matter, "'the allegations stated in the complaint are taken as true and jurisdiction is decided on the face of the pleadings.'" *Folden v. United States,* 379 F.3d 1344, 1354 (Fed. Cir. 2004) (quoting *Shearin v. United States*, 992 F.2d 1195, 1195-96 (Fed. Cir. 1993)).  But when jurisdiction is challenged as a factual matter, the allegations in the complaint do not control and only uncontroverted factual allegations are accepted as true, *see, e.g., Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014).

The question of whether a complaint was properly dismissed for failure to state a claim is also reviewed *de novo*.  *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009).  To state a claim, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above a speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 561-63 (2007) ("a wholly conclusory statement of claim" cannot "survive a motion to dismiss" by simply leaving "open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery").

## II.    Legal Background on Fifth Amendment Takings Claims

The Fifth Amendment's Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. Amend. V.  This Clause "is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a

whole." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

The Federal Circuit has established a "two-part test" for analyzing takings claims. *Am. Pelagic Fishing Co., L.P. v. United States,* 379 F.3d 1363, 1372 (Fed. Cir. 2004). "First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." *Id.* This is a critical inquiry, because "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the court[']s task is at an end." *Id.* "Second, after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." *Id.*

With respect to the first part of the takings analysis, "[t]he parameters of a protected property interest are delimited by the law that creates the interest, and by 'existing rules and understandings' and 'background principles' derived from independent sources, such as state, federal, or common law." *Members of Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citation omitted). This inquiry "focus[es] on the nature of the citizen's relationship to the alleged property, such as whether the citizen had the rights to exclude, use, transfer, or dispose of the property." *Id.* "To have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a unilateral

24

expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)) (cleaned up); *see Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1385 (Fed. Cir. 2019).

If a plaintiff establishes a cognizable property interest, courts have distinguished among several different types of takings with respect to the proper test to apply under the second part of the takings inquiry. As an initial matter, there is a distinction between physical takings and regulatory takings. "The essential question," the Supreme Court has explained, "is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321-23 (2002)). Regulatory takings are then further subdivided into *per se* regulatory or categorical takings, which occur when "governmental action deprives a property owner of all economically beneficial uses of his property," and non-categorical takings, "where the property is not rendered totally valueless." *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1340 (Fed. Cir. 2018) (internal quotations omitted).

Physical and *per se* regulatory takings are analyzed by applying a *per se* test, meaning that the court need not consider factors, such as the Government's reasons for the action at issue. All other regulatory takings claims are analyzed by applying the

25

*ad hoc* factors set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978)), which include "the economic impact of the regulation," "the extent to which the regulation has interfered with distinct investment-backed expectations," and the "character of the governmental action." *Id.*

## III. The Trial Court Erred in Holding That It Possessed Tucker Act Jurisdiction Notwithstanding The Communications Act's Comprehensive Remedial Scheme

The trial court is a court of limited jurisdiction, the scope of which is primarily circumscribed by the Tucker Act. *Jentoft v. United States*, 450 F.3d 1342, 1349 (Fed. Cir. 2006). Pursuant to the Tucker Act, the trial court possesses jurisdiction to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Claims against the United States for just compensation pursuant to the Takings Clause fall within this jurisdictional grant. *See Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007).

The Tucker Act, however, serves only a "gap-filling role" that permits "action[s] against the United States for the breach of monetary obligations *not otherwise judicially enforceable.*" *United States v. Bormes*, 568 U.S. 6, 12-13 (2012) (emphasis added). Thus, where another "precisely drawn, detailed statute" contains "its own judicial remedies," "the specific remedial scheme [of the other statute] establishes the

exclusive framework for the liability Congress created." *Id.* "[S]tatutory schemes with their own remedial framework exclude alternative relief under the general terms of the Tucker Act." *Id.* at 13; *see also Me. Cmty. Health Options v. United States*, 590 U.S. 296, 323-24 (2020) ("The Tucker Act yields when the obligation-creating statute provides its own detailed remedies . . . .").

On three separate occasions, this Court has held that the Communications Act provides a comprehensive remedial scheme that displaces Tucker Act jurisdiction. More than two decades ago, the Court first held that, "[i]n the Communications Act, Congress enacted a comprehensive statutory and regulatory regime governing orders of the [FCC]." *Folden v. United States*, 379 F.3d 1344, 1357 (Fed. Cir. 2004). The Communications Act's remedial scheme imposes detailed administrative exhaustion requirements, contains a variety of unique filing deadlines and case processing rules, and vests the regional circuit courts of appeals with exclusive authority to review FCC orders arising from the statutory scheme. *See id.* "[W]hen such a 'specific and comprehensive scheme for administrative and judicial review' is provided by Congress, the Court of Federal Claims' Tucker Act jurisdiction over the subject matter covered by the scheme is preempted." *Id.* (quoting *Vereda, Ltda. v. United States*, 271 F.3d 1367, 1375 (Fed. Cir. 2001)). In more recent years, the Court has twice reaffirmed that the comprehensive remedial scheme within the Communications Act displaces Tucker Act jurisdiction over takings claims, and the Supreme Court

27

denied certiorari on both occasions. *See Sandwich Isles Commc'ns, Inc. v. United States*, 992 F.3d 1355, 1361-65 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 2647 (2022); *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1092-98 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 78 (2018).

Several noteworthy conclusions can be drawn from the circuit precedent described above. Initially, it teaches that the Communications Act's remedial scheme encompasses any direct challenge to a final FCC order. The Communications Act provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the [FCC] under this chapter . . . shall be brought" to the regional circuit courts of appeals. 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1). Under these provisions, "the statutory jurisdiction of the courts of appeals over claims that fall within the scope of subsection 402(a) is exclusive." *Sandwich Isles*, 992 F.3d at 1362 (citation omitted); *see Folden*, 379 F.3d at 1355-56.

But circuit precedent also establishes that the Communications Act's displacement of Tucker Act jurisdiction sweeps more broadly than just direct challenges to FCC orders. The Act's comprehensive remedial scheme also displaces Tucker Act jurisdiction over any type of claim arising from an FCC order—including a takings claim—where the statutory framework can provide adequate relief.

In *Alpine*, for example, the Court held that the Communications Act provides the exclusive basis for Federal court jurisdiction over contract claims related to a

payment agreement with the FCC, as well as a takings claim related to the FCC's decision to cancel a license, because the FCC could have remedied both types of claims under the Communications Act. *See* 878 F.3d at 1094 (holding that 47 U.S.C. § 402(b)(5) "provided Alpine the opportunity to argue that the FCC's decision was contrary to the terms of the contract"); *id.* at 1096-97 (explaining why "the FCC had the power to grant Alpine adequate relief[] by eliminating the taking, providing compensation, or some combination"). The Court reached this conclusion even though neither the Communications Act nor its implementing regulations had any specific provisions allowing the FCC to entertain contract or takings claims.

Similarly, in *Sandwich Isles*, this Court held that the Communications Act displaced Tucker Act jurisdiction over a takings claim alleging that the FCC had improperly suspended certain subsidies, finding that "the true nature" of plaintiff's allegations "take aim at FCC orders" because they necessarily "challenge[] FCC actions and orders governed by 47 U.S.C. § 402(a)." 992 F.3d at 1364. Significantly, the Court explained that where "the FCC is in the position to prevent an alleged taking in the course of its own proceedings, the agency must be made aware of any such claim," which is "then subsumed into the agency's final decision and can be appealed only to the court of appeals." *Id.* at 1365 n.4. *Sandwich Isles* thus establishes that if a plaintiff's claim raises the type of challenge that implicates section 402, or if the FCC can afford the plaintiff a remedy under the Communications Act, then the

29

claim—regardless of how it is styled—is subject to the Act's comprehensive remedial scheme rather than the Tucker Act's gap-filling grant of jurisdiction.

Despite this precedent, the trial court found that it possessed jurisdiction to entertain Ligado's takings claims because Ligado "does not challenge the validity or propriety of the FCC order concerned." Appx7. This conclusion was erroneous in two respects.

First, Ligado *does* challenge the April 2020 Order, at least indirectly. The mandatory conditions within the April 2020 Order form the barrier that has prevented Ligado from using its licensed spectrum for terrestrial wireless operations. *See* April 2020 Order, 35 FCC Rcd. at 3783 (noting that the FCC "impose[d] conditions on Ligado's ATC authority to ensure Ligado will address any identified potential harmful interference to GPS and MSS operations before ATC network operations commence"); *id.* at 3835 ("As a condition of its ATC authority, Ligado *shall comply* with the conditions set forth below[.]" (emphasis added)). Recognizing this fact, Ligado lamented the mandatory conditions, as well as its alleged inability to comply with them, in its complaint. *See* Appx54-57 (Compl. ¶¶ 79-86). Indeed, to use the spectrum at issue in the way it desires, Ligado must either meet all the conditions within the April 2020 Order or convince the FCC to "enjoin, set aside, annul, or suspend" any unmet conditions pursuant to 47 U.S.C. § 402(a). Much like in *Sandwich Isles*, Ligado's "takings claims" inherently challenge the terms of its FCC license.

30

Second, even if Ligado could have somehow avoided challenging the terms of the April 2020 Order, the Communications Act would still displace Tucker Act jurisdiction because the FCC has the necessary authority to provide Ligado an adequate remedy.  Section 402(a) presents a ready avenue to address the alleged Government actions and inactions underlying Ligado's takings claims.  If Ligado were to inform the FCC of its concerns about alleged agency refusal to cooperate, the FCC could engage NTIA and DoD to address the alleged intransigence.  The FCC could alternatively set aside or suspend the conditions at issue, in whole or with respect to specific agencies, locations, or devices.  47 C.F.R. § 25.117.  Either way, by pursuing administrative remedies through the FCC, Ligado can overcome the barriers to terrestrial wireless operations alleged in its complaint.  This type of available remedy, the Court has held, is the very reason why the Communications Act displaces Tucker Act jurisdiction.  *See Alpine*, 878 F.3d at 1096 (holding that the FCC can provide adequate relief by "eliminating the taking, providing compensation, or some combination"); *Sandwich Isles*, 992 F.3d at 1365 n.4 (explaining that where "the FCC is in the position to prevent an alleged taking in the course of its own proceedings," the trial court lacks Tucker Act jurisdiction).

In short, *Alpine* and *Sandwich Isles* establish that any claim implicating an FCC order is within the Communications Act's comprehensive remedial scheme when it challenges the order's terms or the FCC can afford an adequate remedy.  Ligado's

takings claims fit comfortably within this line of authority. Ligado's complaints about agency actions and inactions pursuant to the April 2020 Order necessarily challenge Ligado's continuing obligation to satisfy the mandatory conditions within that order. And the FCC has the authority to provide an adequate remedy by engaging with Executive Branch agencies, setting aside or modifying any unmet conditions, or both. Thus, contrary to the trial court's holding, the Communications Act displaces its Tucker Act jurisdiction over Ligado's claims.[9]

## IV. The Trial Court Erred in Holding That Ligado Possesses A Cognizable Property Interest for Takings Purposes

The trial court also erred in holding that Ligado's complaint alleged a cognizable property interest in its spectrum license for purposes of stating a takings claim, and it erred in rejecting the significance of the license's conditions on the property inquiry. Appx8-10.

---

[9] As an alternative theory of takings liability, Ligado asserted that DoD has prevented it from deploying a terrestrial network by operating in spectrum licensed to Ligado. Appx41 (Compl. ¶ 47); Appx73-76 (Compl. ¶¶ 122-130). That allegation, however, only becomes meaningful if Ligado can establish a right to deploy a terrestrial network in the first place. Under the April 2020 Order, Ligado has no such right unless and until it can demonstrate compliance with the conditions set forth in its license. And the FCC—not the trial court—is the forum with exclusive jurisdiction over the question whether Ligado has satisfied the conditions within the April 2020 Order (or, alternatively, whether any such conditions should be set aside).

**A.    The Trial Court Erred in Determining Ligado's License to Be Cognizable Property under The Fifth Amendment**

It is well-accepted that to bring a takings claim, a plaintiff must possess a cognizable property interest.  *E.g., Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004) ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end.") (citing *Maritans v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003)).  This Court has explained that "[t]he parameters of a protected property interest are delimited by the law that creates the interest, and by 'existing rules and understandings' and 'background principles' derived from independent sources, such as state, federal, or common law."  *Members of Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citation omitted).

In evaluating whether a license constitutes cognizable property, courts have paid particular attention to the source of law defining the interest, and the revocable nature of the license at issue.  *See United States v. Fuller*, 409 U.S. 488, 492-94 (1973); *Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1276-79 (Fed. Cir. 2023); *Conti v. United States*, 291 F.3d 1334, 1340-42 (Fed. Cir. 2002).  Courts also examine other traditional hallmarks of property such as "whether the citizen had the rights to exclude, use, transfer, or dispose of the property," as well as whether the industry is highly regulated.  *Peanut Quota Holders*, 421 F.3d at 1329; *see Conti*, 291 F.3d at 1341-42.

33

Contrary to the trial court's holding, Appx8-10, Ligado cannot demonstrate that its spectrum license constitutes a cognizable property interest for takings purposes. To begin, there can be no reasonable dispute that Ligado has no state law or common law right to utilize spectrum. Ligado must therefore base any property interest on the Communications Act's statutory scheme. But there is nothing in the text of the Communications Act establishing that Congress intended for the FCC to grant a license holder a Fifth Amendment property interest when it issues a spectrum license. Instead, the Communications Act makes clear that spectrum is a public asset, that no person has an independent right to own or use spectrum, and that any temporary spectrum use by a private party allowed by the Federal Government must flow from authority arising from the provisions of the Act. *See* 47 U.S.C. § 304 (license applicant must "waiv[e] any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise"); *id.* § 301 (providing that licenses are issued for "limited periods of time," and that a license holder has no "ownership" in the subject of the license); *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 475 (1940) ("The policy of the [Communications] Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license."); *In re NextWave Personal Comms., Inc.,* 200 F.3d 43, 51 (2d Cir. 1999) ("A license does not convey a property right; it merely permits the licensee to

34

use the portion of the spectrum covered by the licenses in accordance with its terms."). Accordingly, although the Takings Clause provides a limit on the taking of *private* property, spectrum and licenses authorizing the use of spectrum are quintessential *public* assets controlled by Congress and beyond the purview of private ownership for Fifth Amendment purposes.

Several other provisions of the Communications Act further support the conclusion that no cognizable property interest exists in Ligado's spectrum license for purposes of a takings claim. In the Communications Act, Congress expressly provided the FCC with authority to modify the terms of a license "if in the judgment of the [FCC] such action will promote the public interest, convenience and necessity." 47 U.S.C. § 316(a)(1); *see also* 47 U.S.C. § 312 (identifying circumstances in which FCC can revoke license entirely). Indeed, the FCC has the statutory authority to reallocate assigned spectrum by modifying spectrum licenses.

In addition, the only circuit court of appeals to directly address whether the Communications Act confers a property right for purposes of asserting a takings claim rejected the argument that the statute creates property rights. In *Mobile Relay Associates v. FCC*, 457 F.3d 1, 11-12 (D.C. Cir. 2006), spectrum license holders filed petitions for review of FCC orders that had reconfigured a certain spectrum band. In their petition, the license holders asserted takings claims based on the FCC's actions in reconfiguring the spectrum band, which they alleged had resulted in their inability

to operate certain cellular systems, reducing the value of their spectrum licenses. *Id.* at 11-12. In analyzing whether the holder of an FCC license possesses a cognizable property interest, the D.C. Circuit relied heavily on the text of the Communications Act. *Id.* at 12 (citing 47 U.S.C. §§ 301, 316(a)(1)). The D.C. Circuit focused on the fact that under the statutory scheme, the FCC grants the licensee the "'the use of' the spectrum for a set period of time, 'but not the ownership thereof,'" and that under the statutory framework, the Commission "has the unilateral authority, provided it gives notice to the licensee, to modify a license 'either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity.'" *Id.* (quoting 47 U.S.C. §§ 301, §316(a)(1)). The D.C. Circuit therefore rejected the plaintiffs' takings claims, holding that FCC licenses "confer the right to use the spectrum for a duration expressly limited by statute subject to the Commission's considerable regulatory power and authority," and that such a "right does not constitute a property interest protected by the Fifth Amendment." *Id.*

Moreover, other "traditional hallmarks of property" support the conclusion that Ligado cannot establish a cognizable property interest because Ligado lacks the authority under the statutory scheme to freely sell, assign, or transfer its license. *See Conti*, 291 F.3d at 1341-42. Under the Communications Act establishes, spectrum licensees may only transfer their licenses "upon application to the [FCC] and upon

finding by the [FCC] that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d). In other words, the transferability of a spectrum license is always contingent on the Government's approval.

Although a licensee retains the freedom and right to use a spectrum license in any manner that is consistent with terms set by the Government, the fact that the Government sets those terms, decides if, and when, to allocate spectrum, and maintains oversight responsibilities over its licensees, also weighs strongly against a property interest existing in an FCC license. "Where a citizen voluntarily enters into an area which from the start is subject to pervasive Government control, a property interest is likely lacking." *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012) (citing *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216 (Fed. Cir. 1993)). Although this may not necessarily be a *per se* exclusion, *see id.*, it is another important indicator of whether the holder of a Government-issued license or permit has a cognizable property interest. *See Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1385-86 (Fed. Cir. 2019).

Despite this backdrop, the trial court summarily concluded that Ligado possesses a cognizable property interest in its spectrum license. Appx8-10. The trial court, however, failed to apply this Court's law which examines the statutory structure and traditional hallmarks of property in determining whether a license constitutes property. *See Fishermen's Finest*, 59 F.4th at 1276-79; *Conti*, 291 F.3d at 1341-42. As set

forth above, that analysis supports the finding of a lack of a cognizable property interest for takings purposes.[10]

The trial court also attempted to distinguish *Mobile Relay Associates v. FCC,* 457 F.3d 1, 12 (D.C. Cir. 2006), because it involved "an action by the FCC in limiting a license" and did not find a lack of a property interest for all takings claims. Appx8. But in the face of persuasive authority interpreting the Communications Act from a circuit court of appeals that frequently analyzes the Act, the trial court did not point to a single contrary precedent supporting its conclusion that a spectrum license may be a property interest for takings purposes against one Federal Government agency and not another. Fundamentally, whether a property interest exists for takings purposes turns on the plaintiff's relationship to the interest in question, not on which actor in the Government is doing the alleged taking, which, if relevant to the analysis, would be germane at step two of the takings analysis. *See, e.g., Conti,* 291 F.3d at 1341 (explaining that "property interests for purposes of the Fifth Amendment flow from 'the citizen's relation to the physical thing'") (citation omitted); *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 857 (Fed. Cir. 2009) (same).

---

[10] In its truncated analysis, the trial court also noticeably purported to find a property interest in an FCC license vis-à-vis DoD, but failed to address whether Ligado could allege a property interest in an FCC license vis-à-vis NTIA which regulates spectrum pursuant to Title 47 along with the FCC. *See* Appx9-10.

The trial court also observed that this Court in *Alpine PCS, Inc. v. United States*, 878 F.3d 1086 (Fed. Cir. 2018), and *Sandwich Isles Commc'ns, Inc. v. United States*, 992 F.3d 1355 (Fed. Cir. 2021), did "not reach the issue of whether an FCC license is a valid property interest." Appx8. Although true, this Court affirmed the dismissal of the complaints in both cases based on lack of jurisdiction due to the comprehensive remedial scheme of the Communications Act, meaning the Court had no occasion to reach the property interest question in those cases. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (holding that jurisdictional issues must be decided before the merits).

Instead of properly conducting the property interest inquiry in accordance with this Court's precedent, the trial court appears to have relied on a new factor in determining whether a property interest exists—whether the agency issuing the license can "provide an adequate remedy" for Ligado. Appx9. Although the trial court did not explain how this adequate remedy inquiry relates to whether Ligado has a cognizable property interest, the court found that "it is not clear on whether the FCC can be an adequate remedy." Appx10. Although the existence of an adequate remedy may be relevant on the jurisdictional issue, *see Alpine*, 878 F.3d at 1096-97, it has no place in determining whether an FCC license constitutes property. Indeed, this Court has never considered an "adequate remedy" factor in its property interest inquiry. The trial court accordingly erred in its property interest analysis.

39

Ligado will likely argue that in other contexts courts have found FCC licenses to be property. For example, in the complaint Ligado cited to *In re Atlantic Business & Community Development Corp.*, 994 F.2d 1069 (3d Cir. 1993), Appx78 (Compl. ¶ 136), where the court found that an FCC broadcast license constituted "property" under the Internal Revenue Code (IRC) for purposes of determining whether a tax lien attaches when a license is sold in bankruptcy. But that decision fails to advance Ligado's argument. As a factual matter, the license sale in *In re Atlantic* had already taken place such that the lien was being applied to the proceeds of the sale, rather than to the license itself. 994 F.2d at 1075. In any event, whether Congress broadly defined property in the IRC for tax lien purposes does not answer whether an FCC license constitutes property for takings purposes. Indeed, in a decision concerning Federal fishing licenses, this Court expressly rejected a similar argument—that the treatment of licenses under the IRC indicated that the licenses were property for takings purposes. *See Fishermen's Finest*, 59 F.4th at 1278. This Court instead held that the IRS can tax both Government-issued privileges and protected property under the IRC, but that such taxation does not transform Government privileges into compensable property rights. *Id.*

In sum, the trial court failed to follow this Court's precedent in analyzing whether Ligado possesses a cognizable property interest in its FCC license—the underlying predicate for its takings claims. Because the Communications Act makes

40

clear that a license holder has no ownership in the underlying spectrum, a license can be modified or revoked by the Government, license holders are subject to Government oversight, and a license holder cannot freely transfer the license without Government approval, Ligado cannot establish a cognizable property interest in its FCC spectrum license for purposes of a Fifth Amendment takings claim.

## B.    The Trial Court Erred in Considering The License's Conditions

Similarly, the trial court erred in holding that Ligado's failure to satisfy the conditions of the license did not preclude the existence of a property interest.  The trial court held that the only condition of "significance" in the license is the one requiring Ligado to coordinate with Government agencies, and that Ligado has alleged that the Government agencies failed to meet this condition.  Appx10. According to the trial court, "the FCC's conditions basically require or depend on cooperation with [DoD] to work out a modus operandi with [DoD], which cooperation (according to Ligado) has been frustrated by [DoD]."  Appx12.

It is well-established that certain "background principles" of law may "inhere" in the title of property to limit property rights and thereby preclude a taking under the Fifth Amendment.  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 (1992). Accordingly, "the [G]overnment does not take a property interest when it merely asserts a 'pre-existing limitation upon the [property] owner's title.'" *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021) (quoting *Lucas*, 505 U.S. at 1028-29).  As relevant

41

here, the Communications Act mandates that a spectrum license-holder must comply with the "terms" and "conditions" of a license. 47 U.S.C. § 301; *see P & R Temmer v. FCC,* 743 F.2d 918, 927 (D.C. Cir. 1984) ("A licensee may not accept only the benefits of the license while rejecting the corresponding obligations.")

The trial court erred in its treatment of the conditions restricting Ligado's license and their relationship to the existence of a cognizable property interest. The FCC did not grant Ligado an unfettered right to immediately use its modified license. *See* April 2020 Order, 35 FCC Rcd. at 3835-41. Instead, to address concerns about GPS interference, including interference harmful to national security and other public interests, the FCC attached conditions that Ligado must satisfy before it can use its modified license for terrestrial purposes, conditions that Ligado itself proposed and that inhered in the title to any purported property arising from the order. *Id.* Ligado has not alleged that it has satisfied those conditions in its filings with the FCC or in its briefs to the trial court.

In its opinion, the trial court held that it was irrelevant whether Ligado satisfied the conditions of the license and whether they were conditions precedent because Ligado has alleged that the Government was at fault for any failure to satisfy the conditions. Appx10. But in its determination, the trial court found that the FCC had required DoD to comply with the terms of the April 2020 Order. *See* Appx3 (stating that the FCC recognized that the final requirement [of the April 2020 Order] would

42

require affected agencies to cooperate with Ligado); Appx10; Appx12.  In issuing the

April 2020 Order, however the FCC did not order DoD to comply with the order.  In

fact, the FCC simply stated that "[c]onsistent with FCC precedent in other

proceedings, we would expect Ligado and U.S. Government agencies to work

together in good faith, including with regard to negotiation to resolve any disputes."

April 2020 Order, 35 FCC Rcd. at 3825.  Moreover, the trial court cited no authority

for the proposition that the FCC *could* actually order DoD to cooperate, and by

finding that it could, the trial court misinterpreted the April 2020 Order.

At bottom, Ligado proposed conditions it would take (over Government

agency objections) to obtain the FCC's approval for its modified license, and it is now

complaining when it is unable to meet these conditions.  Ligado's failure to fulfill the

conditions only further serves to establish that it does not have a cognizable property

interest in its license for takings purposes.

## V.    The Trial Court Erred in Determining That Ligado Stated A Viable Takings Claim because The Government Acted Unlawfully

For takings liability to attach, the Government action at issue must be

authorized.  *Mitchell v. United States*, 267 U.S. 341, 345 (1925); *Hooe v. United States*, 218

U.S. 322, 335-36 (1910); *Taylor v. United States*, 959 F.3d 1081, 1089 n.4 (Fed. Cir.

2020) ("A government action cannot be a taking if . . . the government actors lacked

the 'authority' to take the action[.]") (citations omitted); *Rith Energy, Inc. v. United States*,

247 F.3d 1355, 1365-66 (Fed. Cir. 2001); *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998). In addition, as this Court has consistently recognized, a takings clam is not viable where the plaintiff alleges that a taking occurred *because* the Government acted unlawfully. *See Moody v. United States*, 931 F.3d 1136, 1142-43 (Fed. Cir. 2019); *Campbell v. United States*, 932 F.3d 1331, 1340-41 (Fed. Cir. 2019); *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1369-70 (Fed. Cir. 2005); *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed. Cir. 2001) (on petition for reconsideration) ("Rith's complaints about the wrongfulness of the permit denial are therefore not properly presented in the context of its takings claim."); *Rith Energy*, 247 F.3d at 1365-1366; *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) (explaining that the Takings Clause requires just compensation "'in the event of *otherwise proper interference* amounting to a taking'" (citation omitted)).

The heart of Ligado's complaint is that the Government has engaged in an "unlawful scheme" to prevent Ligado from using its FCC-licensed spectrum for terrestrial services. Appx22 (Compl. ¶ 1). Ligado alleges that DoD has unlawfully used Ligado's exclusively licensed spectrum in a manner that interferes with Ligado's use under its license; that to "conceal" such unlawful use, DoD and Commerce have "adopted a strategy of deceit and misinformation," advancing pretextual claims of harmful interference with GPS; and that DoD officials have provided false or misleading testimony to Congress in an effort to "continue to use Ligado's exclusively

44

licensed spectrum without compensation." Appx22-26 (Compl. ¶¶ 1-7); Appx38-43

(Compl. ¶¶ 41-50); Appx53-59 (Compl. ¶¶ 76-90).  In other words, Ligado's takings

claims are necessarily dependent on the Government's actions being unlawful.

Citing *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed.

Cir. 1998), the trial court concluded that "in seeking damages for a taking under the

Tucker Act . . . the government's action must fall 'within the scope of [the agencies']

duties'" and held that Ligado had alleged authorized action under that framework.

Appx10-11.  But the trial court also recognized that the substance of Ligado's takings

theory rests on the notion that Government conduct might effect a taking *because* that

conduct was inconsistent with the FCC's April 2020 Order and therefore unlawful.

*See* Appx7 ("[Ligado] argues that various Government actors have not complied with

the Order, preventing [Ligado] from using its license."); *id.* at Appx8 ("Ligado seeks

damages against the Government for allegedly not complying with the Order and

taking [Ligado's] licensed spectrum.").  Neither *Del-Rio* nor subsequent precedent

from this Court supports the notion that a takings claim may be cognizable *because* the

Government  conduct is unlawful.  *See Rith Energy*, 270 F.3d at 1352; *Rith Energy*, 247

F.3d at 1365-66; *Lion Raisins*, 416 F.3d at 1369-70.

This Court's decision in *Darby Development Co., Inc. v. United States*, 112 F.4th

1017 (Fed. Cir. 2024), does not alter this fundamental principle.  In *Darby*, this Court

endorsed the principle that Executive Branch action may be deemed "authorized" for

takings purposes even if "unlawful," "if it was done within the normal scope of the agent's duties." *See id.* at 1027. As an initial matter, the time for the Government to seek Supreme Court review in *Darby* has not run. In any event, the trial court's decision goes beyond what even *Darby* held with respect to what may constitute a viable takings claim. The *Darby* majority held that, if restrictions imposed by the Executive Branch interfere with established property rights in a way that would *otherwise* constitute a taking, the Government cannot escape takings liability by showing that the Executive Branch restrictions were not authorized by statute. *See* 112 F.4th at 1033 ("Having concluded that there is no 'lack of authorization' impediment to Appellants' takings claim, we turn now to whether their complaint stated a claim for a physical taking by the government."). *Darby* thus held that the plaintiffs there might be able to demonstrate a compensable taking *even though* the relevant Executive Branch conduct was inconsistent with the governing statute. But neither *Darby* nor this Court's prior precedent supports the trial court's conclusion here that the Government's conduct may effect a taking *because* it was unlawful, such as being inconsistent with the Communications Act, FCC regulations, or the FCC's

April 2020 Order.[11]  In fact, this Court's other precedent directly conflicts with such a conclusion.  *See Lion Raisins*, 416 F.3d at 1369-70; *Rith Energy*, 247 F.3d at 1365-66.

In the end, regardless of whether the unlawfulness of particular Executive Branch conduct precludes takings liability for what would otherwise be a taking, that purported illegality itself cannot provide the basis for a viable takings claim under this Court's longstanding precedent.  *See Lion Raisins*, 416 F.3d at 1369-70.

## VI.  The Trial Court Erred in Determining That Ligado Could State A Cognizable Physical Takings Claim

Even if the Court were to determine that the trial court possesses jurisdiction, that Ligado alleged a cognizable property interest in its license, and that the trial court did not err in determining that Ligado stated a viable takings claim despite depending on allegations of unlawful conduct, the trial court nevertheless erred in determining that Ligado had stated a plausible claim for a physical taking of licensed spectrum. Appx8-9.

To state a physical takings claim, a plaintiff must allege a physical invasion or appropriation of its property.  *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021); *Horne v. Dep't of Agric.*, 576 U.S. 350, 359-60 (2015); *Lingle v. Chevron U.S.A.*

---

[11] Indeed, in *Darby*, the plaintiffs did not contend that they had stated a viable takings claim because the eviction moratorium was unauthorized or unlawful. *See* Brief of United States, No. 2022-1929, 2023 WL 2710311, at *25 n.7 (Fed. Cir. Mar. 20, 2023) (United States' brief in *Darby* acknowledging that the rule from *Rith* and *Lion Raisins* was not implicated).

*Inc.*, 544 U.S. 528, 537-38 (2005); *United States v. Pewee Coal Co.,* 341 U.S. 114, 115-17 (1951).  For example, *Horne* involved a USDA order requiring raisin growers to physically reserve a specified portion of their tangible raisin crop for transfer to the Government each year, free of charge.  *Horne*, 576 U.S. at 355.  Because "[a]ctual raisins are transferred from the growers to the Government," the reserve requirement is a "clear physical taking" requiring just compensation.  *Id.* at 361-62.

The trial court here failed to meaningfully address whether a physical taking of Government-licensed spectrum may exist in light of the limited nature of an FCC license.  The trial court's opinion does not have a separate analysis addressing the Government's arguments regarding Ligado's physical takings claim.  The trial court only observed that spectrum "is a physical phenomenon," and implicitly deemed Ligado's allegations that DoD was "occupying" this spectrum to be sufficient to state a physical takings claim.  Appx8-9.

The trial court's implicit determination that Ligado stated a physical taking is erroneous.  This Court has long cautioned that when analyzing an alleged taking, courts must first "identify what, if anything, was the subject of the alleged taking." *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 855 (Fed. Cir. 2009) (citing *Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995)).  As established above, the Communications Act makes clear that Ligado has no property right in the actual electromagnetic spectrum.  47 U.S.C. § 301.  At most, Ligado has only an interest in

its FCC license—providing for the limited ability to use the licensed spectrum subject to the restrictive terms and conditions of the license, the terms of the Communications Act, and applicable regulations. Such a limited use interest is not the same as having a possessory or ownership interest in the spectrum itself. And more fundamentally, an FCC license is intangible. To determine whether a physical or regulatory takings framework applies to a particular property interest, it is well-established that courts must look to the nature of the property interest alleged to have been taken. And the purported taking of an *intangible* asset like a license has been consistently analyzed under the regulatory takings framework, not as a physical taking as the trial court found in failing to dismiss Count I of the complaint. *See Concrete Pipe & Prods. Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 643-44 (1993) (taking of contract rights analyzed as regulatory taking and *not* under physical taking framework); *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 223-25 (1986) (same); *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1004-06 (1984) (taking of intellectual property rights analyzed as regulatory taking).

Applying the regulatory takings framework to the purported taking of a license makes sense based upon the nature of intangible assets, which differ from tangible real or personal property in being able to be physically seized or invaded—the analytical predicate for a physical takings claim under well-established precedent. *See*

49

*Horne*, 576 U.S. at 355, 361-62.  Accordingly, the trial court erred in failing to dismiss Ligado's physical takings claim.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court reverse the trial court's denial of our motion to dismiss.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Director

/s/ Nathanael B. Yale
NATHANAEL B. YALE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:(202) 616-0464

BORISLAV KUSHNIR
Senior Trial Counsel

August 20, 2025                     *Attorneys for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Rule 32(b)(1) of this Court's Rules because it contains 11,413 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Nathanael B. Yale*
Nathanael B. Yale

# ADDENDUM

## INDEX TO ADDENDUM

Opinion and Order from the United States Court of Federal Claims in Case No. 23-1797 (November 18, 2024)……………………………………………………Appx1-13

# In the United States Court of Federal Claims

No. 23-1797L
(Filed:  November 18, 2024)

```
************************************
                                 *
LIGADO NETWORKS LLC,             *
                                 *
                                 *
            Plaintiff,           *
                                 *
      v.                         *
                                 *
THE UNITED STATES,               *
                                 *
            Defendant.           *
                                 *
************************************
```

## OPINION AND ORDER

Plaintiff Ligado Networks LLC ("Ligado") is before this Court alleging that the United States (the "Government") prevented it from using its Federal Communications Commission ("FCC") license thereby taking its property in violation of the Fifth Amendment of the United States Constitution (the "Takings Clause").  The Government moved to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), or in the alternative under RCFC 12(b)(6).  The motion is fully briefed.

In addition, Iridium Communications Inc. and its affiliate Aireon LLC (together, "Iridium"), joined by three airline trade associations, filed a Motion for Leave to File an Amicus Brief in Support of Defendant's Motion to Dismiss.  ECF No. 12.  The Court granted the Motion.[1]  ECF No. 22.

---

[1] In the Amicus Brief in Support of Defendant's Motion to Dismiss, Amici state that, "[b]ecause a petition for reconsideration renders an FCC order non-final for purposes of judicial review, none of the many stakeholders who filed petitions for reconsideration has yet had the opportunity to challenge the [April 2020 Order] under the Administrative Procedure Act in court."  ECF No. 23 at 19.  Amici refer to the fact that there are seven motions for reconsideration filed by interested parties pending review before the FCC and one motion for reconsideration that the FCC has not yet ruled on.  Compl. ¶ 76.  Thus, the Court ordered the parties to briefly address whether the Court lacks jurisdiction because the April 2020 Order is not final.  ECF No. 12-1 at 27.  The parties both argue in their respective briefs that the pending motions for reconsideration do not deprive this Court of jurisdiction because of a lack of finality of the April 2020 Order.  ECF Nos. 24-25.  This Court agrees.  A petition for reconsideration does not alter the legal effect of an FCC decision or order.  47 U.S.C. § 405(a).  The filing of a petition for reconsideration makes an FCC order or decision non-final (and thus non-reviewable)

For the reasons set forth below, the Court **DENIES IN PART AND GRANTS IN PART** the Government's Motion to Dismiss.

## I.     Summary of the Facts

Ligado has held an FCC spectrum license authorizing it to provide Mobile Satellite Services, a service which only includes satellite use, within its licensed spectrum. *See* Compl. ¶¶ 25-26. Ligado sought to obtain a modified license to operate wireless terrestrial 5G services within its licensed spectrum, also known as Ancillary Terrestrial Component ("ATC") authority. Compl. ¶ 3.

In an order dated April 2020, the FCC conditionally granted Ligado's applications to modify its license giving Ligado the requested ATC authority—allowing Ligado to provide wireless terrestrial 5G services within its licensed spectrum. *See* April 2020 Order, *In the Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, 35 FCC Rcd. 3772, 3783 (2020) ("April 2020 Order"); *see* Compl. ¶¶ 63-68. The April 2020 Order is the subject of this case.

## II.     History at the FCC

### A.  Ligado's FCC License Applications and the Resulting April 2020 FCC Order

In December 2015, Ligado filed applications to modify its license to include ATC authority, which would allow Plaintiff to provide wireless terrestrial 5G services within its licensed spectrum. April 2020 Order, 35 FCC Rcd. at 3778-79. In May 2018, following a public comment period in which concerns about the harmful interference implications of Ligado's plan were raised, Ligado amended its 2015 license modification applications by proposing several restrictive conditions, including a reduction in base station power and specific measures to mitigate concerns about potential harmful interference to Federal Government operations. *Id*. at 3780-82. In response, in December 2019, the National Telecommunications and Information Administration ("NTIA"), which manages the Federal Government's use of spectrum, notified the FCC that, based on its own assessment of the potential impact of Ligado's operations "to [NTIA's] missions, national security, and the U.S. economy," it could not recommend approval of the applications. *Id*. at 3782-83, 3796. The Order explains that opponents of Ligado's applications were chiefly concerned with "interference with GPS receiver operations." *Id.* at 3795.

---

with respect to the right to seek further judicial review *by the party filing the petition* under the Communications Act. *TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 133 (D.C. Cir. 1989). The Communications Act states that the filing of a petition for reconsideration does not "operate in any manner to stay or postpone the enforcement" of such an order. 47 U.S.C. § 405(a). Thus, this Court concludes that the motions for reconsideration filed by other interested parties pending before the FCC do not deprive this Court of jurisdiction on the ground that the April 2020 Order lacks finality.

**APPX2**

Then, in April 2020, the FCC granted Ligado's amended license modification applications seeking ATC authority and adopted the stringent conditions proposed by Ligado. *Id.* at 3783; *see* Compl. ¶¶ 63-68. The FCC filed the order over the NTIA's objections, finding that "harmful interference concerns relating to GPS are effectively resolved based on the parameters of Ligado's amended modification applications, the test/data analyses presented in the record, and the conditions imposed" in the order. April 2020 Order, 35 FCC Rcd. at 3841- 42.

A few of the conditions in the April 2020 Order include that Ligado: (1) provide a 23 MHz guard-band of its licensed spectrum to separate its terrestrial base-station transmissions from neighboring operations; (2) reduce the base-station power levels from its initial proposal; (3) engage in a robust information exchange and coordination program with Government agencies before it could start its operations; (4) provide quarterly reports to the FCC concerning the progress of its satisfaction of these conditions; and (5) "cooperate directly" with the Department of Defense ("DOD") and the Department of Commerce ("DOC") to "expeditiously replace or repair as needed any U.S. Government GPS devices that experience or are likely to experience harmful interference from Ligado's operations." *Id.* at 3835- 42.[2]

And finally, the Order states, "Failure to comply with these Conditions may subject Ligado to monetary forfeitures and/or the partial loss of ATC authority in a relevant geographic area based upon the type and scope of violation, or complete loss of such ATC authority." *Id.* at 3835. Most relevant here is that the FCC recognized that the final requirement would require affected agencies to cooperate with Ligado. Compl. ¶ 85. The FCC stated that "[c]onsistent with FCC precedent in other proceedings, we would expect Ligado and U.S. Government agencies to work together in good faith, including with regard to negotiation to resolve any disputes." April 2020 Order, 35 FCC Rcd. at 3825.

It appears from the record that Ligado has not informed the FCC that it has satisfied the conditions imposed by the FCC's April 2020 Order. Ligado has not alleged otherwise.

### B.  May 22, 2020, Proceedings before the FCC

On May 22, 2020, NTIA, on DOD's behalf, filed a petition with the FCC for a stay of the April 2020 FCC Order and a petition for reconsideration. Compl. ¶ 76. On January 19, 2021, the FCC denied NTIA's petition to stay the April 2020 FCC Order. Compl. ¶ 80. The FCC found that NTIA had not met any of the requirements for a stay. *Id.* The FCC has not ruled on NTIA's reconsideration petition and there are seven other reconsideration petitions pending review. Compl. ¶ 76.

### III.    Proceedings before the United States Court of Federal Claims

### A.  Plaintiff's Complaint

---

[2] With respect to the requirement for an exchange of information, the April 2020 Order directed Ligado to cooperate directly with any agency whose GPS devices may be adversely affected. *Id.* ¶ 101.

3

**APPX3**

The Complaint alleges four separate claims under the Takings Clause alleging physical, per se (i.e., categorical) regulatory, regulatory, and legislative takings. Compl. ¶¶ 134-61. To support its takings claims, Plaintiff alleges that "Ligado's exclusive right to use this spectrum pursuant to both its duly authorized FCC license and ATC authority is property protected by the Fifth Amendment to the U.S. Constitution . . . ." Compl. ¶ 136.

Plaintiff claims that the DOD committed a physical taking of Ligado's ability to provide terrestrial services in its exclusively licensed spectrum by physically occupying Ligado's spectrum, Compl. ¶¶ 5; 128, 124. Ligado alleges that the DOD has been "operating previously undisclosed systems that use or depend on Ligado's spectrum without compensation." *Id.* Plaintiff explains,

> To the extent DOD's systems are transmitting or receiving signals in Ligado's allocated spectrum, that is a physical taking of Ligado's licensed spectrum, including its ATC authority. To the extent DOD's systems are receiving signals adjacent to Ligado's allocated spectrum, thus requiring the creation of a "dead zone" or buffer in Ligado's allocated spectrum to avoid harmful interference with DOD's systems, that too is a physical taking of Ligado's licensed spectrum, including its ATC authority.

Compl. ¶ 141.

Additionally, Plaintiff claims that both a categorical or a regulatory taking occurred when DOD refused to cooperate with Ligado according to the Order. In its Complaint, Ligado states that it has attempted to exchange information with the government, per the conditions, but the DOD and the DOC have refused to reciprocate. *Id.* ¶¶ 77-83. Further, Plaintiff alleges that "the DOD (with the Department of Commerce's assistance) made false or misleading claims to the FCC, Congress, the White House, other federal agencies, and the public about the effects of Ligado's proposed 5G terrestrial services on Global Position Systems ("GPS")." *Id.* at 2. Plaintiff alleges that the DOD, the DOC, and the NTIA have affected both a categorical and regulatory taking by:

> (i) threatening Ligado's business partners in order to interfere with the formation or performance of contracts necessary for the development of Ligado's authorized terrestrial services; (ii) failing to engage with the regulatory process and thereby delaying FCC action on Ligado's Applications; (iii) failing to implement the provisions of the April 2020 FCC Order, which provides for federal agencies to engage in information sharing and planning discussions in order to facilitate the deployment of Ligado's terrestrial services; (iv) making submissions to Congress to cause it to include punitive provisions in the NDAA to prevent Ligado from utilizing the spectrum for terrestrial services; (v) failing to certify under the NDAA that Ligado's use of its allocated spectrum for terrestrial services does not cause harmful interference with GPS receivers even though it is clear that it does not; and (vi) publishing incomplete, misleading, and false information about the potential

for harmful interference from Ligado's development of its authorized spectrum for terrestrial services.

Compl. ¶¶ 145, 151.

Finally, Plaintiff alleges that a legislative taking occurred when Congress passed the National Defense Authorization Act for fiscal year 2021 ("NDAA") giving the DOD the power to effectively block Ligado from ever using its ATC authority.  Plaintiff alleges that:

> Congress' passage of Subtitle E of Title XVI of the 2021 NDAA—which, among other things, takes away the right of any company that partners with Ligado on its terrestrial services to do business with DOD (the largest government agency and employer in the United States)—destroyed Ligado's ability to form the partnerships necessary to deploy terrestrial services in its spectrum and thereby effected a legislative taking of Ligado's property rights in its FCC license and ATC authority.

Compl. ¶ 155.  Thus, Plaintiff claims that the NDAA "rendered Ligado unable to proceed with its FCC approved plans," which prevented Ligado from using its authorized spectrum.  Compl. ¶¶ 105, 160.  Plaintiff concludes that this taking has "catastrophic economic effects on Ligado, preventing it from earning income from the ATC authority conferred by its FCC-licensed spectrum." *Id.*

## B.  The Government's Motion in Response to Plaintiff's Complaint

The Government moves to dismiss Plaintiff's Complaint under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), contending that Plaintiff's claim should be dismissed for lack of subject-matter jurisdiction because the Communication Act's comprehensive remedial scheme displaces this Court's jurisdiction.  Def.'s Mot. to Dismiss, ECF No. 11.  Further, the Government moves to dismiss pursuant to RCFC 12(b)(6) arguing that Plaintiff fails to state a claim because Plaintiff's Complaint does not allege a cognizable takings claim.

## C.  Supplemental Briefing in Response to the Court's Questions

After reviewing the parties' respective briefs, the Court ordered the parties to respond to the following additional questions by way of supplemental briefing:

> 1. The FCC granted Plaintiff a license with conditions attached. Have the conditions been met? Are the conditions, conditions precedent or on-going?
> 2. If the conditions are conditions precedent, and certain conditions require coordination and cooperation with certain government entities, how can Plaintiff comply with the conditions if the government entities refuse to cooperate or coordinate?
> 3. How can the FCC remedy refusal by government agencies to cooperate and coordinate if they refuse to do so?

5

**APPX5**

4. The cases cited by the parties that hold that an FCC license is not a property interest appear to apply only to FCC action in not granting, revoking or limiting a license. In this case, according to Plaintiff, government entities other than the FCC are occupying or interfering with the granted spectrum. Why is this not a taking? Is the FCC able to remedy the occupation of or interference with Plaintiff's spectrum by other government entities?

5. Defendant correctly states that, in order for a compensable taking to occur, the taking must be authorized by the government. It would appear that the government entities alleged to have occupied Plaintiff's licensed spectrum acted within their authority. Doesn't this satisfy the requirement of authorized government activity?

6. Regarding the 2021 National Defense Authorization Act: doesn't Congress have the right to modify agency action? If so, how can there be a legislative taking?

7. How can a license, which is not a property interest vis-à-vis the FCC, become one vis-à-vis other government entities? Is the Plaintiff's complaint best characterized as an interference with its license by other government entities, which is a tort and which can be remedied by the FCC?

ECF No. 7. The parties filed their supplemental briefs responding to these questions on September 9, 2024. ECF No. 29, 30.

## IV.   JURISDICTION AND STANDARD OF REVIEW

The Tucker Act authorizes the Court of Federal Claims "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). This grant of jurisdiction covers claims against the United States for just compensation pursuant to the Takings Clause. *See Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007). The Tucker Act, however, serves only a "gap-filling role" that permits "action[s] against the United States for the breach of monetary obligations *not otherwise judicially enforceable*." *United States v. Bormes*, 568 U.S. 6, 12-13 (2012) (emphasis added). Thus, where another "precisely drawn, detailed statute" contains "its own judicial remedies," "the specific remedial scheme [of the other statute] establishes the exclusive framework for the liability Congress created." *Id.* Or stated more simply: "[S]tatutory schemes with their own remedial framework exclude alternative relief under the general terms of the Tucker Act." *Id.* at 13; *see also Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1328 (2020) ("The Tucker Act yields when the obligation-creating statute provides its own detailed remedies . . . .").

The burden of establishing the Court's subject matter jurisdiction rests with the plaintiff. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). When faced with a motion to dismiss for lack of subject matter jurisdiction, pursuant to the Rules of the Court of Federal Claims ("RCFC") 12(b)(1), a court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

6

"To state a claim for a taking under the Fifth Amendment, a plaintiff must identify a legally cognizable property interest." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1384-1385 (Fed. Cir. 2019) (citing *Tex. State Bank v. United States*, 423 F.3d 1370, 1378 (Fed. Cir. 2005)). "The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment." *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Property interests arise from "existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law. . . ." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005) (internal quotation marks omitted). To support a takings claim, a property interest must be more than a "mere unilateral expectation or an abstract need." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980).

## V.    DISCUSSION

### A.    The Government's Motion to Dismiss Pursuant to RCFC 12(b)(1)

As a preliminary matter, the Court considers the Government's argument to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). In its Motion to Dismiss, the Government argues that the Communication Act's comprehensive remedial scheme displaces this Court's jurisdiction over takings claims arising from FCC licensing decisions, and thus Plaintiff's Complaint should be dismissed for lack of subject matter jurisdiction. In determining whether a statutory scheme displaces Tucker Act jurisdiction, a court must "examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes." *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1093 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 78 (2018) (quoting *Horne v. Dep't of Agriculture*, 569 U.S. 513, 527 (2013)).

The Federal Circuit has made clear that where a plaintiff's claim raises the type of challenge that implicates 47 U.S.C. § 402(a), then the claim, regardless of how it is styled, is subject to the Act's comprehensive remedial scheme rather than the Tucker Act's gap-filling grant of jurisdiction. Thus, the Court must determine whether Plaintiff's claims raise the type of challenge that implicates 47 U.S.C. § 402(a). *Sandwich Isles Commc'ns, Inc. v. United States*, 992 F.3d 1355, 1365 n.4 (Fed. Cir. 2021). The Communications Act provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the [FCC] under this chapter . . . shall be brought" to the regional courts of appeals. 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1). The Government argues that Plaintiff's Complaint, "challenge[s] [] the terms of its FCC license." Def.'s MTD at 17. Plaintiff contends that its claims are not challenges to FCC orders and instead are takings claims against the Government. ECF No. 16 at 19.

Plaintiff, however, does not challenge the validity or propriety of the FCC order concerned. Instead, Plaintiff argues that various Government actors have not complied with the Order, preventing Plaintiff from using its license. *See* Compl. ¶¶ 140-41, 144-46, 149-52, 155-60. Plaintiff asks the Court, "to provide Ligado just compensation for . . . [the Government's] taking of Ligado's rights pursuant to the April 2020 FCC Order and prior FCC orders." Compl. at 68. Further, Plaintiff alleges "The stonewalling of Ligado by DOD and others has further stymied Ligado's ability to use its FCC license and ATC authority." *See* Compl. ¶ 79. Thus,

7

Ligado does not seek to modify or remove any conditions of the Order. Instead, Ligado seeks damages against the Government for allegedly not complying with the Order and taking Plaintiff's licensed spectrum.

The Federal Circuit made clear that "we do not imply that all constitutional challenges to the FCC's actions must be presented to the FCC before they can be asserted." *Sandwich Isles*, 992 F.3d at 1365 n.4. *Sandwich Isles* thus applies only to circumstances that specifically involve a "challenge[] to the FCC's actions." *Id.* Accordingly, to the extent Plaintiff's claim does not seek to "enjoin, set aside, annul, or suspend any order of the [FCC] under this chapter," 47 U.S.C. § 402(b) and 28 U.S.C. § 2342(1) are not applicable, and this Court has jurisdiction to consider Plaintiff's claim. 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1); *see Regional Rail Reorganization Cases,* 419 U.S. 102, 127-56 (1974). Thus, because this Court has jurisdiction to consider Plaintiff's claim, the Government's Motion to Dismiss pursuant to RCFC 12(b)(1) is **DENIED**.

### B.   The Government's Motion to Dismiss Pursuant to RCFC 12(b)(6)

#### 1.   Is the FCC License a Valid Property Interest?

Ligado bases its alleged property interest on the fact that it holds an FCC license pursuant to the Communications Act, and in the April 2020 Order, the FCC modified that license to provide it with authority, subject to numerous terms and conditions, for terrestrial use. Compl. ¶¶ 135-138. In its Motion to Dismiss, the Government argues that Ligado's Complaint fails to state a claim because licenses issued by the FCC under the Communications Act do not constitute cognizable property for takings purposes, and thus Plaintiff cannot assert a valid takings claim.

The essential question in this case is whether the license granted to Ligado to utilize part of a designated spectrum under certain conditions is property for the purpose of asserting a takings claim. Although the Government cites to precedent involving a takings claim against the FCC, these cases do not reach the issue of whether an FCC license is a valid property interest. *See Sandwich Isles*, 992 F.3d at 1361-65; *Alpine PCS, Inc.*, 878 F.3d at 1092-98, ECF No. 11 at 24. Instead, in these cases the Federal Circuit affirmed holdings from this Court which dismissed takings claims against the FCC for lack of jurisdiction because the Communication Act's comprehensive remedial scheme displaces this Court's jurisdiction over takings claims arising from FCC licensing decisions. *See id.* The Government points to one case in which an FCC license has been considered not a property right and therefore not subject to a taking. *See* ECF No. 11 at 30-32 (citing *Mobile Relay Associates v. F.C.C*, 457 F.3d 1, 12 (D.C. Cir. 2006)). However, this case involves an action by the FCC in limiting a license. *Mobile Relay Associates*, 457 F.3d at 12. Therefore, there is legal support for the argument that vis-à-vis the FCC a license is not property.[3] But this case is about another government agency, the Department of

---

[3] The Court does not agree with the Government's attempt to inflate the holding in *Mobile Relay Associates* into a "categorical" statement that an FCC license is not property for purposes of a taking claim across the board: "This right does not constitute a property interest protected by the Fifth Amendment." *Mobile Relay Associates*, 457 F.3d at 12. The holding

Defense, "occupying" part of the spectrum licensed to Ligado.  "Occupy" is, of course, a tendentious term in favor of Ligado's argument, but it seems an apt.  The electro-magnetic spectrum is a physical phenomenon, and the Department of Defense ("DOD") is accused of using it to the exclusion of Ligado, which has been granted the right to use it, albeit with limitations.  This Court, therefore, holds that, for purposes of the Motion to Dismiss, that Ligado's FCC license is a property interest vis-à-vis DOD but not vis-à-vis the FCC.

It is not clear that the FCC could provide an adequate remedy for Ligado.  *See Alpine PCS, Inc.*, 878 F.3d at 1098 (finding that the Communication Act's statutory scheme afforded the licensee "'a ready avenue' to bring its takings claim and displaces Tucker Act jurisdiction over that claim" because the licensee "could have raised a constitutional takings claim; the FCC had the authority to grant relief; and the D.C. Circuit had jurisdiction to review whether a taking occurred."); *Sandwich Isles Commc'ns, Inc. v. United States*, 992 F.3d 1355, 1365 n.4 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 2647 (2022) (explaining that where "the FCC is in the position to prevent an alleged taking in the course of its own proceedings, the agency must be made aware of any such claim," which is "then subsumed into the agency's final decision and can be appealed only to the court of appeals").  As stated above, these cases arise from FCC licensing decisions.  The Court is not aware of any law that holds that the FCC has the authority to award monetary damages for improper occupation of all or part of a spectrum licensed to another.  Besides pointing to remedies for intransigence and the FCC's tools for dispute resolution, the Government does not cite to specific legislation or regulation regarding the FCC's authority to remedy Ligado's specific claim.[4]  The Government also spends some time on modification of the conditions imposed by the FCC.  ECF No. 11 at 31-33.  But Ligado's argument is—assuming that the conditions are satisfied—the FCC cannot restore to Ligado whatever part of the licensed spectrum DOD is occupying or can award monetary damages for the taking of it.

In supplemental briefing, the Court asked the parties: "Is the FCC able to remedy the occupation of or interference with Plaintiff's spectrum by other government agencies?"  The Government did not address this issue in its response, although discussed it in its supplemental

---

regarding the plaintiff's taking claim was in the context of FCC regulation, like all the other cases cited by the Government.  Furthermore, the statement would be *dictum* if it were to be expanded to all takings claims, as such a conclusion was not necessary to the decision.  Finally, the case is not binding on this Court.

[4] The Government's supplemental brief focuses on intransigence and informal coordination.  "If Ligado informs the Commission of its concerns about alleged agency bad faith, the FCC can engage NTIA assistance, to address alleged intransigence.  The FCC could set aside or suspend the conditions at issue, in whole or with respect to the specific agencies, locations, or devices at issue."  ECF No. 29 at 4 (citing 47 C.F.R. § 25.117).  The Government's supplemental brief also states, "FCC routinely resolves coordination disputes between Federal and non-Federal operators through informal means, putting it in a strong position to remedy alleged bad faith by agencies. Indeed, the 2014 precedent cited in the April 2020 Order contemplated "informal negotiation, mediation, or non-binding arbitration" to "clearly define and narrow the issues for formal agency resolution by NTIA, the Commission, or jointly, as applicable."  ECF No. 29 at 5 (citing AWS-3 Notice, 29 FCC Rcd. at 8539).

brief.[5]  But in its Motion to Dismiss, in addition to promoting the modification of conditions as a remedy, the Government focused on remedies for intransigence and for informal coordination.[6] The Court's own research, however, discovered the following:

> The Commission and its Enforcement Bureau enforce the Communications Act and the Commission's rules and orders in two primary ways: (1) by initiating investigations, and taking appropriate action if violations are found; and (2) by resolving disputes between industry participants either through mediation and settlement or adjudication of formal complaints.

Federal Communications Commission, https://www.fcc.gov/general/enforcement-primer (last visited October 25, 2024).  What is "appropriate action," and is this case a dispute between "industry participants"?  The Court is not clear on whether the FCC can be an adequate remedy. For purposes of a Motion to Dismiss, the fact that the Government has not been able to point to any FCC authority that would address Ligado's claim, moves the Court to side with Ligado on this point.

### 2.  Conditions

The Government argues that, even if an FCC license is property for purposes of a takings claim, Ligado has not satisfied the conditions precedent to using the license.  ECF No. 11 at 26, 37.  On the contrary, Ligado argues that the conditions are ongoing not precedent. In the Court's view, the only condition of any significance is the one requiring Ligado to coordinate with agencies, including DOD, to address potential GPS interference.  The others seem to depend on this one. Even if all the other conditions were satisfied, this one would prevent the implementation of the license according to the Government's condition precedent argument. Ligado alleges that the DOD, the DOC, and the National Telecommunications and Information Administration ("NTIA") refuse to engage with Ligado.  ECF No. ¶ 145.  Accepting this claim to be true for purposes of a motion to dismiss, the Court agrees with Ligado that "the government argues that it cannot be held liable for a taking because DOD has nullified Ligado's property interest by refusing to implement the Order."  ECF No. 30 at 3.

### 3.  Government Authorization

*Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998) requires that in seeking damages for a taking under the Tucker Act that the government's action must fall "within the scope of [the agencies'] duties."  As Ligado states in its response to

---

[5] The Government argues in its supplemental brief that, Ligado does not have a property right, and thus, any "questions that examine whether a taking has occurred – such as the nature of the alleged Governmental action – are therefore irrelevant to the Court's analysis under step one."  ECF No. 29 at 7-8.

[6] This is because Ligado argues that the DOD refuses to cooperate with Ligado, preventing it from fulfilling one of the conditions that the FCC imposed on the license.  ECF No. 16 at 31.

**APPX10**

Question 5 posed by the Court: "Each of the actions that the government highlights unquestionably falls within DOD's authority—to disseminate information, including to Congress; to withhold government contracts from Ligado's business partners pursuant to the NDAA; and to protect GPS under 10 USC sec. 2281." ECF No. 30 at 6.  The Court agrees with Ligado that the actions of the government agencies were authorized.

### 4. 2021 National Defense Authorization Act

The text of Sections 1661-1664 does not state that Ligado may not use the spectrum assigned to it by the FCC license.  *See* 2021 NDAA, Pub. L. 116-283, §§ 1661-1664, 134 Stat. 3388, 4073-76 (2021).  But Ligado asserts that it effectively does so.[7]  Section 1662 forbids the Secretary of Defense from entering into contracts with an entity that utilizes the part of the spectrum licensed to Ligado "unless the Secretary has certified to the congressional defense committees that such operations do not cause harmful interference to a Global Positioning System device of the Department of Defense." *Id.* at § 1662.  Section 1663 provide for a study by the National Academies to be commissioned by the Secretary to "carry out an independent technical review" of the FCC Order "to the extent that such Order and Authorization affects the devices, operations, or activities" of DOD.  *Id.* at § 1663.  Section 1664 states that DOD cannot use funds to comply with the FCC Order until the secretary "submits to the congressional defense committees an estimate of the extent of covered costs and the range of eligible reimbursable costs associated with harmful interference" to the DOD's GPS receivers.  *Id.* at § 1664.

According to the Government, the National Academies of Science, Engineering, and Medicine (NASEM) "found that high-precision GPS receivers would experience significant harmful interference from Ligado's proposed terrestrial operations, that the conditions in the FCC Order did not resolve DOD's harmful interference concerns, and that the FCC's mitigation conditions were impractical in many circumstances." ECF No. 11 at 12.  The Secretary of Defense has not made the certification to the defense committees as provided by section 1662, presumably because of the NASEM Report.[8]  ECF No. 16 at 17-18.  Thus, the DOD may not contract with entities using Ligado's spectrum for commercial terrestrial operations. According to Ligado, "[i]n practice, this means that DOD cannot do business with any entity that contracts with Ligado for ATC operations in its spectrum." ECF No. 16 at 47.  Ligado further avers that "[b]ecause 'the ability to contract with DOD is essential to businesses operating in the telecommunications industry,' not a single company has agreed to work with Ligado since the NDAA." ECF No. 16 at 48.

---

[7] "The NDAA makes it impossible for Ligado to use the ATC authority conferred by the FCC license without DOD's sign off—effectively blocking Ligado from using its ATC authority."  ECF No. 16 at 17.

[8] The Court has no information about the estimate of costs provided in section 1664 other than Ligado's statement that DOD "has refused to certify estimates to replace potentially affected GPS devices under Section 1664." ECF No. 16 at 18.

**APPX11**

Both parties agree that the FCC can modify or revoke any license that it has granted and that, if it does so, a takings claim does not lie. If the FCC can do this, it follows that Congress may do so as well. In enacting the NDAA with sections 1662-64, Congress effectively limited the FCC Order, apparently because it was concerned that harmful interference with DOD operations would ensue. Thus, because the Secretary of Defense has not made the certification pursuant to section 1662, it may not contract with any entity that uses Ligado's spectrum even though to do so destroys Ligado's business. Furthermore, because the DOD has not provided the cost estimate provided in section 1664, it cannot expend department funds to comply with the FCC Order. Although the Court has presumed that the DOD did not certify as provided in 1662 because of the NASEM Report, the Court does not know why the DOD has not made the cost estimate in 1664. In any event, Ligado argues that its business will be destroyed by the lack of certification in 1662, which appears to have a rational basis. Therefore, puzzlement over the lack of estimate in 1664 does not affect the outcome.

Returning to the "FCC License As Property" notion, if an FCC license is not property vis-à-vis the FCC, then it is also not property vis-à-vis Congress. Just as the FCC can terminate a license without effecting a taking, so Congress's limitations on the license, even if they effectively terminate it, cannot be challenged as a taking. Therefore, Ligado's claims for a legislative taking cannot go forward.

But what does this conclusion say about Ligado's takings claim based on the "occupation" of its licensed spectrum by the DOD? Per the NDAA, the DOD may not contract with entities operating in Ligado's spectrum and DOD may not use department funds to comply with the FCC Order. But the Court does not see here a limitation on the license as such. Congress has not taken over Ligado's licensed spectrum. The provisions of the NDAA affect the DOD, not Ligado—at least directly. Therefore, it seems that parts of Ligado's claims survive.

At the outset, the Court notes that for purposes of the Motion to Dismiss, the Court must accept the truth of Ligado's allegations. Therefore, the Court finds that Ligado's licensed spectrum is property except insofar as the Government has limited it by the NDAA. The Court also finds that the FCC's conditions basically require or depend on cooperation with the DOD to work out a modus operandi with the DOD, which cooperation (according to Ligado) has been frustrated by the DOD. Therefore, Ligado's case may proceed even if the FCC's conditions are conditions precedent. Finally, the Court finds that the DOD's alleged actions are authorized. Thus, the Court **GRANTS IN PART AND DENIES IN PART** the Government's Motion to Dismiss pursuant to RCFC 12(b)(6).

## VI.    CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** the Government's Motion to Dismiss. The Court **ORDERS** the Government to file its Answer to Plaintiff's Complaint within 45 days from the date of this Opinion and Order.

**IT IS SO ORDERED.**

**APPX12**

<u>s/Edward J. Damich</u>
EDWARD J. DAMICH
Senior Judge

**APPX13**