No. 25-1792

# United States Court of Appeals for the Federal Circuit

---

LIGADO NETWORKS LLC,
*Plaintiff-Appellee*,

v.

UNITED STATES,
*Defendant-Appellant.*

---

Appeal from the United States Court of Federal Claims
Case No. 23-1797L, Hon. Edward J. Damich

---

## RESPONSE BRIEF OF APPELLEE LIGADO NETWORKS LLC

---

Harris M. Fischman
Martin Flumenbaum
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
Email: hfischman@paulweiss.com

Philippe Z. Selendy
Yelena Konanova
David A. Coon
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
Email: pselendy@selendygay.com

Donald B. Verrilli, Jr.
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
  Suite 500E
Washington, DC 20001
Tel: (202) 220-1100
Email: donald.verrilli@mto.com

Kevin F. King
COVINGTON & BURLING LLP
850 10th Street NW
Washington, DC 20001-4956
Tel:  (202) 662-6000
Email: kking@cov.com

September 29, 2025                    *Counsel for Ligado Networks LLC*

# CERTIFICATE OF INTEREST

Counsel for Ligado Networks LLC certifies the following:

1.  The full name of every party represented by me in this case is:

    Ligado Networks LLC

2.  The names of the real parties in interest represented by me are:

    None other than Ligado Networks LLC.

3.  All parent corporations and any publicly held companies that own 10% or more of stock in the parties represented by me are:

    Ligado Networks LLC has no parent corporation. The following publicly held companies may hold, either directly or indirectly, 10% or more of Ligado Networks LLC: Great Elm Group, Inc., and JPMorgan Chase & Co.

4.  The law firms, partners, and associates that appeared for the parties now represented by me before the originating court or that are expected to appear in this court (and who have not entered an appearance in this Court) are:

    Carter E. Greenbaum of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, and Megan Crowley of Covington & Burling LLP, 850 10th Street NW, Washington, DC 20001.

5.  The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal is:

    N/A

6.  Organizational Victims and Bankruptcy Cases: Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees) are not applicable because this is not a criminal or bankruptcy case. See Fed. Cir. R. 47.4(a)(6).

    N/A

DATED: September 29, 2025      By: /s/ *Donald B. Verrilli, Jr.*
                                    Donald B. Verrilli, Jr.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................................i

STATEMENT OF RELATED CASES ........................................................1

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF THE ISSUES.................................................................1

INTRODUCTION .....................................................................................2

STATEMENT OF THE CASE....................................................................6

    A.    Factual Background.......................................................................6

    B.    Procedural History......................................................................12

SUMMARY OF THE ARGUMENT ........................................................16

ARGUMENT ...........................................................................................20

I.      Standard of Review......................................................................20

II.    The Communications Act Does Not Displace Tucker Act Jurisdiction........20

III.   Ligado's FCC License Confers A Cognizable Property Right in its
Exclusive ATC Authority. ..........................................................26

    A.    Under the Communications Act framework, Ligado's ATC
authority possesses the indicia of a property right.............................28

          1.    Ligado's ATC license possesses the traditional indicia of
a property right, and the Communications Act confirms
that it is property. .......................................................29

          2.    Defendants' contrary arguments lack merit..........................35

    B.    Ligado's property interest is not contingent on unfulfilled
license conditions. ....................................................42

IV.   Ligado Has Adequately Alleged That The Government Has
Committed A Physical Taking Of Ligado's Property. ..................................46

    A.    The CFC correctly held that the Complaint states a claim for a
physical taking...............................................................47

    B.    The nature of Ligado's ATC authority does not foreclose a
physical taking.................................................................51

# TABLE OF CONTENTS
## (Continued)

**Page**

V.    Ligado Adequately Alleged Authorized Government Conduct....................55

CONCLUSION ........................................................................................59

CERTIFICATE OF COMPLIANCE.......................................................61

CERTIFICATE OF SERVICE ................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*A & D Auto Sales, Inc. v. United States*,
  748 F.3d 1142 (Fed. Cir. 2014) ........................................................20

*Acceptance Ins. Cos. v. United States*,
  503 F.3d 1328 (Fed. Cir. 2007) ........................................................20

*Alpine PCS, Inc. v. United States*,
  878 F.3d 1086 (Fed. Cir. 2018) ...........................................21, 25, 26

*American Radio, LLC v. Qualcomm Inc.*,
  2013 WL 3270404 (C.D. Cal. May 23, 2013) ...................................49

*In re Atl. Bus. & Cmty. Dev. Corp.*,
  994 F.2d 1069 (3d Cir. 1993) ...........................................32, 33, 34, 40

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021).........................................................47, 48, 52, 54

*Celgene Corp. v. Peter*,
  931 F.3d 1342 (Fed. Cir. 2019) ........................................34, 35, 36, 37

*Club Misty, Inc. v. Laski*,
  208 F.3d 615 (7th Cir. 2000) ...........................................................28

*College Savings Bank v. Fla. Prepaid Postsecondary
  Educ. Expense Bd.*,
  527 U.S. 666 (1999)..........................................................................29

*Columbia Broad. Sys. v. Democratic Nat'l Comm.*,
  412 U.S. 94 (1973)............................................................................48

*Concrete Pipe & Prods. Cal., Inc. v. Constr. Laborers
  Pension Tr. for S. Cal.*,
  508 U.S. 602 (1993)....................................................................54, 55

*Connolly v. Pension Benefit Guaranty Corp.*,
  475 U.S. 211 (1986)....................................................................54, 55

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Conti v. United States,*
291 F.3d 1334 (Fed. Cir. 2002) .......................................................35

*Darby Dev. Co. v. United States,*
112 F.4th 1017 (Fed. Cir. 2024) ...............................................*passim*

*Del-Rio Drilling Programs, Inc. v. United States,*
146 F.3d 1358 (Fed. Cir. 1998) ...........................................21, 55, 56

*Dugan v. Rank,*
372 U.S. 609 (1963).......................................................................53

*Fishermen's Finest, Inc. v. United States,*
59 F.4th 1269 (Fed. Cir. 2023) .......................................................35

*Frost v. Corporation Comm'n,*
278 U.S. 515 (1929).......................................................................30

*Hearts Bluff Game Ranch, Inc. v. United States,*
669 F.3d 1326 (Fed. Cir. 2012) ...........................................29, 40, 41

*Horne v. Dep't of Agric.,*
569 U.S. 513 (2013).......................................................................21

*Horne v. Dep't of Agriculture,*
576 U.S. 350 (2015).......................................................................33

*International Paper Co. v. United States,*
68 Ct. Cl. 414 (1929) .....................................................................37

*International Paper Co. v. United States,*
282 U.S. 399 (1931).........................................................37, 38, 53, 54

*Lion Raisins, Inc. v. United States,*
416 F.3d 1356 (Fed. Cir. 2005) .......................................................59

*Loretto v. Teleprompter Manhattan CATV Corp.,*
458 U.S. 419 (1982).......................................................................48

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Lucas v. South Carolina Coastal Council*,
　505 U.S. 1003 (1992)...........................................................................47

*Members of Peanut Quota Holders Ass'n v. United States*,
　421 F.3d 1323 (Fed. Cir. 2005) .................................................*passim*

*Mitchell Arms, Inc. v. United States*,
　7 F.3d 212 (Fed. Cir. 1993) ...............................................................41

*Mobile Relay Associates v. FCC*,
　457 F.3d 1 (D.C. Cir. 2006).........................................................39, 40

*Oil States Energy Servs. v. Greene's Energy Grp.*,
　584 U.S. 325 (2018)..........................................................................28

*Patlex Corp. v. Mossinghoff*,
　758 F.2d 594 (Fed. Cir. 1985) ...........................................32, 34, 42

*Penn Cent. Transp. Co. v. City of New York*,
　438 U.S. 104 (1978)..........................................................................47

*Richmond, F. & P. R.R. Co. v. Louisa R.R.*,
　54 U.S. (13 How.) 71 (1851) ......................................................28, 31

*Rith Energy, Inc. v. United States*,
　270 F.3d 1347 (Fed. Cir. 2001) ........................................................59

*Roman v. United States*,
　61 F.4th 1366 (Fed. Cir. 2023) ........................................................20

*Ruckelshaus v. Monsanto*,
　467 U.S. 986 (1984)..............................................................30, 54, 55

*Sandwich Isles Commc'ns, Inc. v. United States*,
　992 F.3d 1355 (Fed. Cir. 2021) ..........................................21, 25, 26

*Sinclair v. United States*,
　279 U.S. 749 (1929)..........................................................................40

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Todd v. United States*,
  292 F.2d 841 (Ct. Cl. 1961) ................................................................28

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994).................................................................48, 49

*Tyler v. Hennepin Cty., Minn.*,
  598 U.S. 631 (2023)....................................................................29

*United Nuclear Corp. v. United States*,
  912 F.2d 1432 (Fed. Cir. 1990) .................................................44, 45

*United States v. Cress*,
  243 U.S. 316 (1917)....................................................................47

*United States v. Fuller*,
  409 U.S. 488 (1973)....................................................................35

*United States v. Gen. Motors Corp.*,
  323 U.S. 373 (1945)...........................................................51, 52, 53

*United States v. Petty Motor Co.*,
  327 U.S. 372 (1946)....................................................................33

*Voda v. Cordis Corp.*,
  476 F.3d 887 (Fed. Cir. 2007) ....................................................47

*Wash. Fed. v. United States*,
  26 F.4th 1253 (Fed. Cir. 2022) ..................................................23

*Washoe Cnty., Nev. v. United States*,
  319 F.3d 1320 (Fed. Cir. 2003) ...............................................52, 53

*West River Bridge Co. v. Dix*,
  47 U.S. (6 How.) 507 (1848) ......................................................31

*Wilmington R.R. v. Reid*,
  80 U.S. (13 Wall.) 264 (1871) ...................................................31

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

**REGULATORY CASES**

*In Re LightSquared*, Order and Authorization,
  35 FCC Rcd. 3772 (2020) ............................................................*passim*

**FEDERAL STATUTES**

10 U.S.C. § 2281 ................................................................................57

28 U.S.C. § 1292(b)(2) .......................................................................16

28 U.S.C. § 1292(d) ............................................................................1

28 U.S.C. § 1292(d)(2) ........................................................................1

28 U.S.C. § 1491 .................................................................................1

28 U.S.C. § 1491(a)(1) ......................................................................20

35 U.S.C. § 307 .................................................................................34

35 U.S.C. § 318 .................................................................................34

35 U.S.C. § 328 .................................................................................34

47 U.S.C. § 209 .................................................................................23

47 U.S.C. § 301 ............................................................................*passim*

47 U.S.C. § 303(b) ..............................................................................7

47 U.S.C. § 303(c) ..............................................................................7

47 U.S.C. § 304 .................................................................................33

47 U.S.C. § 310(d) ............................................................................31

47 U.S.C. § 312 ....................................................................18, 35, 36

47 U.S.C. § 312(b) ............................................................................24

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

47 U.S.C. § 316 ................................................................................35

47 U.S.C. § 316(a) ...........................................................................39

47 U.S.C. § 402 ................................................................................21

47 U.S.C. § 402(a) ...........................................................................13

47 U.S.C. § 901(c) ...........................................................................57

47 U.S.C. § 902(b)(2)(H) .................................................................57

**FEDERAL REGULATIONS**

47 C.F.R. § 1.9001(b) ......................................................................31

47 C.F.R. § 1.9005 ...........................................................................31

47 C.F.R. § 1.9020(a) ......................................................................31

47 C.F.R. § 25.121(a)(1) ..................................................................32

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. V .........................................................................3

**OTHER AUTHORITIES**

A. Copiz, *Scarcity in Space:  The International Regulation of
    Satellites*, 10 CommLaw Conspectus 207 (2002) ..............................49

Decl. of Douglas Smith, *In re Ligado Networks LLC*,
    No. 25-bk-10006 (Bankr. D. Del. Jan. 6, 2025), ECF No. 2 ..............15

Huber, Kellogg, & Thorne, *Federal Telecommunications Law*, § 10.3,
    Spectrum Allocation: General Considerations (last updated June
    2025) ...........................................................................................32

## STATEMENT OF RELATED CASES

Ligado Networks LLC (Ligado) is not aware of any other appeal in or from this civil action.  Nor is Ligado aware of any case pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The Court of Federal Claims (CFC) had jurisdiction over this suit pursuant to the Tucker Act, 28 U.S.C. § 1491.  This Court possesses jurisdiction pursuant to 28 U.S.C. § 1292(d).  The CFC certified its order adjudicating Defendants' motion to dismiss for interlocutory appeal.  28 U.S.C. § 1292(d)(2); Appx14.  This Court granted Defendants' petition for permission to appeal.  Appx15-16.

## STATEMENT OF THE ISSUES

1.  Whether the Communications Act, 47 U.S.C. § 301 *et seq*., displaces the CFC's Tucker Act jurisdiction over this suit under the Takings Clause, even though the Communications Act provides no avenue for Ligado to raise its claims and the FCC lacks authority to grant any relief.

2.  Whether Ligado's exclusive, transferable authority to use its dedicated spectrum band to provide 5G terrestrial services pursuant to an FCC license constitutes a cognizable property interest for takings purposes.

3.   Whether Ligado has pleaded a claim for a physical taking, where the Department of Defense (DOD) has physically occupied Ligado's licensed spectrum, thereby appropriating it for its own use.

4.   Whether Ligado has sufficiently pleaded authorized government action for takings purposes, where Defendants' alleged actions undisputedly were within their statutory authority.

## INTRODUCTION

Plaintiff-Appellee Ligado Networks owns an exclusive nationwide FCC license to provide 5G terrestrial wireless communications on specific spectrum bands covered by the license.  Ligado's FCC-conferred right to use that spectrum is worth billions of dollars, reflecting the intense market demand for spectrum needed to support the explosion of 5G telecommunications services in this country. In granting the license to Ligado, the FCC specifically identified the important public interest in deploying spectrum to meet that demand.

Ligado has possessed the right to use the licensed spectrum for 5G services (known as Ancillary Terrestrial Component (ATC) authority) since 2020, but Defendants—principally DOD, but also the Department of Commerce (DOC)—have prevented Ligado from deploying the spectrum for 5G services.  Their ostensible justification is concern that Ligado's 5G service will interfere with Global Positioning System (GPS).  But that is pure pretext.  DOD and DOC participated in

the FCC proceedings that led to the grant of Ligado's ATC authority and set forth their purported interference concerns in painstaking detail. The FCC—the expert agency charged by Congress with making spectrum allocation decisions in the public interest—concluded that those GPS concerns were largely unfounded and could be addressed through simple ameliorative steps taken cooperatively by Ligado and DOD.

The real reason for DOD's effort to thwart Ligado is that DOD itself is using Ligado's licensed spectrum to support a secret national security program. Thus, rather than cooperate with Ligado to implement the modest changes needed to allow Ligado to use the spectrum for 5G services as the FCC ordered, DOD has instead physically occupied the spectrum for its own purposes, ousting Ligado in the process. And Defendants seek to cover their tracks by persisting with spurious GPS interference claims that the FCC has already rejected.

Ligado has staked its future on the ability to use its FCC-conferred ATC authority to provide wireless 5G services and has paid out huge sums to do so. But Defendants' takeover of the spectrum allocated to Ligado has sabotaged Ligado's ability to earn a return on those investments. That, in plain terms, is a taking. It is bedrock law that although the government may appropriate private property for public use, it must provide just compensation when it does so. U.S. Const. amend. V. The government can no more physically oust Ligado from its licensed spectrum

without paying just compensation than it could oust Ligado from real property it leased to run its business without paying just compensation. Accordingly, whatever the nature of or justifications for DOD's undisclosed national security program, DOD may not simply commandeer Ligado's immensely valuable property right to use its licensed spectrum without compensating Ligado.

To vindicate its constitutional entitlement to just compensation, Ligado filed this suit in the CFC, alleging physical, categorical, regulatory, and legislative takings claims against the United States, DOD, DOC, and the National Telecommunications and Information Administration (NTIA) (collectively, Defendants). After Defendants moved to dismiss, the CFC correctly held that Ligado had adequately alleged that Defendants had commandeered Ligado's right to use the spectrum for 5G services and that the vast majority of Ligado's suit should move forward. As the CFC recognized, Ligado has pleaded valid takings claims: the government has appropriated Ligado's immensely valuable property rights in its ATC authority.

Defendants' interlocutory challenge to the CFC's ruling flies in the face of precedents of this Court and the Supreme Court, and should be rejected. First, there is no merit to Defendants' effort to evade responsibility for providing just compensation by challenging the CFC's jurisdiction. This case belongs in the CFC, not the FCC, because it raises no issue about how the FCC has exercised its statutory authority. Ligado challenges Defendants' appropriation of its spectrum and

4

Defendants' pattern of blocking Ligado from using the spectrum in the manner that the FCC has already approved—not any conduct by the FCC or any condition of its order granting Ligado ATC authority.  The Communications Act provides no avenue for raising or obtaining relief on those claims.  Second, the CFC correctly held that Ligado has a cognizable property interest in the ATC authority granted by its FCC license.  The Communications Act imbues such grants of authority with the core attributes of property rights precisely to encourage the sort of massive investments that Ligado undertook and that are necessary to provide vital 5G services to the public.  Third, the CFC correctly held that Ligado stated a claim for a physical taking: Defendants have physically occupied Ligado's allocated portion of the electromagnetic spectrum for their own purposes, thereby preventing Ligado from transmitting over that spectrum.  And although Defendants complain that Ligado's allegations should be analyzed as a regulatory taking rather than a physical taking, Ligado has asserted regulatory takings claims too, and Defendants do not challenge the CFC's refusal to dismiss them.  Finally, the CFC was plainly correct that Defendants' alleged conduct is authorized for purposes of the Takings Clause because their actions fell within their statutory authorities and are attributable to the government.

   This suit has now been pending for almost two years, and in that time, Ligado has been forced to seek bankruptcy protection, largely because Defendants' actions

have deprived Ligado of adequate cash flow. It is therefore of pressing importance that Ligado promptly be afforded the opportunity for just compensation to which the Constitution entitles it. The Takings Clause exists to prevent such injustices.

The importance of correctly resolving the issues presented extends beyond Ligado. Wireless providers have invested, and continue to invest, hundreds of billions of dollars based on the assumption that, when the FCC grants them spectrum licenses, DOD or other actors in the government cannot simply oust them from their licensed spectrum for pretextual or unspecified policy reasons. Defendants' actions are certain to deter investment, as providers will be reluctant to invest in developing and providing wireless services at anything like the current robust levels if a cloud of uncertainty hangs over their right to use licensed spectrum over the long term. By the same token, such uncertainty will depress spectrum auction prices, depriving the government of much needed revenue.

For all of these reasons, this Court should affirm the CFC's ruling.

## STATEMENT OF THE CASE

### A.    Factual Background

Since 1989, Ligado has owned an FCC license to operate a mobile satellite services (MSS) network within a defined portion of the electromagnetic spectrum known as the L-Band. Appx34 (Compl. ¶ 32). Because electromagnetic spectrum is finite, the FCC has exclusive authority to allocate bands of electromagnetic

frequencies, license use of those frequencies, and regulate the activities of commercial and government users. 47 U.S.C. § 303(b)-(c); Appx30 (Compl. ¶ 22).

In 2003, to meet the overwhelming need for new terrestrial spectrum for advanced wireless services, the FCC began allocating mid-band spectrum—like Ligado's L-Band spectrum—for 5G and other advanced wireless services. Appx31-33 (Compl. ¶¶ 27-29). That year, Ligado applied to the FCC to modify its existing MSS license to include ATC authority, which would enable it to provide terrestrial 5G services. Appx34 (Compl. ¶ 32). The FCC repeatedly approved Ligado's plans, explaining that Ligado's proposal would offer "a significant public interest benefit." *Id.*

During Ligado's development of ATC services, concerns arose regarding the potential for harmful interference with GPS devices. Ligado addressed those concerns by entering into agreements with major GPS manufacturers. Appx37 (Compl. ¶ 38). Ligado also agreed to forgo providing terrestrial 5G services in part of its spectrum to create a buffer insulating GPS operators against potential interference. Appx36-37 (Compl. ¶ 37).

Defendants initially supported Ligado's application. Appx37-38 (Compl. ¶¶ 39-40). In 2017, Defendants published a study of their own test results demonstrating that Ligado's services would not cause widespread harmful interference to GPS services. NTIA and DOD publicly affirmed that conclusion. *Id.*

In 2018, however, DOD and DOC abruptly changed course. Although no new circumstances had arisen, DOD and DOC began campaigning against Ligado's application based on the pretext that Ligado's services could cause harmful interference with GPS receivers. Appx42 (Compl. ¶ 48). According to a whistleblower, DOD officials sidelined experienced employees who supported Ligado's application. Appx42-43 (Compl. ¶¶ 49-51). DOD then claimed to NTIA that Ligado's proposed 5G services could result in harmful interference. Appx43-44 (Compl. ¶ 52). By 2019, NTIA had also ceased supporting Ligado's application. Appx46 (Compl. ¶ 56).

Industry experts viewed Defendants' new arguments as not credible. Appx45-47 (Compl. ¶¶ 54, 57-59). The FCC Chairman confirmed that they were inconsistent with FCC standards. Appx44 (Compl. ¶ 53). Navy officials concluded that they had "no analytical rigor." Appx47 (Compl. ¶ 59). And the whistleblower told his superiors that DOD's position "overreaches to the point of falsity." *Id.*

Notwithstanding Defendants' opposition, in April 2020, the FCC unanimously granted Ligado's application, finding that it was "in the public interest to" do so. Appx48-49 (Compl. ¶¶ 63-64). The FCC's detailed, 74-page order (the "2020 Order") rebutted Defendants' arguments and criticized DOD and DOC's evidence as "inconsistent with established spectrum management policies," "imprecise," and "inapplicable." Appx50 (Compl. ¶ 67). The 2020 Order concluded

that any potential for harmful GPS interference could be mitigated through cooperation between Ligado and Defendants. *Id.*; *see In Re LightSquared*, Order and Authorization, 35 FCC Rcd. 3772, 3835-42 (2020). To address specific circumstances in which GPS devices "could be affected" by Ligado's terrestrial operations, the Order directed Ligado to work with government agencies to "develop[] a program to repair or replace" affected devices. Appx50 (Compl. ¶ 68). The FCC noted that it "expect[ed]" that "Ligado and U.S. Government agencies [would] work together in good faith." 35 FCC Rcd. at 3825.

Rather than cooperate, Defendants obstructed Ligado's efforts to implement the 2020 Order. Appx52 (Compl. ¶ 74). DOD and DOC instructed government agencies not to work with Ligado or share information necessary for Ligado to develop the "repair or replace" program, thereby stymying Ligado's ability to do so. Appx49-50 (Compl. ¶¶ 67-68). Ligado sent letters to 15 government agencies to initiate information sharing concerning the repair and replace program, as required by the 2020 Order. Appx53-54 (Compl. ¶ 78). At DOD's behest, *no* agency cooperated with Ligado. *Id*. Indeed, the only agency to respond told Ligado that it and other agencies would not cooperate due to opposition from DOD and DOC. Appx55 (Compl. ¶ 82). DOD and DOC also refused to discuss potential solutions to their interference concerns with Ligado. Appx53 (Compl. ¶ 75). And NTIA, on

DOD's behalf, filed a petition for reconsideration of the 2020 Order. Appx53 (Compl. ¶ 76).

DOD's obstruction was designed to obscure DOD's own use of Ligado's spectrum for secret purposes. Appx23 (Compl. ¶ 2). After the FCC issued the 2020 Order, DOD and NTIA disclosed to the FCC that DOD was using Ligado's licensed spectrum. Appx38 (Compl. ¶ 41); Appx39-41 (Compl. ¶¶ 43-46). Senior government officials also represented to Ligado that DOD needed all of Ligado's spectrum. Appx39 (Compl. ¶ 42). At a hearing before the Senate Armed Services Committee, DOD representatives testified that DOD "ha[d] to be able to operate in that spectrum"; that DOD's concerns were "not just GPS"; and that part of the reason DOD advocated to keep Ligado out of the entire L-Band was for reasons unrelated to potential harmful interference with GPS systems. Appx39 (Compl. ¶ 43). Although the full details remain unknown, it appears that DOD is using Ligado's licensed spectrum either by transmitting or receiving signals in the spectrum or by receiving signals adjacent to Ligado's spectrum so as to render the spectrum a "dead zone." Appx41 (Compl. ¶ 47).

DOD urged Congress to facilitate DOD's obstruction of Ligado's ability to provide 5G services. At a May 2020 hearing before the Senate Armed Services Committee, DOD officials repeated their spurious claims about harmful GPS interference that the FCC had considered and rejected, and inaccurately indicated

that the FCC had not consulted with DOD before issuing the 2020 Order. Appx57-58 (Compl. ¶¶ 88-89). Contemporaneously, DOD launched a public website that falsely claimed that Ligado's 5G services would harm military and civilian GPS users. Appx60-62 (Compl. ¶¶ 93-94). Again, the FCC had considered and rejected those claims.

Ultimately, Congress included provisions in the National Defense Authorization Act ("NDAA") of 2021 that made it impossible for Ligado to use the ATC authority conferred by the FCC license without DOD's sign-off—effectively blocking Ligado from using its ATC authority. Appx63-64 (Compl. ¶¶ 96-100). In relevant part, those provisions barred any company that works with Ligado from obtaining government contracts with DOD unless DOD "has certified to the congressional defense committees" that Ligado's operations do not cause harmful GPS interference to DOD. Pub. L. 116-283 § 1662, 134 Stat. 3388, 4074 (2021). The NDAA also mandated that DOD engage the National Academies to investigate claims of harmful interference. Appx67-68 (Compl. ¶ 110).

DOD has refused to certify that Ligado's services would not result in harmful interference with GPS systems. The National Academies' report contemplated by the NDAA concluded—contrary to DOD's assertions—that "most commercially produced GPS receivers will not experience significant harmful interference from Ligado's" proposed 5G services. Dkt. 11, at 12. But it asserted, based on nonpublic

DOD statements, that Ligado's "terrestrial network" authorized by the 2020 Order could impair "DOD missions" "aside from GPS." Appx40 (Compl. ¶ 45); *contra* Br.13 n.6 (suggesting erroneously that the report validated DOD's professed concerns about GPS interference).

For its part, Ligado has taken every possible step to prepare to utilize its FCC license to provide 5G services. Appx70 (Compl. ¶ 115). Ligado has invested substantial time, energy, and capital on projects to standardize the L-Band, invest in the L-Band ecosystem, develop technology, and create 5G base stations and mobile chipsets compatible with its authorized spectrum. Appx70-71 (Compl. ¶¶ 115-118). Further, in reliance on the 2020 Order, Ligado raised approximately $4 billion in additional capital and converted $6 billion of debt to equity to build out its licensed spectrum. Appx24 (Compl. ¶ 4). But because of Defendants' actions, Ligado cannot use its ATC authority to provide 5G services in its exclusively licensed spectrum. Appx70 (Compl. ¶ 114).

### B.    Procedural History

1. In October 2023, Ligado filed this suit, raising four claims under the Takings Clause. Count I of the Complaint alleged that DOD committed a physical taking by physically occupying Ligado's exclusively licensed spectrum, preventing Ligado from using the spectrum, and denying Ligado the ability to control the spectrum. Appx77-81 (Compl. ¶¶ 135-141). Count II alleged that Defendants

committed a categorical taking by refusing to implement the 2020 Order, thus denying Ligado all economic value in the use of its licensed spectrum. Appx81-83 (Compl. ¶¶ 144-246). Count III alleged that Defendants likewise committed a regulatory taking by refusing to implement the 2020 Order. Appx83-85 (Compl. ¶¶ 149-152). Count IV alleged that the 2021 NDAA effected a legislative taking by facilitating DOD's obstruction. Appx85-87 (Compl. ¶¶ 155-160).

Defendants moved to dismiss the Complaint. Dkt. 11 at 14-45. Defendants argued that (1) the Communications Act's remedial scheme displaced the CFC's Tucker Act jurisdiction; (2) Ligado lacked a cognizable property interest in its ATC authority; (3) Ligado lacked any takings claim because Defendants' alleged conduct was unauthorized; and (4) each of Ligado's four takings claims should be dismissed for failure to state a claim.

2. After soliciting supplemental briefing on various issues, *see* Appx5-6, the CFC granted in part and denied in part Defendants' motion. The court first ruled that it had jurisdiction, explaining that the Communications Act displaces the court's jurisdiction only where a plaintiff seeks to "enjoin, set aside, annul, or suspend any order of the [FCC]." Appx7-8 (quoting 47 U.S.C. § 402(a)). Here, the court explained, Ligado "does not challenge the validity or propriety" of the 2020 Order or "seek to modify" it; instead, Ligado "seeks damages against the Government for allegedly not complying with the Order and taking [Ligado's] licensed spectrum."

13

*Id.* Moreover, the court observed, it is "not clear that the FCC could provide an adequate remedy for Ligado," as Defendants had not suggested that the FCC could award Ligado monetary damages or otherwise remedy its injuries. Appx9.

Next, the court rejected Defendants' argument that Ligado has no property interest in its licensed spectrum. Appx8-10. The court acknowledged "legal support for the argument that vis-à-vis the FCC a license is not property" because the FCC may revoke the license under certain circumstances. Appx8. But the court rejected Defendants' argument that an FCC license can never be property, observing that Defendants' cited decisions held only that licensees could not assert a takings claim against the *FCC* given its authority to revoke or modify licenses. Appx8 n.3. The court therefore held that for purposes of Ligado's claims against Defendants—who are government agencies *other than* the FCC—Ligado's license "is a property interest." Appx9. The court explained that the "electro-magnetic spectrum is a physical phenomenon," and Ligado "has been granted the right to use it, albeit with limitations." *Id.*

The court next denied Defendants' motion to dismiss with respect to Ligado's physical, categorical, and regulatory takings claims. Appx8-9; Appx12; Br.2-3. The court held that DOD's alleged occupation of the spectrum sufficiently pleaded a taking. DOD "is accused of using [the spectrum] to the exclusion of Ligado," in violation of Ligado's "right to use it." Appx9. The court dismissed Ligado's

14

legislative takings claim based on the NDAA, however, reasoning that because the FCC can "modify or revoke any license," "it follows that Congress may do so as well." Appx12.

Finally, the court rejected two additional arguments Defendants offered in support of dismissal. First, the court explained that the fact that Ligado has not satisfied the license conditions requiring coordination with the government does not prevent Ligado from bringing its takings claims because, according to the Complaint, Ligado's failure to satisfy those conditions is attributable to Defendants' alleged takings. Appx10. Second, the court held that the Complaint adequately alleged authorized governmental conduct, because DOD's alleged conduct—disseminating information, withholding government contracts, and working to guard against purportedly harmful interference—fell within its statutory authority. Appx11.

3. In January 2025, after more than two years of litigation, Ligado was forced to file for Chapter 11 bankruptcy protection, largely because Defendants' conduct has prevented the company from generating "adequate cash flows from [its] operations," costing the company "billions of dollars in sunk costs and lost profits." Decl. of Douglas Smith ¶ 9, *In re Ligado Networks LLC*, No. 25-bk-10006 (Bankr. D. Del. Jan. 6, 2025), ECF No. 2.

4.  Also in January 2025, Defendants moved to certify the CFC's order for interlocutory appeal under 28 U.S.C. § 1292(b)(2).  Defendants argued that interlocutory review was appropriate with respect to the CFC's holdings that it had jurisdiction, that Ligado had a property interest in its ATC authority, that Defendants' conduct was authorized, and that Ligado had stated a physical takings claim.  Defendants did not identify the CFC's refusal to dismiss Ligado's categorical and regulatory takings claims as warranting interlocutory consideration.  Dkt. 37.

In February 2025, Defendants filed their Answer and responded to Ligado's physical, categorical, and regulatory takings claims.  Defendants took the position that no answer was required with respect to the dismissed legislative takings claim. Dkt. 39 at 30-33.

Shortly thereafter, the CFC certified its decision for interlocutory appeal and stayed proceedings.  Appx14.  This Court accepted the appeal.  Defendants now challenge the same four CFC rulings that they identified in their motion to certify, and do not challenge the CFC's refusal to dismiss Ligado's categorical and regulatory takings claims.  Br.5.

## SUMMARY OF THE ARGUMENT

The government, through the actions of DOD and DOC, has appropriated to itself Ligado's exclusive FCC-granted property right to use its licensed spectrum for 5G services—a right of vast economic value—in order to protect DOD's use of that

spectrum for an undisclosed national security program. That is a classic taking that requires just compensation. Defendants' appropriation has inflicted devastating consequences on Ligado, which invested significant resources in preparing to provide much needed 5G services to the public, and now has been forced into bankruptcy by Defendants' conduct.

The CFC correctly declined to dismiss the bulk of Ligado's takings claims. Each of Defendants' interlocutory challenges to that decision flies in the face of well-established precedents of this Court and the Supreme Court. This Court should affirm the CFC's decision and permit Ligado an opportunity to prove its claims.

I. Defendants' contention that the Communications Act displaces Tucker Act jurisdiction over this suit is meritless. Ligado is not challenging any decision or action of the FCC, and the Communications Act therefore provides no framework for adjudicating Ligado's claims. Rather, Ligado's Complaint assumes the validity of the 2020 Order and seeks compensation for Defendants' subsequent commandeering of Ligado's spectrum and corresponding obstruction of Ligado's ability to use the ATC authority conferred by the 2020 Order. Equally to the point, Ligado cannot obtain relief under the Communications Act, as the FCC has no statutory authority to award compensation against the government for a takings claim or to enjoin Defendants from obstructing the 2020 Order.

17

II.  The well-established law of this Court and the Supreme Court leaves no doubt that Ligado's exclusive ATC authority constitutes a property right for purposes of the Takings Clause.  This Court has held that in the case of government grants, "a compensable interest is indicated by the absence of express statutory language precluding the formation of a property right in combination with the presence of the right to transfer and the right to exclude."  *Members of Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1331 (Fed. Cir. 2005).  Ligado's license confers all the core indicia of property: Ligado's ATC authority is exclusive, it is transferable, and it exists for a definite term.  And nothing in the Communications Act precludes a property right; to the contrary, the statute strongly indicates that licenses confer property rights.  Otherwise, companies like Ligado would never be willing to invest the billions of dollars necessary to develop and improve the spectrum to provide services to the public.  Defendants all but ignore the license's conferral of core property rights, instead focusing on the FCC's procedurally and substantively limited authority to revoke the license.  *See* 47 U.S.C. § 312.  But that revocation authority does not alter the fact that Ligado has a cognizable property interest that is protected against appropriation by *other* agencies, including DOD.

III.  The CFC correctly held that Ligado stated a claim for a physical taking. The Complaint alleges that Defendants have physically occupied Ligado's spectrum

by operating systems that use and/or render Ligado's spectrum a "dead zone," thereby preventing Ligado from using the same spectrum. That is a textbook physical taking. Defendants' sole contrary argument is that because Ligado's ATC authority is an intangible right akin to a leasehold interest, Ligado's claim should be analyzed as a regulatory taking. But numerous cases from the Supreme Court and this Court expressly hold that the government effects a physical taking when it occupies physical property that the plaintiff has an exclusive right to use—as Defendants have done here—whether or not the plaintiff owns the property outright. In all events, the CFC held that Ligado had *also* stated claims for categorical and regulatory takings, and Defendants do not challenge that ruling here.

IV. Finally, the CFC correctly held that the conduct alleged in Ligado's Complaint was authorized and therefore may support a takings claim. Defendants transmitted or received signals in or near Ligado's licensed spectrum, pressured Ligado's business partners, instructed agencies not to work with Ligado, and advocated for legislation. That conduct is plainly "chargeable to the government," *Darby Dev. Co. v. United States*, 112 F.4th 1017, 1027 (Fed. Cir. 2024) (citation omitted), as it ostensibly served Defendants' statutory objectives. Defendants' insistence that their alleged conduct was "unlawful" because it was inconsistent with the 2020 Order is both incorrect and irrelevant under *Darby*. Defendants' conduct

was authorized for takings purposes because it fell within the scope of their duties. Nothing more is required to support a takings claim.

## ARGUMENT

### I.     Standard of Review

This Court reviews the CFC's denial of a motion to dismiss de novo, accepting all well-pleaded factual allegations as true. *See Roman v. United States*, 61 F.4th 1366, 1370 (Fed. Cir. 2023); *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1150 (Fed. Cir. 2014).

### II.     The Communications Act Does Not Displace Tucker Act Jurisdiction.

Ligado's claims for just compensation belong in the CFC, not the FCC.  Those claims cannot be brought under the Communications Act, and Ligado's injuries cannot be remedied by the FCC.  Defendants' contrary contention rests on serious distortions of the nature of Ligado's claims.

A.  The Tucker Act grants the CFC "exclusive original jurisdiction over 'any claim against the United States founded . . . upon the Constitution' in excess of $10,000." *Acceptance Ins. Cos. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007) (quoting 28 U.S.C. § 1491(a)(1)).  Such claims include Fifth Amendment takings claims seeking just compensation. *Id.*  Thus, "[i]f the government appropriates property without paying just compensation, a plaintiff may sue in the Court of Federal Claims on a takings claim," even if the plaintiff "could have

challenged the government's conduct as wrongful in another forum." *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1363 (Fed. Cir. 1998).

Congress may choose to displace Tucker Act jurisdiction over a takings claim "in favor of some other remedial scheme." *Del-Rio*, 146 F.3d at 1367; *see Horne v. Dep't of Agric.*, 569 U.S. 513, 527 (2013). But an alternative statutory scheme cannot displace the Tucker Act unless it "provide[s] the plaintiff a 'ready avenue' to bring" the same claim. *Sandwich Isles Commc'ns, Inc. v. United States*, 992 F.3d 1355, 1363 (Fed. Cir. 2021) (quoting *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1098 (Fed. Cir. 2018)). Accordingly, this Court has made crystal clear that the CFC retains jurisdiction over a takings claim unless another, more specific statutory scheme is adequate "both to adjudicate the takings claim and, if a taking is found, to provide the constitutionally required relief." *Alpine*, 878 F.3d at 1097.

B. Defendants' contention that Ligado's claims must be channeled through the Communications Act's review framework is spurious.

*First*, it is self-evident that the Communications Act does not provide a framework for adjudicating Ligado's takings claims. The Act's review provision permits only appeals to "enjoin, set aside, annul, or suspend" certain enumerated "decisions and orders of the [FCC]." 47 U.S.C. § 402. Ligado does not seek to enjoin or set aside any FCC order or part thereof, including the 2020 Order and its conditions. Quite the opposite. Ligado seeks just compensation from agencies *other*

21

than the FCC for precluding it from exercising the rights that the 2020 Order conferred on Ligado. Ligado alleges that Defendants have prevented Ligado from using its licensed spectrum, including by employing the spectrum for Defendants' own purposes and threatening Ligado's potential partners. Appx41, Appx53, Appx56, Appx70, Appx72, Appx78 (Compl. ¶¶ 47, 77, 84, 114, 119, 128). Defendants never argue that the Communications Act provides a forum for adjudicating and granting relief on claims like those. That should be the end of the matter.

To get around that fatal flaw in their jurisdictional argument, Defendants resort to mischaracterization. Specifically, they misdescribe Ligado's claims as efforts to set aside the mandatory conditions in the 2020 Order. Br.30. But Defendants' ipse dixit does not make it so. Ligado's Complaint could not be clearer: as the CFC observed, Ligado "does not seek to modify or remove any conditions of the [2020] Order." Appx8; Appx35; Appx89. Indeed, Ligado *proposed* many of the conditions adopted by the FCC. *See* 35 FCC Rcd. at 3835; Appx35. And far from "lament[ing]" the 2020 Order's conditions, Br.30, Ligado's allegations take as given the validity of the 2020 Order—including all of its conditions on Ligado's use of the spectrum. Tellingly, the specific complaint allegations that Defendants identify as purportedly challenging the license conditions say nothing of the sort; instead, they detail the "stonewalling of Ligado by DOD" and DOC. Appx54-57 (Compl. ¶¶ 79-

86).   Those allegations support Ligado's contention that Defendants refused to cooperate with Ligado in fulfilling the 2020 Order's conditions.

*Nowhere* does Ligado challenge the conditions themselves—or suggest that because of Defendants' obstruction, the conditions must be relaxed or eliminated. Rather, the Complaint exclusively challenges Defendants' actions *after* the FCC issued the 2020 Order.  Those claims belong in the CFC.  *See Wash. Fed. v. United States*, 26 F.4th 1253, 1262-63 (Fed. Cir. 2022) (jurisdictional dismissal of takings claims unwarranted where plaintiffs sought monetary relief for harm resulting directly from agency's appointment as conservator, even though statute channeled challenge to appointment itself into district court).

*Second*, the Communications Act's framework cannot provide adequate relief for Ligado's claims.  Defendants assert that "the FCC has the necessary authority to provide Ligado an adequate remedy."  Br.31.  But their idea of an "adequate remedy" is for the FCC to "engage" with Defendants "to address the alleged intransigence." *Id*.  That cleverly-worded phrase effectively concedes that the FCC has no authority to *compel* DOD and other agencies to comply with the 2020 Order, or to otherwise grant relief for Ligado's claim that Defendants have appropriated its spectrum.  The FCC cannot, for instance, award compensation against the government for a takings claim.  *Cf.* 47 U.S.C. § 209 (authorizing damages only against a common carrier). Nor can it issue a cease-and-desist order or injunction barring Defendants from

occupying Ligado's licensed spectrum or obstructing the 2020 Order. *See* 47 U.S.C. § 312(b) (authorizing cease-and-desist orders only against a "person"); *id.* § 401 (authorizing the FCC to seek an injunction only against a "person"); *id.* § 153(39) (defining "person" not to include the government). Defendants' tepid suggestion of "engage[ment]" ignores that the 2020 Order expressly contemplated that DOD would cooperate with Ligado to resolve GPS interference concerns, *see* 35 FCC Rcd. at 3825, yet DOD refused to do so. Appx50 (Compl. ¶ 68). The FCC is powerless to *compel* DOD to change course, and Defendants never argue otherwise.

Defendants' next suggestion—that the FCC might "set aside or suspend the conditions" in the 2020 Order at Ligado's request, Br.31—borders on disingenuous. Those conditions reflect the FCC's considered judgment as to what is necessary to further the public interest, consistent with its statutory mandate. 35 FCC Rcd. at 3773, 3835. There is no reason to think that the FCC would lift them now. And Defendants no doubt would oppose any loosened restrictions, given that they argued strenuously during the FCC licensing proceedings that Ligado should not receive ATC authority at all. *See, e.g.*, *id.* at 3832-34. Moreover, even if the FCC lifted every condition, Ligado *still* would be unable to use its spectrum because Defendants' physical occupation of it would obstruct Ligado's ability to use it in the manner that its license permits. It is therefore particularly inappropriate for Defendants to suggest that the problems they created can be solved by the FCC.

24

Finally, (at the risk of repetition), Defendants' suggestion is ill-taken because Ligado has not sought to set aside the conditions or otherwise challenged any aspect of the 2020 Order. Defendants glancingly acknowledge that point in a footnote. Br.32 n.9 (inaccurately describing Ligado's allegation that "DOD has prevented it from deploying a terrestrial network by operating in spectrum licensed to Ligado" as an "alternative" theory). It speaks volumes that Defendants' only acknowledgment of Ligado's *actual* theory of liability is buried in a footnote. Defendants suggest that Ligado's property interest in its ATC authority does not vest until it has complied with the conditions that Defendants have prevented it from fulfilling, and thus Ligado must first ask the FCC to set aside the conditions. That argument lacks merit as explained further below; Ligado currently possesses a vested property interest and therefore has no need to (and does not) seek to set aside the conditions. *See* pp. 42-45, *infra*.

Defendants' heavy reliance on *Sandwich Isles Commc'ns, Inc. v. United States*, 992 F.3d 1355 (Fed. Cir. 2021), and *Alpine PCS, Inc. v. United States*, 878 F.3d 1086 (Fed. Cir. 2018), only undermines their arguments. Br.27-28. As the CFC explained, those decisions involved challenges to *FCC* actions concerning licenses, not challenges to other agencies' actions. Appx9. In *Alpine*, the plaintiff alleged that the FCC's cancellation of certain licenses was a taking. 878 F.3d at 1088. And in *Sandwich Isles*, the plaintiff alleged that the FCC's orders reducing

the plaintiff's federal subsidies effected a taking.  992 F.3d at 1364.  In both cases, although the challenges were clothed in constitutional garb, they ultimately were "premised on . . . disagreement" with the FCC's actions and sought to "set aside" the FCC orders in question based on arguments about the scope and exercise of the *FCC's* statutory authority.  *Id*.  As a result, they fell squarely within the Communications Act's remedial scheme—and the FCC therefore had authority to address them.

*Alpine* and *Sandwich Isles* thus hold only that where "the FCC is in the position to prevent an alleged taking in the course of its own proceedings, the agency must be made aware of any such claim," which is then "subsumed into the agency's final decision and can be appealed only to the court of appeals."  992 F.3d at 1365 n.4 (citing *Alpine*, 878 F.3d at 1096-98).  Here, by contrast, Ligado's claims are not premised on disagreement with the FCC's order, and the FCC could not have prevented the taking.  For all the reasons just explained, Ligado seeks compensation for Defendants' appropriation of Ligado's rights under the 2020 Order, and the FCC can neither address Ligado's claims nor grant meaningful relief.

## III. Ligado's FCC License Confers A Cognizable Property Right in its Exclusive ATC Authority.

Ligado's exclusive authority to use its spectrum to deploy terrestrial 5G services is a property interest protected by the Fifth Amendment.  Pursuant to the Communications Act and accompanying FCC regulations governing the creation

and terms of Ligado's license, Ligado's ATC authority is exclusive, transferable, and conferred for a definite term. Those are the quintessential hallmarks of a property interest. That makes sense: without cognizable property rights in an FCC license to use the spectrum, companies like Ligado would never be willing to invest the billions of dollars necessary to employ the spectrum to provide vital 5G services to the public.

Defendants' contrary arguments misconceive both the statutory framework and the essential attributes of Ligado's license. Defendants rely primarily on the fact that spectrum licenses are granted by the FCC and can be revoked by the FCC under specific circumstances. But this Court and the Supreme Court have long held that government grants of exclusive use rights can constitute property interests, and that even when such rights are revocable in certain circumstances, the government may effect a taking when it appropriates those rights rather than seeking to revoke them. Defendants are also wrong to argue that no property interest could have vested because Defendants themselves have prevented Ligado from fulfilling the license's ongoing operational conditions. The 2020 Order granted Ligado *immediate* authority to use the spectrum. By stymying Ligado's efforts to comply with the license's conditions, Defendants have appropriated Ligado's ATC rights for themselves. Under Defendants' view, the government could induce parties like Ligado to invest billions of dollars in preparation for using their spectrum authority,

27

only to snatch away that authority with impunity. The Fifth Amendment is designed to prevent precisely that injustice.

### A. Under the Communications Act framework, Ligado's ATC authority possesses the indicia of a property right.

Ligado's FCC license confers on Ligado a protected property right in its exclusive authority to use its portion of the spectrum to provide ATC services. At the outset, Defendants make much of the fact that Ligado's ATC authority arises from an FCC license granted pursuant to the Communications Act, rather than any pre-existing state-law or common-law right. Br.34. That is true, but irrelevant. It is well established that government grants such as franchises, patents, and licenses can give rise to property interests protected by the Fifth Amendment. See, *e.g., Oil States Energy Servs. v. Greene's Energy Grp.*, 584 U.S. 325, 338 (2018) (patents); *Todd v. United States*, 292 F.2d 841, 845 (Ct. Cl. 1961) (fishing license); *Richmond, F. & P. R.R. Co. v. Louisa R.R.*, 54 U.S. (13 How.) 71, 83 (1851) (franchise to maintain a rail line); *Club Misty, Inc. v. Laski*, 208 F.3d 615, 618-19 (7th Cir. 2000) (liquor license).

The framework for determining whether a government grant gives rise to a cognizable property interest is equally well established, although Defendants have not applied it here. Br.33-34. "[A] compensable interest is indicated by the absence of express statutory language precluding the formation of a property right in combination with the presence of the right to transfer and the right to exclude."

28

*Peanut Quota Holders*, 421 F.3d at 1331. The critical question is therefore whether Ligado's ATC authority bears "crucial indicia of a property right," including the right to use and exclude others from using the interest, and to dispose of the interest through sale, assignment, or other transfer. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012); *Tyler v. Hennepin Cty., Minn.*, 598 U.S. 631, 638 (2023). It clearly does. And nothing in the Communications Act "preclud[es] the formation of a property right" in the authority granted by the license, *Peanut Quota Holders*, 421 F.3d at 1331; to the contrary, the Act confirms that Ligado's authority to provide ATC services is a property right.

       **1.**    **Ligado's ATC license possesses the traditional indicia of a property right, and the Communications Act confirms that it is property.**

    a. Ligado's license confers the traditional hallmarks of a property right. First and foremost, Ligado's ATC authority gives it the right to exclude others from using its licensed spectrum for ATC services. *See College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999) ("The hallmark of a protected property interest is the right to exclude others."). Under the Communications Act, an entity may use the "channels of radio transmission" *only* pursuant to a license granted by the FCC. 47 U.S.C. § 301. Ligado holds such a license—making it the *sole* licensee nationwide that enjoys authority to operate in the relevant spectrum. Appx30, Appx48-49 (Compl. ¶¶ 23, 63). Ligado therefore

29

has the exclusive right to operate in the spectrum and the legal right to exclude others from doing so. *Id.* The right to exclude others is "generally one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1011 (1984).

Defendants gloss over Ligado's right to exclude, instead asserting that spectrum is a "quintessential *public* asset[]" and therefore "beyond the purview of private ownership." Br.35. That misses the point. To be sure, Ligado's FCC license does not grant it ownership of the spectrum itself, which remains a public asset, 47 U.S.C. § 301; instead, the license grants the exclusive right to use the spectrum and to preclude all others from doing so. This Court has repeatedly acknowledged that such exclusive *use* rights may constitute property: "[a] property right accrues when the government has seen fit to take a limited resource and secure it for the benefit of an individual or a predetermined group of individuals." *Peanut Quota Holders*, 421 F.3d at 1334. Thus, the government can confer property rights on private entities by giving them the exclusive right to use a "*public* asset," thereby creating an "excludable interest" and "isolat[ing] their particular interest from competition." *Id.* Indeed, the Supreme Court has long held that where the government grants a party the exclusive right to use a public asset upon compliance with statutory conditions, that right bears all the traditional indicia of private property. *See, e.g.*, *Frost v. Corporation Comm'n*, 278 U.S. 515, 519-20 (1929) (franchise to operate cotton gin

for public benefit and to exclude others from doing so constituted private property; "the right to carry on the business of a telephone system, to operate a railroad, a street railway" are other examples of publicly conferred property rights).   And because such franchises are property, they may not be taken without "suitable compensation." *Richmond, F. & P.R.R.*, 54 U.S. at 83; *Wilmington R.R. v. Reid*, 80 U.S. (13 Wall.) 264, 268 (1871); *West River Bridge Co. v. Dix*, 47 U.S. (6 How.) 507, 534 (1848).   Ligado's FCC license falls within the heartland of this precedent: it is an excludable interest that is isolated from competition.

Second, Ligado can transfer its ATC authority.   The regulatory scheme permits Ligado to assign, lease, transfer, or otherwise dispose of the right conferred by the license, *i.e.*, Ligado's exclusive right to use the spectrum.  Appx79 (Compl. ¶ ¶ 138); *see* 47 U.S.C. § 310(d); 47 C.F.R. §§ 1.9001(b), 1.9005.  Ligado may transfer its spectrum interest with FCC approval, and it may lease its spectrum without prior approval (after giving notice).   47 C.F.R. § 1.9020(a).   Defendants emphasize that transfers are "contingent on the Government's approval," Br.37—but this Court has made clear that such restrictions do not "undermine the importance of transferability to the characterization of [an interest] as a form of property." *Peanut Quota Holders*, 421 F.3d at 1332 (historical requirement of government transfer approval did not prevent right to sell peanut quota from being property).   In other words, even a *restricted* alienability right is evidence of a cognizable property interest.   *See id.*;

*accord In re Atl. Bus. & Cmty. Dev. Corp.*, 994 F.2d 1069, 1073 (3d Cir. 1993) (FCC license constituted property for bankruptcy purposes, in part because it was alienable subject to certain limitations).

Third, Ligado enjoys its exclusive right to use its spectrum for as long as its ATC authority continues in force. Ligado's FCC license, to which its ATC authority is attached, has a base 15-year term. 47 C.F.R. § 25.121(a)(1). And, like other FCC licensees, Ligado has strong renewal expectations that make its license, "for all practical purposes, permanent." Huber, Kellogg, & Thorne, *Federal Telecommunications Law*, § 10.3, Spectrum Allocation: General Considerations (last updated June 2025). Absent that strong renewal expectation, licensees would lack the incentive to make the massive investments required to provide advanced telecommunications services. The U.S. telecommunications industry would not exist in its current form if licensees could not rely on the continuing nature of their licenses. Thus, the leading telecommunications treatise recognizes that FCC licenses create "de facto property rights." Huber at § 10.3.

In all events, when a grant of exclusive, transferable rights persists for a defined term, the fact that the term is limited does not suggest that the grant is not property. For instance, the Federal Circuit has held that even the strictly time-limited rights conferred by a patent gave rise to a property interest for Fifth Amendment purposes during the term of the patent. *Patlex Corp. v. Mossinghoff*, 758 F.2d 594,

599 (Fed. Cir. 1985) (patent conferred property rights during its then-17-year term); *accord Horne v. Dep't of Agriculture*, 576 U.S. 350 (2015) (patents "confer[] upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation"). In other words—and contrary to Defendants' suggestion (Br.34)—permanent ownership is not necessary to establish a protected property interest.[1] *See United States v. Petty Motor Co.*, 327 U.S. 372, 377-81 (1946) (evaluating just compensation for interests taken from tenant). Just like a patent, an FCC license confers exclusive rights to use the underlying asset during the license's term, and it may be transferred during that term. That is sufficient to create a protected property interest. *See In re Atlantic*, 994 F.2d at 1075 (spectrum license constituted property for tax lien purposes because it was transferable, had value, and was protected by procedural safeguards).

    b.    The larger Communications Act framework confirms that Ligado's ATC authority constitutes a property right. Where, as here, a license includes the rights to transfer and exclude, "a compensable interest is indicated by the absence of

---

[1] Section 304 of the Communications Act is not to the contrary. That provision establishes that a license does not confer a renewal *right*, requiring that every licensee "waive[] any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the United States because of *the previous use of the same*, whether by license or otherwise." 47 U.S.C. § 304 (emphasis added). But a renewal right is not necessary for an interest to constitute property; like a patent, a license confers cognizable property rights during its term.

33

express statutory language *precluding* the formation of a property right." *Peanut Quota Holders*, 421 F.3d at 1331.   Rather than precluding property rights, the Communications Act implicitly acknowledges their existence.   Section 301 states that no license is to be "construed to create any right, *beyond* the terms, conditions, and periods of the license."   47 U.S.C. § 301 (emphasis added).   That language "implies the creation of rights akin to those created by a property interest limited only by the 'terms, conditions and periods of the license.'" *In re Atlantic*, 994 F.2d at 1073-74.   In other words, the grant of the license gives rise to a property interest within the defined conditions of the license.

Once again, patents provide an apt analogy.   Although—like FCC licenses*, see infra* pp. 35-40—the exclusion rights conferred by patents are limited both in duration and by statutory provisions permitting the Patent and Trademark Office to cancel patents in certain circumstances, *see* 35 U.S.C. §§ 307, 318, 328, the grant of a patent nonetheless gives rise to a property interest.   That interest is "founded on existing rules" and therefore is limited by the conditions set forth in the statutory scheme governing patents. *Patlex Corp.*, 758 F.2d at 599; *Celgene Corp. v. Peter*, 931 F.3d 1342, 1358 (Fed. Cir. 2019) (noting that government did not dispute that patents confer property rights and analyzing whether taking had occurred).   But because those limiting conditions do not alter the fact that the patentee enjoys the indicia of property ownership—while the patent is in force, the patentee may exclude

others and transfer the patent—the patent is a property interest protected by the Takings Clause. *See Celgene Corp.*, 931 F.3d at 1358.

The same is true of Ligado's FCC license. Although the license does not confer "any right, beyond the terms, conditions, and periods of the license," 47 U.S.C. § 301, Ligado's rights to exclude, transfer, and hold the license for a definite term are rights *within* the "terms, conditions, and periods of the license." The license therefore confers on Ligado the key indicia of property ownership.[2]

### 2.    Defendants' contrary arguments lack merit.

Defendants' arguments that Ligado lacks any cognizable property interest in its ATC authority rest on the license's revocability and the heavily regulated nature of the spectrum. Neither argument has merit.

a. Defendants first emphasize that the FCC may revoke or modify the license. Br.36; 47 U.S.C. §§ 312, 316. As an initial matter, the FCC's revocation authority is far more limited than Defendants acknowledge. The FCC may do so only after providing due process and only for specified reasons, including that the licensee has

---

[2] In passing, Defendants cite a few decisions holding that various licenses did not confer cognizable property rights. Each is distinguishable from Ligado's ATC authority in ways that reinforce that Ligado's license does confer a property right. *See United States v. Fuller*, 409 U.S. 488, 492-94 (1973) (statute authorizing licenses expressly stated that they conferred no property right); *Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1276-79 (Fed. Cir. 2023) (fishing license was not exclusive or transferable); *Conti v. United States*, 291 F.3d 1334, 1340-42 (Fed. Cir. 2002) (same).

breached the terms of the license, or the licensee has willfully failed to operate as contemplated in the license. 47 U.S.C. § 312. In other words, a licensee operating in compliance with the license has a reasonable expectation that its license will not be revoked.

In all events, just as in the patent context, the FCC's revocation and modification authority does not undermine Ligado's property rights in the license. Rather, the FCC's authority is simply one of the statutory conditions that define the *scope* of Ligado's property right; it does not nullify that right. Because Ligado's property right is limited by the FCC's ability to revoke or modify the license, Ligado would not be able to assert that the FCC effected a taking by exercising its statutory authority to revoke or modify the license. But because the license confers the rights to exclude and transfer *subject only to the FCC's* revocation and modification authority, Ligado's property rights may be taken if—as here—*other* government actions appropriate its rights.

This Court and the Supreme Court have expressly so held. This Court has held that patents confer property rights limited by the regulatory framework existing at the time of the grant. *Celgene Corp.*, 931 F.3d at 1358. Thus, although a patentee may not claim a taking if the PTO cancels the patent based on statutory authority that existed when the patent was granted, if the PTO uses later-arising authority that differs "significantly enough" from the regime that existed at the time the patent was

granted, a taking of the "patent right granted by the PTO . . . may have occurred." *Id*. Where the PTO cancels a patent using authority that did not limit the original grant of property rights, the patent holder has a property right as against that cancellation, and may claim a taking.

Similarly, the Supreme Court held in *International Paper Co. v. United States* that the government effected a taking of water rights held pursuant to a revocable sublicense from the United States because the government simply appropriated the water rather than using its contractual authority to revoke the water rights. 282 U.S. 399, 404 (1931); *International Paper Co. v. United States*, 68 Ct. Cl. 414, 434-36 (1929) (relevant rights were revocable at will). The plaintiff contended that the government took its property when it ordered the plaintiff's water rights to be cut off so that the water could be used for the war effort. 282 U.S. at 405-06. The government argued that it had not committed a taking because its order had the same effect as a revocation of the water-rights license, an action that the government would have been contractually permitted to take. *See* 282 U.S. at 407; 68 Ct. Cl. at 436. The Court rejected that argument, holding that the government *had* taken the rights because the government had not invoked its contractual rights, but instead had simply appropriated the water rights without terminating the license first. 282 U.S. at 407. The necessary premise of that holding was that the plaintiff held a property right in its water rights despite their contractual revocability, and the plaintiff could

assert that right as against government appropriation by means *other* than the government's pre-existing revocation right.

Those decisions confirm that Ligado's license confers property rights, and that Ligado may assert those rights against government conduct *other than* FCC revocation or modification. As discussed above, the license unquestionably confers the rights to exclude and transfer, and the FCC has not revisited that grant or purported to terminate it. Instead, other government agencies have deprived Ligado of the spectrum rights granted by the FCC. As *International Paper* makes clear, even when the government might have authority to revoke a property right by one method, if the government does not proceed in the allowed manner, but instead simply appropriates the party's property rights, the property owner may assert a taking based on the government's appropriation. 282 U.S. at 407. That is exactly what Ligado contends here: the FCC license grants Ligado a property interest to exclude others, including DOD, from the spectrum, yet DOD has simply appropriated Ligado's right to use the spectrum for itself.[3]

---

[3] That point disposes of Defendants' observation that the CFC did not address whether Ligado could allege a property interest vis-à-vis NTIA, "which regulates spectrum pursuant to Title 47 along with the FCC." Br.38 n.10. NTIA does not possess, and did not purport to exercise, any authority to revoke or modify Ligado's license. Instead, it participated in DOD's appropriation of Ligado's spectrum authority. *E.g.*, Appx53 (Compl. ¶ 76).

For that reason, Defendants' heavy reliance on *Mobile Relay Associates v. FCC*, 457 F.3d 1 (D.C. Cir. 2006), does not help them.  There, the court upheld the FCC's reallocation of permitted uses for a spectrum band used by numerous licensees.  *Id.* at 3-6.  The licensees argued that they had a property interest in the "flexibility" permitted by the licenses and that the reallocation constituted a taking.  The court rejected that contention because the "right to use the spectrum for a duration expressly limited by statute subject to the [FCC's] considerable regulatory power and authority . . . does not constitute a property interest protected by the Fifth Amendment."  *Id.* at 12.  That holding is a straightforward application of the principles discussed above: because the FCC's authority to modify a license was a condition on which the license was granted, *id.* (citing 47 U.S.C. § 316(a)), the property interest in the license did not include the right to prevent the FCC from exercising its authority to modify the license.  In asserting that an FCC modification was a taking, therefore, the licensees improperly sought to assert a property interest "beyond" the conditions of their licenses.  47 U.S.C. § 301.  Here, by contrast, Ligado is asserting a property right within the terms and conditions of its license— a right to exclusive use of its ATC authority, free from DOD appropriation.

*FCC* v. *Sanders Bros. Radio Station* is similarly unhelpful to Defendants.  309 U.S. 470 (1940).  Contrary to Defendants' suggestion, Br.3, that case does not hold that an FCC license can never give rise to property rights.  The Court stated, in dicta,

that "no person is to have anything in the nature of a property right as a result of the granting of a[n FCC] license." *Id*. at 475. But as in *Mobile Relay*, the plaintiffs' claim challenged the *FCC's* authority, as the licensees asserted a right to be free of competition that purportedly limited the FCC's authority to renew or revoke licenses. *Id*. The case therefore did not concern whether a license could give rise to a compensable property interest under the Takings Clause against other government actions. *See Sinclair v. United States*, 279 U.S. 749, 767 (1929) ("Always the language used in an opinion must be read in the light of the issues presented."). For that reason, the Third Circuit has held that *Sanders* does not preclude a conclusion that an FCC license does confer cognizable property rights. *See In re Atlantic*, 994 F.2d at 1073-74 (Section 301 "implies the creation of rights akin to those created by a property interest limited only by the 'terms, conditions and periods of the license'" (citation omitted)).

b. Trying a different tack, Defendants also contend that Ligado's license does not confer any property interest because the spectrum is subject to "pervasive government control." *Hearts Bluff*, 669 F.3d at 1331; Br.37. But *Hearts Bluff* did not announce any such bright-line rule. Instead, it stands for the uncontroversial proposition that whether a government grant confers a property interest depends on whether the statutory scheme confers traditional hallmarks of property rights. *Id*. Statutory frameworks that pervasively regulate an area are less likely to confer those

rights.  *Id.* (fishing permit framework did not create property rights because it did not confer rights to exclude and transfer); *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216 (Fed. Cir. 1993) (Social Security benefit system did not create property rights because beneficiaries had no right to exclude).  That was the case in *Hearts Bluff* itself, where the Court held that a landowner had no property right entitling it to receive a Clean Water Act mitigation bank permit enabling it to develop land, because the government had complete "discretionary authority" to deny entry into the program.  669 F.3d at 1331.  Here, by contrast, Ligado has *already received entry into the relevant program:* the FCC granted it a license for ATC authority.  And under the Communications Act framework, that license *does* confer rights to exclude, transfer, and hold the interest for a definite time—and it therefore constitutes property.

Indeed, the contrast between the Communications Act framework and the statutes described in *Hearts Bluff* and *Mitchell Arms* reinforces the conclusion that Ligado's FCC license gives rise to a property right in its ATC authority.  The Clean Water Act, Social Security Act, and other frameworks discussed in those cases were not designed to induce extensive private investment in the underlying asset at issue.  The FCC license system unquestionably is.  The "fundamental purpose" of granting an FCC license is to "encourage[] . . . investment-based risk" in developing the capacity to provide ATC service—an endeavor that requires enormous investment

that parties are able and willing to undertake only because the government has granted them "the right to exclude." *Patlex Corp.*, 758 F.2d at 599.  If the license did not confer enforceable property rights, it is inconceivable that private parties would invest the billions of dollars necessary to develop the ability to provide terrestrial 5G services.  Indeed, collectively, winning bidders routinely bid billions of dollars just for FCC licenses to the spectrum, *see* Auctions Summary, FCC, *available at* fcc.gov/auctions-summary, and then incur substantial costs to develop and deploy the relevant technology.

### B.     Ligado's property interest is not contingent on unfulfilled license conditions.

Defendants next contend that Ligado's property interest has not vested because Ligado purportedly "fail[ed] to satisfy the conditions of the license," Br.41-43, and it has no property right "until it can demonstrate compliance with the conditions," Br.32 n.9.  That argument is not only wrong; it is astonishing.  It is wrong because the 2020 Order grants Ligado immediate ATC authority, subject only to ongoing operational conditions.  It is astonishing because it is Defendants themselves who have prevented Ligado from fulfilling those conditions so that DOD may use Ligado's licensed spectrum for its own purposes.  In essence, Defendants' position is that their appropriation of Ligado's property interest prevents Ligado from having such an interest in the first place.  That cannot be right.

1. Defendants are wrong to suggest that Ligado's property interest is contingent on compliance with the license's conditions. The license conditions set forth in the 2020 Order are ongoing conditions on Ligado's *operation* of its ATC authority, not conditions precedent to the *existence* of that authority. Several aspects of the 2020 Order confirm that conclusion. The 2020 Order's ordering clauses grant immediate ATC authority to Ligado, stating that "[Ligado's] authorization for [ATC] operations . . . is modified to *include authority* to provide terrestrial service as described in its application." 35 FCC Rcd. at 3842, ¶ 159 (emphasis added). The 2020 Order then states that "[f]ailure to comply with these Conditions [set forth in Section H] may subject Ligado to monetary forfeitures and/or the *partial loss of ATC authority*." *Id.* at 3835, ¶ 131 (emphasis added). That language confirms that the conditions to which that grant is subject are structured to be *ongoing* obligations that shape how Ligado may use its vested authority—not conditions on the existence of that authority. If the conditions were prerequisites to Ligado's ATC authority, then there would be no ATC authority to lose if Ligado did not meet the conditions. The CFC therefore correctly held that Ligado possesses a property interest in its ATC authority regardless of its fulfillment of the conditions.

Defendants emphasize that Ligado may not *use* its ATC authority by operating in the spectrum until it fulfills the conditions, Br.42—but that point is irrelevant to the existence of Ligado's property interest. This Court has recognized that an entity

43

may have a property interest arising out of government-granted authority, even if the entity requires further government approval to use its authority. In *United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990), the plaintiff had obtained a leasehold interest in mining minerals, but regulations required Interior Department approval before the plaintiff began mining. *Id*. at 1437. This Court held that the plaintiff's "leasehold interest in the minerals" gave rise to a property interest in mining under the lease, even though the plaintiff could not begin mining without government approval. *Id*. The Court concluded, moreover, that the government's refusal to grant approval for reasons not contemplated by the extant regulatory scheme constituted a taking. *Id*. at 1437-38. So too here. Even if the 2020 Order is construed as requiring Ligado to satisfy certain conditions before beginning ATC operations, that does not alter the fact that the 2020 Order confers on Ligado immediate authority over the relevant spectrum, including the immediate rights to exclude and transfer. The 2020 Order therefore confers a property right notwithstanding the license's conditions.

2. It is important to recognize the deep injustice inherent in Defendants' conditions-precedent argument. As Ligado alleges and Defendants do not dispute, Ligado has satisfied the 2020 Order's conditions to the fullest extent possible given DOD's refusal to implement the Order. Appx53 (Compl. ¶ 77). Ligado has taken steps to facilitate its use of the spectrum with other spectrum-industry players, has

44

developed an equipment replacement program, and has designed essential equipment. Appx53-56 (Compl. ¶¶ 77-78, 81-82, 84-85). And Ligado repeatedly attempted to coordinate with the government about GPS concerns, as the 2020 Order contemplates. Appx53-56 (Compl. ¶¶ 77-83). But DOD's refusal to engage has made it impossible to meet that condition. 35 FCC Rcd. at 3838, Order ¶¶ 144-45, Appx53-56 (Compl. ¶¶ 77-83). DOD has even instructed other agencies not to work with Ligado or permit Ligado to develop the "repair or replace" program for affected devices required by the 2020 Order. Appx49-50 (Compl. ¶¶ 67-68, 74).

So long as DOD refuses to cooperate, Ligado cannot comply with the conditions requiring coordination—and therefore cannot avail itself of its exclusive authority to use the spectrum. Defendants' argument that Ligado's inability to comply deprives Ligado of any property interest, *see* Dkt. 11, at 27-28, therefore reduces to the absurd proposition that the government cannot be held liable for a taking because DOD has nullified Ligado's property interest by refusing to implement the 2020 Order. Appx10; *see also United Nuclear*, 912 F.2d at 1434-35. The government's refusal to work in good faith with Ligado is integral to its appropriation of Ligado's ATC authority. That conduct effects a taking of Ligado's property interest in its FCC-granted ATC authority; it does not prevent that property interest from vesting in the first place.

**IV.  Ligado Has Adequately Alleged That The Government Has Committed A Physical Taking Of Ligado's Property.**

The CFC correctly held that Ligado adequately alleged that Defendants have effected a physical taking of Ligado's exclusively licensed spectrum.  The Complaint alleges that Defendants have physically occupied Ligado's spectrum by "operating previously undisclosed systems that use—and indeed, depend on—[Ligado's] spectrum," Appx24-25 (Compl. ¶ 5), thereby preventing Ligado from using its authority to provide 5G services using the same spectrum.  That is a classic physical taking.

Defendants challenge that ruling, arguing that Ligado's license rights are intangible and therefore can be the subject only of a regulatory takings claim, not a physical takings claim.  Br.49.  That argument is misconceived; it is well-established that when a private party possesses the exclusive right to use an underlying physical asset, the government's occupation of that physical asset effects a physical taking even if the private party does not own the property outright.

Defendants' challenge also does little to advance this litigation.  As Defendants acknowledge, they challenge *only* the CFC's physical takings ruling, *i.e.*, its "fail[ure] to dismiss Count I of the complaint."  Br.49.  But the CFC *also* declined to dismiss Ligado's categorical and regulatory takings claims (Counts II and III of

46

the Complaint).  Br.2.  Defendants do not challenge those rulings here.[4]  Thus, assuming this Court holds, as it should, that the CFC has jurisdiction, Ligado has a property interest, and Defendants' conduct was authorized for takings purposes, Ligado's regulatory and categorical takings claims will go forward on remand regardless of how this Court rules on Ligado's physical takings claim.  *Cf. Voda v. Cordis Corp.*, 476 F.3d 887, 890 (Fed. Cir. 2007) (remanding for further proceedings on claims not implicated in interlocutory appeal).  Nevertheless, the Court should affirm the CFC's holding that Ligado stated a valid physical takings claim because Defendants' arguments to the contrary are meritless.

### A.    The CFC correctly held that the Complaint states a claim for a physical taking.

Ligado has stated a claim for a physical taking.  A physical taking occurs when the government "physically takes possession" or "occupies" property "without acquiring title."  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021).  An invasion is a physical taking if it ousts the owner from use and possession of his property.  *Id.*; *see also United States v. Cress*, 243 U.S. 316, 327 (1917).  Because a physical taking nullifies the property holder's core property interests—his rights "to

---

[4] In any event, the CFC correctly held that Ligado adequately pleaded its categorical- and regulatory-takings claims.  *See*, *e.g.*, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978).  The government has wholly blocked Ligado from using its ATC authority, depriving Ligado of all economically beneficial use and thwarting its reasonable, investment-backed expectations.  *See*, *e.g.*, Appx34-37; Appx55.

possess, use and dispose" of his property—it is "the most serious form of invasion of an owner's property interests." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). As a result, if "the government physically takes an interest in property, it must pay for the right to do so." *Cedar Point Nursery*, 594 U.S. at 154.

The Complaint contains extensive allegations that the government has physically occupied Ligado's exclusively licensed spectrum. As an initial matter, the Complaint alleges that the spectrum has physical properties: it is composed of electromagnetic waves that "are defined according to their frequencies—that is, how many times per second the wave oscillates." Appx29 (Compl. ¶ 19); *see also* Appx9 (CFC recognizing that "[t]he electromagnetic spectrum is a physical phenomenon"). Each range of frequencies—known as a band—has *finite* physical capacity because too many transmitters operating within a band can interfere with receivers' ability to collect information. Appx29 (Compl. ¶ 21). That is why the spectrum must be allocated among users. Indeed, the spectrum's physical characteristics and finite capacity are beyond dispute: the Supreme Court has long recognized that "broadcasting is subject to an inherent *physical* limitation," *Columbia Broad. Sys. v. Democratic Nat'l Comm.*, 412 U.S. 94, 101 (1973) (emphasis added), because "if two broadcasters were to attempt to transmit over the same frequency in the same

48

locale, they would interfere with one another's signals," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637 (1994).

Ligado's FCC license provides it with the exclusive right to transmit and receive electromagnetic waves within a certain band in a given geographical space. Appx31 (Compl. ¶ 25); *see generally* A. Copiz, *Scarcity in Space: The International Regulation of Satellites*, 10 CommLaw Conspectus 207, 211 (2002). Thus, Ligado has exclusive rights to use its designated band of electromagnetic waves—which themselves have physical properties—in a specifically defined physical area. *See American Radio, LLC v. Qualcomm Inc.*, 2013 WL 3270404, at *2 (C.D. Cal. May 23, 2013).

Because spectrum has physical properties, and in particular physical limitations—bands can only accommodate finite amounts of simultaneous transmission—Ligado's right to use its spectrum can be physically disturbed and invaded. If others transmit or receive electromagnetic waves of the same frequency in the same space, those actions accomplish a physical occupation of the spectrum that interferes with the ability of Ligado's receivers to properly transmit and gather information. Appx29 (Compl. ¶ 21); Appx41 (Compl. ¶ 47 n.31) (FCC's recognition that a spectrum can be "[p]hysically occup[ied]").

The Complaint alleges that Defendants have physically invaded Ligado's spectrum in just this way. DOD is using Ligado's licensed spectrum by (1)

"transmitting or receiving signals in Ligado's allocated spectrum that prevent Ligado from transmitting or receiving its own signals in its exclusively licensed spectrum"; and/or (2) "receiving signals adjacent to Ligado's allocated spectrum in a manner that requires Ligado's that allocated spectrum be a 'dead zone' for terrestrial services so as to avoid harmful interference with DOD's systems."  Appx41 (Compl. ¶ 47); Appx75 (Compl. ¶ 129).  Through either or both methods, DOD's actions are physically barring Ligado from accessing its spectrum and using it to transmit and receive signals.  Appx53 (Compl. ¶ 75) (government has "wholly prevented Ligado from using its ATC authority to deploy terrestrial services"); *see also* Appx8-9 (finding that DOD is "occupying" Ligado's licensed spectrum).

That physical invasion is ongoing:  DOD is physically transmitting and receiving electromagnetic waves in the band and through the space covered by Ligado's exclusive spectrum license (or it is ensuring that Ligado's band remains vacant to prevent interference).  That physical invasion both precludes Ligado from using the spectrum, Appx41 (Compl. ¶ 47), and appropriates Ligado's right to exclude others—including the government—from its spectrum.  Removing any doubt about that, the Complaint points to DOD officials' statements confirming that DOD wishes to "keep Ligado out of the entire L-Band," Appx39 (Compl. ¶ 43), thereby "appropriat[ing] Ligado's property for its own benefit," Appx82 (Compl. ¶ 146).

**B.    The nature of Ligado's ATC authority does not foreclose a physical taking.**

Defendants contend that Ligado may not assert a physical takings claim because it does not own the "actual electromagnetic spectrum," but instead has only "intangible" use rights conveyed by the FCC license.  Br.49.  As explained above, while no one *owns* the spectrum, the licensees have a property interest in the use rights conveyed by their licenses.  It is those rights that the government has taken by physically occupying the spectrum and preventing Ligado from using it according to the terms of its license.  While Defendants argue that intangible rights cannot be physically taken, *id.*, that argument defies common sense as well as decades of Fifth Amendment precedent.

Defendants' argument rests on the premise that "to determine whether a physical or regulatory takings framework applies to a particular property interest," the "nature of the property interest" is dispositive—and an intangible interest cannot be physically taken.  Br.49.    That is obviously wrong.  If government exercises eminent domain to condemn a building, a private party that has leased that building to conduct its business is entitled to compensation for the economic losses caused by its taking of the leasehold interest.  *United States v. Gen. Motors Corp.*, 323 U.S. 373, 375 (1945).  The government's physical invasion has deprived the leaseholder of the economic value it has lost as a result of the taking.  By the same token, if government action results in the flooding of farmland, a private party that has leased

the property to farm it is entitled to just compensation for the physical invasion that has caused the party's loss. That is just common sense.

Unsurprisingly, black-letter law confirms that it is the nature of the *government's intrusion* that determines whether a physical taking has occurred—not the nature of the private party's interest in the property. "A physical taking generally occurs when the government directly appropriates private property or engages in the functional equivalent of a practical ouster of [the plaintiff's] possession." *Washoe Cnty., Nev. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003) (citation modified); *Cedar Point*, 594 U.S. at 149 (government appropriation of the "right to exclude" is a physical taking). As *Washoe County* makes clear, because ouster of "*possession*" can constitute a physical taking, the plaintiff need not own the underlying physical property to assert that the government has physically taken it. The government can physically appropriate property, or oust a private party from that property, even if the private party owns only intangible rights to use the property.

For instance, the Supreme Court has held that a physical taking occurred when the government ousted a leaseholder from its possession of a building. *Gen. Motors Corp.*, 323 U.S. at 375. The Court explained: "[w]hen the sovereign exercises the power of eminent domain it substitutes itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing . . . That interest

may comprise the group of rights for which the shorthand term is 'a fee simple' or it may be the interest known as an 'estate or tenancy for years', as in the present instance. The constitutional provision is addressed to every sort of interest the citizen may possess." *Id*. at 378. In other words, even though the leaseholder did not own the building—it did not possess "fee simple"—the government effected a physical taking by physically ousting the leaseholder from the interest it did possess, i.e., the exclusive right to occupy the rented space. *Id*.

*General Motors* does not stand alone. This Court and the Supreme Court have recognized that the government can physically take intangible water rights by "physically divert[ing] water for its own consumptive use or decreas[ing] the amount of water accessible by the owner of the water rights." *Washoe Cnty.*, 319 F.3d at 1326; *Dugan v. Rank*, 372 U.S. 609, 625-26 (1963) (finding physical taking of water rights based on construction of a dam); *International Paper*, 282 U.S. at 407 ("the petitioner's right was to the use of the water; and when all the water" to which it was entitled was "turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take that use"). In those cases, the plaintiffs asserted only that they owned rights to *use* certain amounts of water from particular sources. But the courts recognized that by physically taking water for its own use, the government invaded the plaintiffs' property interest in their water-use rights, thereby effecting a physical taking.

Ligado's physical takings claim is exactly the same as those at issue in *General Motors* and the water rights cases. Ligado's license gives it the exclusive authority to physically occupy and use its spectrum for a defined term of years—and the right to exclude others, including DOD, from physically occupying the band and using the spectrum. Defendants have physically occupied the electromagnetic waves in Ligado's licensed spectrum, just as the government occupied the leased building in *General Motors* and diverted the plaintiffs' water in *International Paper*. That occupation has ousted Ligado from its exclusive use authority by physically preventing the Company from using its spectrum. That is a physical taking, pure and simple. It does not matter that Ligado does not own the underlying spectrum, any more than it mattered that the leaseholder in *General Motors* did not own the building.

The decision on which Defendants rely are not to the contrary. *See* Br.49; *Concrete Pipe & Prods. Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 643-44 (1993); *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 223-25 (1986); *Ruckelshaus*, 467 U.S. at 1004-06. In each, the government had not purported to appropriate any property *for its own use* or that of someone else— the sine qua non of a physical taking. *Cedar Point*, 594 U.S. at 149. Instead, in each the government had regulated in a way that assertedly lowered the value of the rights at issue—a traditional regulatory taking. *Id*. It was the regulatory nature of the

government's alleged intrusion, not the intangible nature of the rights at issue, led the Court to analyze the claims under the regulatory takings framework. *See, e.g., Connolly,* 475 U.S. at 223 (explaining that pension plan regulation did not appropriate employer funds for the government's own use, but instead merely regulated employer's withdrawal of funds); *Concrete Pipe*, 508 U.S. at 643-44 (similar); *Ruckelshaus*, 467 U.S. at 1004-06 (statutory data-disclosure provisions lowered value of data submitted to government).

## V.   Ligado Adequately Alleged Authorized Government Conduct.

The CFC correctly held that the conduct alleged in Ligado's Complaint "unquestionably" falls within the scope of Defendants' duties and therefore may support Takings Clause liability.  Appx11.  Defendants' contrary contention—that their conduct was allegedly unlawful and therefore not "authorized"—flies in the face of this Court's consistent and recently reaffirmed precedent.

A.  Government action ordinarily is "authorized" for purposes of the Takings Clause if government agents act "within the general scope of their duties." *Darby*, 112 F.4th at 1024 (quoting *Del-Rio*, 146 F.3d at 1362), *reh'g denied*, 2025 WL 1604947 (June 6, 2025).  Thus, if a government agent takes action as "a natural consequence of congressionally approved measures" or "pursuant to the good faith implementation of a congressional act," that action is "chargeable to the government," regardless of whether the action was "lawful" or "done with legal

authority." *Id.* at 1023-24 (quoting *Del-Rio*, 146 F.3d at 1362) (emphasis omitted). Were the rule otherwise, government agents could "physically occupy private property for public use, resist for months the owner's legal attempts to make them leave, and then, when finally made to leave, say they need not pay for their stay because they had no business being there in the first place." *Id.* at 1031.

Consistent with that precedent, this Court has repeatedly deemed government action authorized for purposes of takings liability where government agents acted within the general scope of their duties, regardless of whether their action complied with applicable legal requirements. In *Del-Rio*, for example, an agency's unlawful denial of a permit was authorized because "part of [the agents'] job" was to "interpret the statutes and regulations" governing permits, and in denying the permit, agents had applied the legal authorities as they understood them. *Del-Rio*, 146 F.3d at 1363. Likewise, in *Darby*, the Court held that an order of the Centers for Disease Control and Prevention halting residential evictions was authorized even if it exceeded the agency's statutory authority because it was issued within the scope of the agency's duties to prevent communicable diseases and did not contravene any "explicit prohibition or positively expressed congressional intent." 112 F.4th at 1027-29. Moreover, the Court observed, Congress itself had "extended" the order, which likewise suggested that any taking was "fairly chargeable to the government." *Id.* at 1029.

Here, too, the Complaint alleges conduct within the scope of Defendants' duties. Defendants undertook a range of conduct chargeable to the government, including by transmitting or receiving signals in or near Ligado's licensed spectrum, pressuring Ligado's business partners, instructing government agencies not to work with Ligado or share any information, publicly disparaging Ligado, and advocating for legislation. Appx41, Appx56-62, Appx70, Appx72, Appx75 (Compl. ¶¶ 47, 84, 87-95, 114, 119, 128). That conduct ostensibly served Defendants' statutory directives—to disseminate information, manage government contracts, protect GPS from harmful interference, and promote the secure and efficient use of spectrum. *See, e.g.*, 10 U.S.C. § 2281; 47 U.S.C. §§ 901(c), 902(b)(2)(H); Appx39-41, Appx43-46, Appx53, Appx57-58, Appx60-62 (Compl. ¶¶ 43-46, 52, 56, 76, 88, 93-95). And as in *Darby*, Congress itself stepped in, enacting the NDAA provisions to facilitate Defendants' objectives. *See* Appx57-64 (Compl. ¶¶ 87-100). Accordingly, the CFC correctly held that "[e]ach of the [government] actions" at issue "unquestionably falls within DOD's authority—to disseminate information, including to Congress; to withhold government contracts from Ligado's business partners pursuant to the NDAA; and to protect GPS under [Section] 2281." Appx11.

B. Defendants nonetheless contend that Ligado has failed to plead authorized government conduct, asserting that Ligado alleges that Defendants' actions constituted a taking "*because*" they were "inconsistent with the FCC's April 2020

Order and therefore unlawful." Br.45 (emphasis in original). But Defendants' focus on *lawfulness* cannot be reconciled with this Court's precedent. To be sure, an allegation that the government has appropriated property that the government itself granted to the plaintiff necessarily implies that the government's actions are inconsistent with its grant of property to the plaintiff. But as *Darby* makes clear, that does not suggest that the conduct is unauthorized for takings purposes. The determinative question is instead "whether the alleged invasion of property rights is chargeable to the government" or, in other words, "whether the government should be held liable for its agents' actions." 112 F.4th at 1024 (citation omitted); *see id.* at 1027 ("To summarize: even if an action by a government agent is unlawful, it will likely be deemed authorized for takings-claim purposes if it was done within the normal scope of the agent's duties.").

The dispositive point, therefore, is that Defendants' actions were within the scope of their statutory authority. Defendants have never suggested otherwise, or argued that their actions "contravened an explicit prohibition or other positively expressed congressional intent." *Id.* at 1027; *see id.* at 1028 ("The government, for its part, does not identify any relevant explicit prohibition or intent.").[5]

---

[5] In fact, Defendants' actions were authorized even under the dissent in *Darby*. Judge Dyk distinguished between government action that "exceeds the authority of the very statute which the government claims grants it authority" (unauthorized) and government action that "is illegal or wrongful based on violation of some other statute or regulation" (potentially authorized). *Darby*, 112 F.4th at 1045-46 (Dyk,

The cases on which Defendants rely do not suggest otherwise. They hold only that a plaintiff may not avoid an administrative review scheme by recharacterizing a challenge to agency action as a takings claim. *See, e.g.*, *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed. Cir. 2001) (plaintiff alleging that agency's permit denial exceeded its statutory authority and therefore constituted a taking must proceed through available administrative review proceeding); *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1369 (Fed. Cir. 2005). In other words, a plaintiff may not bypass the Communications Act's review scheme by arguing that the FCC revoked a license on improper grounds. But, as discussed above, that is not Ligado's claim, and Ligado lacks any avenue for relief under the Communications Act. *See* Part II, *supra*. Ligado argues that *other* agencies have obstructed Ligado's use of its FCC license—by taking actions within those agencies' statutory authority. And in any event, Defendants' premise—that the CFC held that Defendants' conduct was unlawful because it violated the FCC's 2020 Order—is plainly incorrect. The CFC did not so hold, Appx10-11—no doubt because the FCC did not purport to bind Defendants in the Order (nor could it have). *See* pp. 23-24, *supra*; *accord* Br. 43.

## CONCLUSION

For the foregoing reasons, the Court should affirm.

---

J., dissenting). Defendants do not argue that their conduct exceeded the authority of the statutes under which they acted.

DATED: September 29, 2025        MUNGER, TOLLES & OLSON LLP

By: /s/ *Donald B. Verrilli, Jr.*

Harris M. Fischman

Martin Flumenbaum

PAUL, WEISS, RIFKIND, WHARTON

& GARRISON LLP

1285 Avenue of the Americas

New York, NY 10019

Tel: (212) 373-3000

Email: hfischman@paulweiss.com

Donald B. Verrilli, Jr.

Ginger D. Anders

MUNGER, TOLLES & OLSON LLP

601 Massachusetts Ave. NW

  Suite 500E

Washington, DC 20001

Tel: (202) 220-1100

Email: donald.verrilli@mto.com

Philippe Z. Selendy

Yelena Konanova

David A. Coon

SELENDY GAY PLLC

1290 Avenue of the Americas

New York, NY 10104

Tel: (212) 390-9000

Email: pselendy@selendygay.com

Kevin F. King

COVINGTON & BURLING LLP

850 10th Street NW

Washington, DC 20001-4956

Tel:  (202) 662-6000

Email: kking@cov.com

*Counsel for Ligado Networks LLC*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 13,992 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

DATED: September 29, 2025          By: /s/ *Donald B. Verrilli, Jr.*
                                                              Donald B. Verrilli, Jr.

## **CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system on September 29, 2025.

I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED: September 29, 2025             By: _/s/ *Donald B. Verrilli, Jr.*_
                                                            Donald B. Verrilli, Jr.