No. 2025-1792

# IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LIGADO NETWORKS LLC,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

On Appeal from the United States Court of Federal Claims,
Case No. 23-1797, Senior Judge Edward J. Damich

## DEFENDANT-APPELLANT'S REPLY BRIEF

BRETT A. SHUMATE
*Assistant Attorney General*

PATRICA M. McCARTHY
*Director*

NATHANAEL B. YALE
BORISLAV KUSHNIR
*Attorneys, Commercial Litigation Branch*
*Civil Division, U.S. Department of Justice*
*P.O. Box 480, Ben Franklin Station*
*Washington, DC 20044*
*(202) 616-0464*

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

ARGUMENT .......................................................................................................... 3

I.    The Communications Act's Comprehensive Remedial Scheme Displaces
Tucker Act Jurisdiction Over Ligado's Takings Claim ................................ 3

II.    The Trial Court Erred in Holding That Ligado Possesses A Cognizable
Property Interest for Takings Purposes ........................................................ 7

    A. The Trial Court Erred in Concluding Ligado's License Is Cognizable
Property under The Fifth Amendment ..................................................... 7

        1.  The Trial Court's Property Interest Analysis Was Erroneous ......... 8

        2.  Ligado's Property Interest Arguments Are Unavailing ..................... 9

        3.  Ligado's Policy Arguments Do Not Change The Analysis ........... 21

    B. The Trial Court Erred in Its Consideration of The License's
Conditions ............................................................................................ 22

III.    The Trial Court Erred in Determining That Ligado Stated A Viable
Takings Claim because The Government Acted Unlawfully .................... 25

IV.    The Trial Court Erred in Determining That Ligado Could State A
Cognizable Physical Takings Claim ............................................................ 28

CONCLUSION .................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Alpine PCS, Inc. v. United States,*
   878 F.3d 1086 (Fed. Cir. 2018) ................................................................. 5, 7, 8

*Ariad Pharm., Inc. v. Eli Lilly & Co.,*
   598 F.3d 1336 (Fed. Cir. 2010) ...................................................................... 13

*AT&T Servs., Inc. v. FCC,*
   21 F.4th 841 (D.C. Cir. 2021) ......................................................................... 18

*Campbell v. United States,*
   932 F.3d 1331 (Fed. Cir. 2019) ...................................................................... 25

*Celgene Corp. v. Peter,*
   931 F.3d 1342 (Fed. Cir. 2019) ...................................................................... 15

*Conti v. United States,*
   291 F.3d 1334 (Fed. Cir. 2002) ................................................................*passim*

*Darby Development Company, Inc. v. United States,*
   112 F.4th 1017 (Fed. Cir. 2024) ...............................................................*passim*

*Del-Rio Drilling Programs, Inc. v. United States,*
   146 F.3d 1358 (Fed. Cir. 1998) ...................................................................... 27

*FCC v. Sanders Brothers Radio Station,*
   309 U.S. 470 (1940) ......................................................................................... 13

*Fishermen's Finest, Inc. v. United States,*
   59 F.4th 1269 (Fed. Cir. 2023) .................................................................*passim*

*Folden v. United States,*
   379 F.3d 1344 (Fed. Cir. 2004) ........................................................................ 5

*Hearts Bluff Game Ranch, Inc. v. United States,*
   669 F.3d 1326 (Fed. Cir. 2012) ...................................................................... 20

*In re Atlantic Business & Community Development Corp.*,
994 F.2d 1069 (3d Cir. 1993) ................................................................ 19, 20

*Ins. Co. of the West v. United States*,
243 F.3d 1367 (Fed. Cir. 2001) ....................................................................13

*International Paper Co. v. United States*,
282 U.S. 399 (1931) ..........................................................................*passim*

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ..................................................................................25

*Lion Raisins, Inc. v. United States*,
416 F.3d 1356 (Fed. Cir. 2005) ......................................................25, 27, 28

*Members of Peanut Quota Holders, Ass'n, Inc. v. United States*,
421 F.3d 1323 (Fed. Cir. 2005) .....................................................................9

*Mitchell Arms, Inc. v. United States*,
7 F.3d 212 (Fed. Cir. 1993) ................................................................. 20, 21

*Mobile Relay Assocs. v. FCC*,
457 F.3d 1 (D.C. Cir. 2006) ..............................................................*passim*

*Moody v. United States*,
931 F.3d 1136 (Fed. Cir. 2019) ............................................................ 25, 27

*P & R Temmer v. FCC*,
743 F.2d 918 (D.C. Cir. 1984) ....................................................................22

*Prometheus Radio Project v. FCC*,
373 F.3d 372 (3d Cir. 2004) ................................................................. 8, 20

*Rith Energy, Inc. v. United States*,
270 F.3d 1347 (Fed. Cir. 2001) ...................................................................25

*Sandwich Isles Communications, Inc. v. United States*,
992 F.3d 1355 (Fed. Cir. 2021) .........................................................*passim*

*Stone Container Corp. v. United States*,
229 F.3d 1345 (Fed. Cir. 2000) ...................................................................14

*Taylor v. United States,*
   959 F.3d 1081 (Fed. Cir. 2020) ........................................................24

*United Nuclear Corp. v. United States,*
   912 F.2d 1432 (Fed. Cir. 1990) ........................................................24

*United States v. Fuller,*
   409 U.S. 488 (1973) ................................................................. 14, 17

*United States v. General Motors Corp.,*
   323 U.S. 373 (1945) ........................................................................29


**Statutes**

35 U.S.C. § 261 ...................................................................................16

47 U.S.C. § 301 .............................................................................*passim*

47 U.S.C. § 303(y) ..............................................................................18

47 U.S.C. § 304 ...................................................................................11

47 U.S.C. § 310(d) ..............................................................................18

47 U.S.C. § 312 ...................................................................................11

47 U.S.C. § 316(a) ...............................................................................11

47 U.S.C. § 402(a) .................................................................................4


**Administrative Decisions**

*Matter of LightSquared Technical Working Group Report and LightSquared License Modification
   Application,*
   Order and Authorization, 35 FCC Rcd. 3772 (2020) .............................*passim*

# INTRODUCTION

The response brief of Ligado Networks LLC (Ligado) only confirms that the United States Court of Federal Claims (trial court) committed several reversible errors in denying-in-part the Government's motion to dismiss Ligado's takings claims. First, the trial court incorrectly held that it possesses jurisdiction to entertain the claims. As this Court has held on multiple occasions, by enacting the Communications Act, Congress established a comprehensive remedial scheme that displaces the trial court's Tucker Act jurisdiction, including for takings claims that arise out of licensing decisions of the Federal Communications Commission (FCC). Ligado's complaint directly implicates an FCC licensing decision, the April 2020 Order,[1] including the FCC's statutory authority to impose terms and conditions on Ligado's modified license, which is exactly the kind of action that Congress has channeled through the statute's comprehensive scheme. The trial court therefore erred in failing to find that the Communications Act displaced the trial court's Tucker Act jurisdiction over Ligado's takings claims.

Second, the trial court erred in holding that Ligado's FCC license is a cognizable property interest for takings purposes. Given the limiting language of the Communications Act, no court (other than the trial court for the very first time in this case) has held that an FCC license is property for takings purposes. In fact, the

---

[1] *In the Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, Order and Authorization, 35 FCC Rcd. 3772 (2020).

United States Court of Appeals for the District of Columbia Circuit has held that

FCC licenses are not property under the Takings Clause. *Mobile Relay Assocs. v. FCC*,

457 F.3d 1, 11-12 (D.C. Cir. 2006). In reaching a contrary conclusion, the trial court

did not engage in the sort of analysis this Court routinely requires for determining

whether a Federal license can constitute property for takings purposes. Instead, the

trial court relied on a series of inapposite determinations to support its property

interest holding. As set forth below and contrary to Ligado's assertions, the correct

property interest analysis leads to one clear conclusion—Ligado's license is not a

cognizable property interest for Fifth Amendment takings purposes.

Third, the trial court's decision is premised on the erroneous notion that a

plaintiff can state a viable takings claim *because* the Government acted unlawfully, a

determination that conflicts with a long line of decisions from this Court. Ligado

mostly argues that the Governmental action supporting its takings claims falls within

the authority framework articulated by this Court in *Darby Development Company, Inc. v.

United States*, 112 F.4th 1017 (Fed. Cir. 2024). But Ligado's claims and the trial court's

decision push far beyond *Darby*, which simply does not hold that a cognizable takings

claim exists because the Government allegedly engaged in unlawful conduct.

Finally, the trial court erred when it held that an FCC license can be the subject

of a physical takings claim. Even assuming that Ligado has attempted to allege a

cognizable property interest, Congress nonetheless has made clear that no person can

have a property interest in the spectrum itself.  As a result, any purported property interest that Ligado possesses is necessarily confined to its FCC license, which is an intangible asset that may properly trigger only a regulatory takings analysis.

The trial court's judgment should be reversed.

## ARGUMENT

### I.    The Communications Act's Comprehensive Remedial Scheme Displaces Tucker Act Jurisdiction Over Ligado's Takings Claim

In our opening brief, we established that the Communications Act provides the exclusive remedial scheme whenever (1) a claim challenges the terms of a final FCC order, or (2) the FCC can provide "adequate relief" to the plaintiff.  Applnt. Br. 26-30. Ligado does not dispute that the statement above accurately summarizes the Court's prior holdings in cases implicating the Communications Act.  *See* Resp. Br. 20-26. Instead, it argues only that it does not challenge the terms of the April 2020 Order, and that the FCC is incapable of remedying its takings claims in any event.  *See id.*  As explained below, both arguments lack merit.

With respect to the nature of its takings claim, Ligado emphasizes how careful it was not to directly attack the April 2020 Order in its complaint.  Resp. Br. 22-23. As explained in our opening brief, however, Ligado's artful pleading is unavailing because the complaint necessarily mounts an *indirect* challenge to the April 2020 Order.  Ligado has recognized that the FCC "expected" Ligado to work with affected

3

Executive Branch agencies to resolve all ongoing disputes before network operations could commence. Appx50 (Compl. ¶ 68). Ligado has further recognized that the FCC "directed [it] to deploy a program . . . that would facilitate the information sharing and coordination called for by the [April 2020 Order]." Appx51 (Compl. ¶ 69). These allegations demonstrate that Ligado never had sole control over the conditions precedent imposed by the April 2020 Order; the discretionary cooperation of several Executive Branch agencies, including the Department of Defense (DoD) and the National Telecommunications and Information Administration (NTIA), has always been required. To deploy network operations without further input from DoD or NTIA, Ligado would have to petition the FCC to set aside or suspend the conditions within the April 2020 Order. *See* 47 U.S.C. § 402(a). Ligado's assertion that DoD and NTIA may not impede its license, therefore, necessarily targets its continued obligation to coordinate with these agencies, a precondition set by the FCC in the license.

Importantly, this Court has made clear that Ligado cannot artfully plead its way out of the Communications Act's exclusive remedial scheme. In *Sandwich Isles Communications, Inc. v. United States*, 992 F.3d 1355 (Fed. Cir. 2021), the plaintiff similarly tried to avoid dismissal by claiming that it brought a takings claim for monetary relief, rather than a challenge to the validity of an FCC order. *Id.* at 1360. The Court, however, explained that "[i]n analyzing whether subsection 402(a) [of the

Communications Act] applies, [it] 'must look to the true nature of the plaintiff's claim, not how plaintiff characterizes it.'" *Id.* at 1364 (quoting *Folden v. United States*, 379 F.3d 1344, 1359 n.13 (Fed. Cir. 2004)) (original modifications omitted).  And because the "true nature" of the claim in *Sandwich Isles* was a "disagreement with FCC decisions," the Court held that "the statutory scheme set forth in the Communications Act displaces the Claims Court's Tucker Act jurisdiction." *Id.*

Likewise here, the "true nature" of Ligado's takings claim is a disagreement with its continuing obligation to coordinate with Executive Branch agencies before network operations can commence.  Because the FCC imposed these continuing obligations as part of the April 2020 Order, Ligado must bring its challenge under the Communication Act's comprehensive remedial scheme.

With respect to the FCC's ability to provide adequate relief, Ligado argues that no such relief is available because the FCC cannot compel the coordination required by the April 2020 Order.  Resp. Br. 23-24.  But adequate relief is not limited to the specific relief a plaintiff may seek in litigation.  In *Alpine PCS, Inc. v. United States*, 878 F.3d 1086 (Fed. Cir. 2018), for example, the Court held that the FCC could provide several different forms of "adequate relief"—including "by eliminating the taking, providing compensation, or some combination"—even though the plaintiff in that case sought only a monetary remedy.  *Id.* at 1096.  The Court then reiterated this principle in *Sandwich Isles*, explaining that a claim must be pursued under the

Communications Act whenever "the FCC is in the position to prevent an alleged taking in the course of its own proceedings," regardless of the remedy sought in litigation. 992 F.3d at 1365 n.4; *see also id.* at 1365 (holding that an FCC waiver is a form of "adequate relief" in a takings case). Here, Ligado does not dispute that the FCC can negotiate with DoD and NTIA to achieve an amicable resolution to Ligado's allegations. Resp. Br. 23-24. Such a process, in turn, could effectively prevent the taking Ligado alleges, thus offering the very "adequate relief" contemplated by this Court's precedents.

Ligado also brushes aside the notion that the FCC could prevent the alleged taking by setting aside or suspending the conditions precedent within the April 2020 Order, asserting that the FCC is unlikely to do so because the Government "no doubt would oppose any loosened restrictions." Resp. Br. 24. Ligado's objection is based on little more than unsupported supposition, as it cannot forecast how the FCC will approach an administrative claim that could be appealed under section 402(a) of the Communications Act. Indeed, any attempt to foretell what the FCC might do is particularly misguided here, as the FCC has already demonstrated a willingness to not blindly accept warnings from Executive Branch agencies when it agreed to modify Ligado's spectrum license in April 2020. *See* Applnt. Br. 9-10.

Ligado cannot credibly claim that FCC action to set aside or suspend the conditions precedent within the April 2020 Order would somehow fail to remedy the

taking it alleges. As a result, instead of doing so, Ligado relies on baseless assumptions to argue that the FCC is *unlikely* to provide the desired relief. But likelihood of success is not the test for determining whether the Communications Act's remedial scheme displaces Tucker Act jurisdiction. So long as "the FCC is in the position to prevent an alleged taking in the course of its own proceedings," the Communications Act provides the exclusive jurisdictional avenue for adjudicating the claim. *Sandwich Isles*, 992 F.3d at 1365 n.4; *see Alpine*, 878 F.3d at 1096. The FCC is indisputably "in the position to prevent an alleged taking" here by setting aside or suspending the conditions precedent that continue to prevent Ligado from commencing network operations. By stubbornly refusing to petition the FCC, Ligado has effectively blocked its only path for obtaining adequate relief.

## II.    The Trial Court Erred in Holding That Ligado Possesses A Cognizable Property Interest for Takings Purposes

As we established, the trial court further erred in holding that Ligado's complaint alleged a cognizable property interest in its spectrum license for purposes of stating a takings claim, and by rejecting the significance of the license's conditions for the property interest inquiry. Applnt. Br. 33-43.

### A.    The Trial Court Erred in Concluding Ligado's License Is Cognizable Property under The Fifth Amendment

The statutory language of the Communications Act, the traditional hallmarks of property, the highly regulated nature of the telecommunications industry, and relevant

precedent all lead to one firm conclusion—Ligado's spectrum license is not a cognizable property interest for takings purposes. Applnt. Br. 33-41. Indeed, the Communications Act has been on the books for nearly a century, yet Ligado has not identified a single case, from any court, holding that a spectrum license is cognizable property for takings purposes. And the court tasked with hearing many significant FCC licensing matters—the United States Court of Appeals for the D.C. Circuit—has expressly held that FCC licenses are *not* property under the Takings Clause. *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11-12 (D.C. Cir. 2006); *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004) (holding FCC license not cognizable property for takings purposes).

### 1.    The Trial Court's Property Interest Analysis Was Erroneous

The trial court's contrary ruling was misguided. The trial court failed to conduct a structured property interest analysis of the kind required by this Court in various cases involving Federal licenses. *See Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1275-79 (Fed. Cir. 2023); *Conti v. United States*, 291 F.3d 1334, 1340-42 (Fed. Cir. 2002). Instead, in determining that Ligado had alleged a cognizable property interest, the trial court relied heavily on the fact that this Court correctly did not reach the patently non-jurisdictional property interest question in *Alpine* and *Sandwich Isles*, as well as the trial court's determination that Ligado purportedly lacked an "adequate remedy" at the FCC. Appx8-10. As we demonstrated, Applnt. Br. 38-

8

40, the trial court erred in even making these conclusions. The takings claims in *Alpine* and *Sandwich Isles* were both dismissed on threshold jurisdictional grounds that foreclosed any need to reach the issue of whether an FCC license constitutes a cognizable property interest. And the trial court's novel "adequate remedy" standard is simply not germane to the property interest analysis.

Unsurprisingly, Ligado almost entirely sidesteps the trial court's actual rationale for finding a cognizable property interest. *See* Resp. Br. 28-42. Implicitly acknowledging the trial court's errors, Ligado does not rely on either *Alpine* or *Sandwich Isles* to support its property interest argument, nor does it even address the trial court's "adequate remedy" inquiry as part of the property interest analysis. Instead, Ligado sets forth a series of other incorrect arguments as to why its license constitutes property for takings purposes.

## 2.     Ligado's Property Interest Arguments Are Unavailing

To begin, Ligado appears to suggest that this Court has adopted a bright line rule that *all* Federal licenses are property for takings purposes absent express statutory language disclaiming the creation of a property interest so long as the licenses have certain indicia of property. *See* Resp. Br. 28-29. Ligado relies on *Members of Peanut Quota Holders, Ass'n, Inc. v. United States*, 421 F.3d 1323 (Fed. Cir. 2005), to support this bright line rule. But this Court's precedents have not limited the property interest inquiry in the way Ligado claims. Instead, this Court has engaged in a comprehensive

review of the applicable statutory scheme, weighing numerous factors that could impact the question whether Congress provided a licensee with private property protection. *See Fishermen's Finest*, 59 F.4th at 1275-79. As set forth more fully below, Ligado is particularly incorrect in its assertion that courts may not examine whether the license can be revoked or modified. *See Fishermen's Finest*, 59 F.4th at 1275-1277; *Conti*, 291 F.3d at 1340-42.

In any event, Ligado does not disagree that determining the existence of a property interest requires the Court to, first and foremost, examine the text of the Communications Act. *See* Resp. Br. 28-34. As we established, the restrictive language of the Communications Act demonstrates that Congress did not intend for the FCC to grant a license holder a Fifth Amendment property interest when it issues a spectrum license. Applnt. Br. 34-36. To the contrary, the Communications Act indicates that spectrum is not a private asset, and that any temporary spectrum use by a private party allowed by the Federal Government must flow from authority arising from the Act's provisions, including any limitations, constraints, and conditions that may be imposed by the Federal Government. Indeed, the Communications Act explicitly provides that licenses are only issued for "limited periods of time," a licensee can have no "ownership" of the spectrum, and a licensee must "waiv[e] any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same,

10

whether by license or otherwise." 47 U.S.C. §§ 301, 304. The Act also explicitly provides that licenses may only be issued subject to the dictate that the "United States" "maintain[s] control over all the channels of radio transmission." *Id.* § 301. And Congress expressly granted the FCC authority to modify the terms of a spectrum license "if in the judgment of the [FCC] such action will promote the public interest, convenience and necessity." *Id.* at § 316(a)(1); *see also id.* at § 312 (identifying circumstances in which FCC can revoke the license entirely).

Contrary to the clear import of this statutory language, Ligado counters that it possesses a cognizable property interest because the Communications Act states that a license provides for the use of spectrum and that "no license is to be 'construed to create any right, *beyond* the terms, conditions, and period of the license.'" Resp. Br. 34 (quoting 47 U.S.C. § 301). But this language expressly *limiting* a spectrum license cannot be reasonably construed as expressing clear congressional intent to affirmatively grant Ligado a private property interest for takings purposes simply via the license itself. Unsurprisingly, when faced with interpreting the language of the Communications Act, including section 301, and its relationship to the existence of a cognizable property interest for takings purposes, the D.C. Circuit in *Mobile Relay* flatly rejected Ligado's position. *Mobile Relay*, 457 F.3d at 11-12.

Ligado reads *Mobile Relay* as holding only that the property interest in a license does not extend beyond the license's terms and conditions, and Ligado contends that

11

it is asserting a right within the terms and conditions of the license.  Resp. Br. 39.

This interpretation, however, cannot be squared with the D.C. Circuit's actual

analysis.  The court explained that the interests at issue were the "800 MHz SMR

spectrum licenses" held by the licensees that entitled them to make certain uses of the

spectrum assignments prior to the FCC's reallocation of that spectrum.  457 F.3d at

11-12.  The claims were predicated on the contention that after the reallocation, the

"value of their spectrum assignments," *i.e.*, the value of their licenses, was purportedly

reduced.  *Id.*  The court made clear that the limited use right licensees enjoyed

"confer[s] the right to use the spectrum for a duration expressly limited by statute

subject to the [FCC's] considerable regulatory power and authority," and "[t]his right

does not constitute a property interest protected by the Fifth Amendment."  457 F.3d

at 12.  Accordingly, Ligado's purported distinction—to be asserting a use right within

the terms and conditions of the license—is not a plausible basis to distinguish *Mobile

Relay*'s property interest holding.  Simply put, the D.C. Circuit expressly held that a

licensed use under section 301 "does not constitute a property interest protected by

the Fifth Amendment" given the statutory and regulatory framework.  *Id.*  The trial

court erred by concluding otherwise here.

Ligado also contends that the D.C. Circuit in *Mobile Relay* was merely applying

principles arising from decisions of the Supreme Court and this Court that where a

property interest is revocable or capable of modification, a property holder may

12

"assert those rights against government conduct" *other than* revocation or modification, but not against the act of revocation or modification itself.  Resp. Br. 35-39.  Ligado's argument thus suggests that the Government's ability to statutorily revoke or modify a license is immaterial to the question whether a property interest exists for takings purposes in the first instance in the absence of revocation or modification.

Ligado is mistaken.  In *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470 (1940), the Supreme Court specifically relied not on actual revocation or modification, but on the fact that FCC licenses "may be revoked" to explain that they are not cognizable property interests.  *Id.* at 475 ("The policy of the [Communications] Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license.").  Ligado contends that the statements in *Sanders Brothers* were dicta and notes that it was not a takings case, Resp. Br. 39-40, but the Supreme Court relied on the language of the statute and was unequivocal and explicit in its explanation that FCC licenses do not confer property rights.  *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1347 (Fed. Cir. 2010) (en banc) ("As a subordinate federal court, we may not so easily dismiss [the Supreme Court's] statements as dicta but are bound to follow them.").  This Court's obligation to follow the Supreme Court's interpretation of law applies even when the statement is dicta.  *Ins. Co. of the West v. United States,* 243 F.3d 1367, 1372 (Fed. Cir. 2001); *Stone Container Corp. v. United*

13

*States*, 229 F.3d 1345, 1350 (Fed. Cir. 2000) (declining to disregard the Supreme Court's "explicit and carefully considered" statement).

Other cases beyond *Sanders Brothers* support the same conclusion. In *United States v. Fuller*, 409 U.S. 488 (1973), for example, the Supreme Court relied heavily on the fact that grazing permits were "revocable" in holding that they were not a cognizable property interest for takings purposes. *See Conti*, 291 F.3d at 1340-42 (analyzing *Fuller* and explaining that "the Supreme Court focused on the revocability of the permits" along with other restrictive statutory language). This was the case even though the Governmental action at issue in *Fuller* was *not* the agency's use of its statutory revocation power with respect to the licenses. Similarly, this Court has relied heavily on revocability when determining that certain Federal fishing licenses were not cognizable property. *See Conti*, 291 F.3d at 1340-42. Indeed, revocability was central to the property interest inquiry irrespective of whether the Governmental action was predicated on revocation authority. *See id.* at 1340 (noting plaintiff's contention that he was still in possession of his permit and analyzing the import of revocability).[2] Fundamentally, the relevance of revocability to the property interest inquiry makes

---

[2] Although this Court treated the question of revocability in *Peanut Quota Holders* as bearing on whether there was a taking rather than whether there was a property interest, this Court has otherwise made clear that the question of revocability falls within the property interest inquiry under the first step of the takings analysis. *See Fishermen's Finest*, 59 F.4th at 1275-1277; *Conti*, 291 F.3d at 1341-42.

perfect sense given that if the Government can revoke or modify a license, the license holder can have no guarantee that its rights will continue in perpetuity. *See also Fishermen's Finest*, 59 F.4th at 1271 (distinguishing between "revocable privileges" and "compensable property interests").

To support its erroneous argument concerning the Court's consideration of revocability and modification to the property interest inquiry, Ligado heavily relies on two cases, *Celgene Corp. v. Peter*, 931 F.3d 1342 (Fed. Cir. 2019), and *International Paper Co. v. United States*, 282 U.S. 399 (1931). Neither advances its argument. In *Celgene*, this Court held that retroactive application of the *inter partes* review process to certain patents did not constitute an unconstitutional taking. 931 F.3d at 1362-63. *Celgene* does not help Ligado because whether a patent constitutes a cognizable property interest in the first instance, and the proper framework for analyzing that question, were not at issue. Instead, at step one of the two-part takings inquiry, the Government did not contest that a patent is a Fifth Amendment property interest. *Id.* at 1358 ("The [agency] does not dispute that a valid patent is private property for the

purposes of the Takings Clause."). This Court certainly did not hold in *Celgene* that revocability of a license is irrelevant to the property interest inquiry.[3]

*International Paper* is even farther afield. In that case, the plaintiff paper company and a power company at Niagara Falls held water rights under New York State law. Pursuant to a statute issued during World War I, the exercise of the water rights also required a license from the Secretary of War. The Secretary of War subsequently requisitioned all the power company's hydroelectric power, for which the Government promised to pay "fair and just compensation." 282 U.S. at 405. In response to the Government's direction to "cut off the water being taken" by International Paper to increase power production, the power company stopped its diversion of certain water to International Paper, which was consequently unable to operate its mill for several months. *Id.* at 405-406. Relying heavily on the fact that the Secretary of War had "promised to pay for all the power that the canal could generate," which necessitated the appropriation of plaintiff's water rights, the Court found an unconstitutional taking. *Id.* at 407.

---

[3] More broadly, Ligado's heavy reliance on patents throughout its brief is misplaced. Patents hold a unique place in the constitutional structure, have a significant history of Supreme Court law addressing their status as property, and implicate a distinct statutory scheme in which Congress has now expressly dictated that "patents shall have the attributes of personal property," 35 U.S.C. § 261. None of those circumstances exist here.

16

Ligado points out that the Court in *International Paper* disagreed that the fact that revocability of the license to divert water was sufficient alone to support a finding that no taking occurred. Resp. Br. 37. Ligado suggests that the "necessary premise" of the Court's holding is therefore "that the plaintiff held a property right in its water rights despite their contractual revocability, and the plaintiff could assert that right as against appropriation by means other than the governments' preexisting revocation right." Resp. Br. 37-38 (emphasis omitted). Ligado vastly overreads *International Paper*, which did not analyze whether a Federal license constitutes a cognizable property interest for takings purposes. Indeed, there is no discussion as to whether the statutory license issued by the Department of War constituted a cognizable property interest in and of itself. And as Ligado itself recognizes, Resp. Br. 37, the Court never expressly adopted a rule that would preclude consideration of revocability in determining whether a property interest exists in the absence of the Governmental action at issue being revocation or modification. Whether "contractual revocability" was a complete defense in one particular water rights case certainly does not generate the leap necessary to preclude revocability to be considered when weighing whether a spectrum license constitutes cognizable property. Simply put, *International Paper* does not hold that although a license is revocable, the license is still constitutionally protected property against Governmental actions that are not revocation. Ligado cannot overcome the more apt precedent from the Supreme Court in *Fuller*, which

17

specifically considered and credited revocability as a key characteristic in finding no cognizable property interest with respect to a Federal license. Accordingly, contrary to Ligado's argument, the uncontested fact that Ligado's license can be modified and revoked under the applicable statutory scheme weighs heavily in favor of the finding of no cognizable property interest.

Ligado next argues that the traditional hallmarks of property law conclusively establish that its spectrum license constitutes a property right for takings purposes. Resp. Br. 30-33. Ligado is incorrect. To start, Ligado lacks authority under the statutory scheme to freely sell, assign, or transfer its license. *See Conti*, 291 F.3d at 1341-42. As the Communications Act establishes, spectrum licensees may only transfer their licenses "upon application to the [FCC] and upon finding by the [FCC] that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d). In other words, the ability to sell, assign, or transfer a spectrum license is always expressly contingent on the Government's approval. Ligado argues that the lack of an ability to sell or transfer without governmental approval does not necessarily preclude the finding of a cognizable property interest. *See* Resp. Br. 31. Although we agree, the fact that Ligado's ability to sell or transfer the license is heavily restricted does not weigh in favor of the existence of a property interest here.

Ligado also asserts that its license is exclusive, yet it overlooks that the FCC has authority to license another private entity to use what Ligado considers to be "its"

18

spectrum, subject to other considerations within the FCC's purview such as the harmful interference among users. *See* 47 U.S.C. § 303(y); *AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 843 (D.C. Cir. 2021) (rejecting challenge to FCC decision to allow unlicensed users to operate within spectrum bands in which incumbents operate). Indeed, it is commonplace for spectrum bands to have multiple users, including assignments to Federal users issued by NTIA.[4] Any exclusivity is also statutorily tempered by the terms and conditions of the license, including the explicit, necessary cooperation with Government and other private authorities. And in any event, Ligado can cite no decision holding that exclusivity of an FCC license is sufficient to establish a cognizable property interest.

In addressing the traditional indicia of property, Ligado relies heavily on the Third Circuit's decision in *In re Atlantic Business & Community Development Corp.*, 994 F.2d 1069 (3d Cir. 1993), in which the court found that an FCC broadcast license constituted "property" under the Internal Revenue Code (IRC) for purposes of determining whether a tax lien attaches when a license is sold in bankruptcy. Ligado's reliance on *In re Atlantic Business & Community* is misplaced. Resp. Br. 32-33. The decision is factually distinguishable because the lien was being applied to the proceeds

---

[4] This further demonstrates that spectrum management is a highly technical area that should remain the purview of the FCC under the Communications Act's comprehensive scheme, *see* Section I, *infra*.

19

of the sale, and not to the license itself.  Regardless, whether Congress broadly

defined property in the IRC for tax lien purposes does not resolve the question

whether an FCC license constitutes property for *takings* purposes.  As we previously

showed, Applnt. Br. 40, this Court has already rejected a similar argument—that the

treatment of licenses under the IRC indicated that the licenses were property for

takings purposes.  *See Fishermen's Finest*, 59 F.4th at 1278.  This Court instead held that

the IRS can tax both Government-issued privileges and protected property under the

IRC, but that such taxation does not transform Government privileges into

compensable property rights.  *Id.*  In any event, when addressing the salient

question—whether an FCC license is cognizable property for Fifth Amendment

*takings* purposes—the Third Circuit has already held that it is not.  *Prometheus Radio*

*Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004).  Accordingly, *In re Atlantic Business &*

*Community* should carry no weight in this takings case.

    We further established, Applnt. Br. 37, that the fact that the Government sets

the terms of FCC licenses, decides if and when to allocate and modify spectrum

assignments, and maintains oversight responsibilities over its licensees, also weighs

strongly against the existence of a property interest.  This is so because "[w]here a

citizen voluntarily enters into an area which from the start is subject to pervasive

Governmental control, a property interest is likely lacking."  *Hearts Bluff Game Ranch,*

*Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012) (citing *Mitchell Arms, Inc. v.*

*United States*, 7 F.3d 212, 216 (Fed. Cir. 1993)). Ligado responds that this Court has not created a "bright-line rule" based on pervasive Governmental control. Resp. Br. 40. We agree and acknowledged this in our opening brief. Applnt. Br. 37. But this Court has still recognized pervasive governmental control as a significant consideration in determining whether a cognizable property interest exists, and the telecommunications industry is clearly highly regulated in light of the extensive statutory and regulatory scheme. Ligado suggests that the principle is inapplicable here because Ligado has already received an FCC license and therefore "has already received entry into the relevant program." Resp. Br. 41 (emphasis omitted). But that observation does not differentiate this case from cases like *Mitchell Arms*, where the plaintiff had already received entry into the Federal firearms import program, but then had its import permits subsequently revoked. *See* 7 F.3d at 214-16.

### 3.    Ligado's Policy Arguments Do Not Change The Analysis

Finally, Ligado cautions in passing that "[i]f the license did not confer enforceable property rights, it is inconceivable that private parties would invest the billions of dollars necessary to develop the ability to provide terrestrial 5G services." Resp. Br. 42. To bolster this point, Ligado and USTelecom as amicus also point out that private parties routinely bid billions of dollars for licenses to use spectrum. *Id.*; USTelecom Amicus Br., ECF No. 24 at 5-6. These claims ring hollow as, once again, no Court has ever held an FCC license to be cognizable property for takings purposes

21

and despite this, spectrum auctions have brought in billions of dollars from private parties nonetheless. And of course, the lack of a cognizable property interest for takings purposes says nothing about all other potential remedies that an aggrieved licensee may have available including, as discussed above, through the FCC administrative process.

In addition, if the Court were to hold that FCC licenses were cognizable Fifth Amendment property interests, there would be striking implications for the Federal Government's management of spectrum. As stated above, there are many spectrum bands in which both private and Government users operate simultaneously. A determination that an FCC license is a cognizable property interest for takings purposes would almost certainly have the unintentional effect of transforming many regulatory disputes among private and Government users into constitutional takings claims in the Court of Federal Claims. Such pervasive litigation, by a court that lacks expertise in the unique world of spectrum licensing, could upend an industry that has operated as Congress intended for over a century.

## B. The Trial Court Erred in Its Consideration of The License's Conditions

In addition, the trial court erred in ignoring that Ligado's failure to satisfy the conditions of the license precluded the existence of a cognizable property interest. Applnt. Br. 41-43. The Communications Act mandates that a spectrum license-holder

must comply with the "terms" and "conditions" of a license. 47 U.S.C. § 301; *see P & R Temmer v. FCC,* 743 F.2d 918, 927 (D.C. Cir. 1984) ("A licensee may not accept only the benefits of the license while rejecting the corresponding obligations."). The FCC did not grant Ligado an unfettered right to immediately use its modified license. *See* April 2020 Order, 35 FCC Rcd. at 3835-41. Instead, to address concerns about GPS interference, including interference harmful to national security and other public interests, the FCC attached conditions that Ligado must satisfy before it can use its modified license for terrestrial purposes, conditions that Ligado itself proposed and that directly limited any purported property arising from the order. *Id.* Once again, Ligado has not alleged that it has satisfied those conditions in its filings with the FCC or in its briefs to the trial court or this Court.

Ligado calls our argument "astonishing" and suggests that it is irrelevant whether Ligado needs to fulfill certain conditions prior to using its spectrum. Resp. Br. 42-43. According to Ligado, we are "wrong to suggest that Ligado's property interest is contingent on compliance with the license's conditions." *Id.* at 43. It adds that the fact that it "may not use its ATC authority by operating in the spectrum until it fulfills the conditions" is "irrelevant to the existence of Ligado's property interest." Resp. Br. 43. But it is Ligado that is wrong, as the plain language of the Communications Act makes clear. Even if the Court were to determine that an FCC license is a cognizable property interest (which it should not), such an interest could

23

only be the ability to "use" the licensed spectrum in accordance with the "terms, conditions, and periods of the license." 47 U.S.C. § 301. Any use of the spectrum beyond the conditions of the license cannot fall within the purported property interest. In other words, if conditions prevent Ligado from using the spectrum then that is the extent of what it has obtained through its license.

*United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990), Resp. Br. 44-45, does not hold otherwise. There, this Court found a taking of certain uranium mining leases where the Government had denied approval of mining after having specifically promised its approval. 912 F.2d at 1433-36; *see Taylor v. United States*, 959 F.3d 1081, 1089 (Fed. Cir. 2020). Even though the leaseholder met all the regulatory requirements, the Department of the Interior insisted that approval of a Tribe be obtained based on the doctrine of Indian self-determination, which was not a regulatory requirement for mining approval. As an initial matter, *United Nuclear* contains scant analysis of the plaintiff's property interest, much less announces any wide-ranging property interest rule as Ligado suggests, Resp. Br. 43-44. Moreover, that case bears no factual resemblance to this one. There, the plaintiff was contesting Governmental conditions that were not part of its lease; here, Ligado seeks to avoid the very conditions that it proposed to be part of its license and that govern the terms of its license through the very statute that must indisputably create any property interest. Once again, if Ligado wishes to remove or modify the conditions it

proposed, it can seek to do so in accordance with the framework of the Communications Act. But it has no cognizable property interest broader than the terms and conditions imposed through its license.

Ligado asserts that there is a "deep injustice inherent in Defendants' [sic] conditions-precedent argument," but that fails on two fronts. Resp. Br. 44. First, considerations of fairness are irrelevant to the inquiry as to whether there is even a threshold cognizable property interest, as this Court has recognized. *See Fisherman's Finest*, 59 F.4th at 1278 n.6. Second, there is no fundamental unfairness here. Ligado voluntarily agreed to the conditions of the FCC Order and indeed proposed the relevant ones. The fact that it cannot meet the conditions is nothing more than a product of the highly restricted interest it obtained from the Government.

## III.    The Trial Court Erred in Determining That Ligado Stated A Viable Takings Claim because The Government Acted Unlawfully

In addition, as we established, the trial court erred in its determination that Ligado's takings claims were viable where Ligado is alleging that a taking exists *because* the Government acted unlawfully. Applnt. Br. 44-47. As we showed, this Court has consistently recognized that a takings clam is not viable in this scenario. Applnt. Br. 44-46; *see Moody v. United States*, 931 F.3d 1136, 1142-43 (Fed. Cir. 2019); *Campbell v. United States*, 932 F.3d 1331, 1340-41 (Fed. Cir. 2019); *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1369-70 (Fed. Cir. 2005); *Rith Energy, Inc. v. United States*, 270 F.3d

25

1347, 1352 (Fed. Cir. 2001) (on petition for reconsideration) ("Rith's complaints about the wrongfulness of the permit denial are therefore not properly presented in the context of its takings claim."); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) (explaining that the Takings Clause requires just compensation "'in the event of *otherwise proper interference* amounting to a taking'" (citation omitted)).

There can be little dispute that the gravamen of Ligado's takings claims centers on the allegation that the Government has engaged in a pretextual and "unlawful scheme" to prevent Ligado from using its FCC-licensed spectrum for terrestrial services. Appx22 (Compl. ¶ 1). Ligado alleges that DoD has unlawfully used Ligado's exclusively licensed spectrum in a manner that interferes with Ligado's use under its license; that to "conceal" such unlawful use, DoD and Commerce have "adopted a strategy of deceit and misinformation," advancing pretextual claims of harmful interference with GPS; and that DoD officials have provided false or misleading testimony to Congress in an effort to "continue to use Ligado's exclusively licensed spectrum without compensation." Appx22-26 (Compl. ¶¶ 1-7); Appx38-43 (Compl. ¶¶ 41-50); Appx53-59 (Compl. ¶¶ 76-90). In other words, Ligado's takings claims are directly dependent on the Government's actions being unlawful, and Ligado does little to dispute this characterization.

Ligado's heavy reliance on *Darby Development Co., Inc. v. United States*, 112 F.4th 1017 (Fed. Cir. 2024), Resp. Br. 55-57, is misplaced. In *Darby*, this Court explained

that Executive Branch action may be deemed "authorized" for takings purposes even if "unlawful," "if it was done within the normal scope of the agent's duties." *See id.* at 1027. The Court held that, if restrictions imposed by the Executive Branch interfere with established property rights in a way that would *otherwise* constitute a taking, the Government cannot escape takings liability by showing that the Executive Branch restrictions were not authorized by statute. *See* 112 F.4th at 1033 ("Having concluded that there is no 'lack of authorization' impediment to Appellants' takings claim, we turn now to whether their complaint stated a claim for a physical taking by the government."). *Darby* therefore held that the plaintiffs there might be able to demonstrate a compensable taking *even though* the relevant Executive Branch conduct was inconsistent with the governing statute. But neither *Darby* nor this Court's other precedent supports the trial court's conclusion here that the Government's conduct may effect a taking *because* it was unlawful, and, in fact, this Court's other precedent directly conflicts with such a conclusion. *See Lion Raisins*, 416 F.3d at 1369-70; *Moody*, 931 F.3d at 1142-43.

Ligado asserts that we have not argued that the Government's actions were unauthorized. Resp. Br. 58. But the burden to plead a cognizable takings claim including the authority element is on Ligado, and it is not on the Government to disprove it. *See Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998). And it is difficult to square how Ligado's allegations concerning a

27

pretextual scheme to mask illegality involving claims of lying to Congress and threatening private companies could fall within *Darby*'s framework for authorized Governmental action.  *See Darby*, 112 F.4th at 1027 (explaining that an action is authorized for takings purposes if "it was done 'pursuant to the good faith implementation of a congressional act.'" (quoting *Del-Rio*, 146 F.3d at 1362)).  In any event, as previously stated, *Darby* does not extend as far as Ligado posits.  Irrespective of whether the unlawfulness of particular Government conduct precludes takings liability for what would otherwise be a taking, that purported illegality itself cannot provide the basis for a viable takings claim under this Court's other longstanding precedent.  *See Lion Raisins*, 416 F.3d at 1369-70.

## IV.   The Trial Court Erred in Determining That Ligado Could State A Cognizable Physical Takings Claim

We also established in our opening brief that the trial court erred in holding that Ligado could state a viable claim for a physical taking.  Applnt. Br. 47-50.  This is so, we explained, because a spectrum license—like other intangible property interests—does not give rise to a physical taking.  *Id.*

Ligado primarily responds by arguing that spectrum is a physical phenomenon.  Resp. Br. 47-50; *see also* Roberson Amicus Br. (similar).  This argument is beside the point.  The Communications Act makes clear that Ligado has no ownership rights in spectrum itself.  47 U.S.C. § 301; *see* Resp. Br. 30 (correctly recognizing that "Ligado's

FCC license does not grant it ownership of the spectrum itself, which remains a public asset"); *see also* 47 U.S.C. § 301 (providing that licenses may only be issued subject to the provision that the "United States" "maintain[s] control over all the channels of radio transmission"). Thus, whether the appropriation of spectrum can give rise to a physical taking is immaterial; the question before the Court is whether interference with its limited spectrum *license* can do so. And Ligado offers no persuasive rationale why a license should be treated differently than other intangible property interests, like contract rights or intellectual property rights. *See* Resp. Br. 54-55 (trying to distinguish analogous cases based on the alleged Governmental action, yet offering no analysis of the property interests implicated). And the cases Ligado primarily cites as examples of the Supreme Court employing a physical takings analysis for intangible rights—*International Paper* and *United States v. General Motors Corp.*, 323 U.S. 373 (1945)—predate the Court's modern regulatory takings jurisprudence and the distinction between regulatory and physical appropriations. The trial court therefore erred in holding that a spectrum license could give rise to a physical takings claim.

## CONCLUSION

For these reasons and those in the opening brief, we respectfully request that the Court reverse the trial court's denial of our motion to dismiss.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Director

/s/ Nathanael B. Yale
NATHANAEL B. YALE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:(202) 616-0464

BORISLAV KUSHNIR
Senior Trial Counsel

November 10, 2025                    *Attorneys for Defendant-Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Rule 32(b)(1) of this Court's

Rules because it contains 6,993 words. This brief also complies with the typeface and

type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it

was prepared using Microsoft Word in Garamond 14-point font, a proportionally

spaced typeface.

*/s/ Nathanael B. Yale*
Nathanael B. Yale