NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**LIGADO NETWORKS LLC,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

———————————

2025-1792

———————————

Appeal from the United States Court of Federal Claims in No. 1:23-cv-01797-EJD, Senior Judge Edward J. Damich.

———————————

Decided: March 9, 2026

———————————

DONALD B. VERRILLI, JR., Munger, Tolles & Olson LLP, Washington, DC, argued for plaintiff-appellee. Also represented by GINGER ANDERS; EVAN JENNINGS MANN, San Francisco, CA; DAVID COON, YELENA KONANOVA, PHILIPPE SELENDY, Selendy Gay PLLC, New York, NY; HARRIS FISCHMAN, MARTIN FLUMENBAUM, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; KEVIN F. KING, Covington & Burling LLP, Washington, DC.

NATHANAEL YALE, Commercial Litigation Branch, Civil Division, United States Department of Justice,

Washington, DC, argued for defendant-appellant. Also represented by BORISLAV KUSHNIR, PATRICIA M. MCCARTHY, BRETT SHUMATE.

————————————

Before MOORE, *Chief Judge*, TARANTO and STOLL, *Circuit Judges*.

TARANTO, *Circuit Judge*.

We have before us a decision of the United States Court of Federal Claims (Claims Court) in this Takings Clause case against the United States based on a radio license issued to Ligado Networks LLC under the Communications Act of 1934, as amended, 47 U.S.C. §§ 151–646. The Claims Court declined to dismiss the case in the respects now before us, and we accepted the government's request for interlocutory review upon the certification of the Claims Court under 28 U.S.C. § 1292(d)(2). We now decide only a subset of the issues presented to us. We conclude, in agreement with the Claims Court, that it had jurisdiction and that the takings claim met the authority requirement for such a claim. But we do not decide the key issue of whether the requirement of a property right protected by the Takings Clause has been met here, or the follow-on categorization issue whether a physical taking has been alleged. As to those issues, we conclude that the parties have presented arguments at too high a level of generality and with insufficient focus on the specifics of the statute at issue and of actions taken under it. We vacate the Claims Court's rulings regarding those issues and remand for the parties to litigate the key issues through an analysis having the focus required for a fully informed decision about whether the government or Ligado is correct.

I

In April 2020, the Federal Communications Commission (Commission or FCC), acting pursuant to the Communications Act of 1934, 47 U.S.C. §§ 307, 309, granted to Ligado Networks LLC (hereafter "Ligado," also referring to its predecessors-in-interest) authority to provide certain wireless services using specified radio frequencies (spectrum): 1526–1536 MHz, 1627.5–1637.5 MHz, and 1646.5–1656.5 MHz. *Order and Authorization*, ¶¶ 1, 159, FCC 20-48, 35 FCC Rcd. 3772, 3773, 3842 (2020) (*2020 Order*). That Order followed a multi-step process, commencing in 2004, to add authorization for an ancillary terrestrial component (ATC) to Ligado's previous authorization for mobile satellite services (MSS) operation. *Id.* ¶¶ 4–17, 35 FCC Rcd. at 3774–83. The Commission granted the authorization (which we, like the parties, interchangeably call a license) despite opposition over many years from the National Telecommunications and Information Administration (NTIA)—the agency within the Department of Commerce charged with, among other things, representing the telecommunications interests of non-FCC federal agencies such as the Department of Defense (DoD)—that focused on potential interference with Global Positioning Satellite (GPS) services. *Id.* ¶¶ 5–17, 35 FCC Rcd. at 3775–83. But the Commission expressly made the grant of authority conditional on Ligado's meeting various conditions, which included certain specified coordination with non-FCC federal agencies (including, as especially relevant here, DoD). *Id.* ¶¶ 131–55, 159, 35 FCC Rcd. at 3835–42. The conditions were supplemented by Congress on January 1, 2021, which made Ligado's ability to offer service even more dependent on decisions by DoD. *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, §§ 1661–64, 134 Stat. 3388, 4073–76 (2021) (codified at 10 U.S.C. § 2281 note) (*2021 NDAA*).

In October 2023, Ligado filed an action against the United States in the Claims Court under the Tucker Act, 28 U.S.C. § 1491. Complaint, *Ligado Networks LLC v. United States*, No. 23-1797 (Fed. Cl. Oct. 12, 2025), ECF No. 1 (*Complaint*). Ligado stated that it had not been able to launch its services as a result of actions of non-FCC federal agencies after the *2020 Order*, and, invoking the Takings Clause of the Fifth Amendment, Ligado sought damages for what it alleged to be an uncompensated taking for what it asserted was a property right it had relating to the spectrum at issue based on the *2020 Order*. Ligado does not press claims based on government actions or rights held preceding the *2020 Order*. The complaint focused on what we summarize, for present purposes, as two forms of government action assertedly effecting a taking: (a) use of the spectrum at issue by DoD itself; and (b) noncooperation by DoD, NTIA, and Commerce with Ligado's efforts to meet the conditions for commencing service. Ligado also asserted a taking based on Congress's enactment of the *2021 NDAA*, but that claim is not now before us.

Ligado asserted four takings claims. It asserted (1) a "physical taking" based on DoD's use of spectrum within and/or adjacent to Ligado's licensed portion, Complaint at ¶¶ 134–42, citing, *e.g.*, *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021); (2) a "categorical taking" based on the deprivation of all "economically beneficial use" of the asserted property, Complaint at ¶¶ 143–47, citing, *e.g.*, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992); (3) a general "regulatory taking," Complaint at ¶¶ 148–53, citing, *e.g.*, *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978); and (4) a "legislative taking" based on the 2021 NDAA, Complaint at ¶¶ 154–60, citing, *e.g.*, *Penn Central*, 438 U.S. at 124.

The government moved to dismiss on jurisdictional and merits grounds, invoking Rule 12(b)(1) and (6) of the Rules of the Court of Federal Claims, but on November 18, 2024, the Claims Court mostly disagreed with the government's

contentions. J.A. 1–13. The Claims Court rejected the government's contention that the Communications Act's remedial scheme displaces the jurisdiction conferred by the Tucker Act, explaining that Ligado's complaint did not challenge the Commission's *2020 Order* or any other Commission decision, also noting that it was not aware of any law permitting the Commission to award monetary damages for the alleged DoD occupation of Ligado's licensed spectrum. J.A. 7–10. The Claims Court also ruled that Ligado's license *could* give it a property right against non-FCC federal agencies even if Ligado has no property right against the Commission and that DoD's occupation of the spectrum at issue might constitute a "physical taking." J.A. 8–9, 12. The Claims Court further agreed with Ligado that the actions of the government agencies were "authorized" for Takings Clause purposes under our precedent. J.A. 10–11. Finally, in its one ruling for the government, the Claims Court held that Ligado had no viable legislative-taking claim, reasoning that "[j]ust as the FCC can terminate a license without effecting a taking" (because Ligado lacks a property right in a license against the Commission itself), "Congress's limitations on the license, even if they effectively terminate it, cannot be challenged as a taking" because the license cannot confer "property vis-à-vis Congress." J.A. 11–12. Based on that analysis, the Claims Court denied the Rule 12(b)(1) motion and, as to the Rule 12(b)(6) motion, denied the motion except as to the claim of a legislative taking, which the court dismissed.

In January 2025, the government asked the Claims Court to certify that four issues met the standard for interlocutory appeal under 28 U.S.C. § 1292(d)(2): (1) whether the Claims Court has subject-matter jurisdiction under the Tucker Act; (2) whether the actions of the non-FCC federal agencies alleged to effect a taking were authorized; (3) whether Ligado has a property right for Takings Clause purposes against the non-FCC federal agencies and their challenged actions; and (4) whether DoD use of the

spectrum could constitute a physical taking if Ligado had a property right and DoD use was authorized. Motion to Certify Interlocutory Appeal, *Ligado Networks LLC v. United States*, No. 23-1797 (Fed. Cl. Jan. 16, 2025), ECF No. 37 at 6–18. Ligado did not seek certification of the dismissal of the legislative-taking claim. *See* Opposition to Motion to Certify Interlocutory Appeal, *Ligado Networks LLC v. United States*, No. 23-1797 (Fed. Cl. Jan. 30, 2025), ECF No. 38.

In February 2025, the Claims Court granted the government's motion to certify the interlocutory appeal. J.A. 4. The government then petitioned this court for permission to appeal the interlocutory order. Petition for Permission to Appeal an Interlocutory Order, *Ligado Networks LLC v. United States*, No. 25-120 (Fed. Cir. Mar. 10, 2025), ECF No. 2. Ligado opposed the petition, while, in the alternative, cross-petitioning for interlocutory review of the Claims Court's dismissal of the legislative-taking claim. Opposition to Petition for Leave to Appeal and Conditional Cross-Petition for Leave to Appeal, *Ligado Networks LLC v. United States*, No. 25-120 (Fed. Cir. Mar. 20, 2025), ECF No. 6 at 4. In May 2025, we granted the government's petition for interlocutory appeal and denied Ligado's cross-petition. *Ligado Networks LLC v. United States*, No. 25-120, 2025 WL 1443750 (Fed. Cir. May 20, 2025); J.A. 15–16.

We have jurisdiction under 28 U.S.C. § 1292(d)(2). We review de novo the Claims Court's denial of the motion to dismiss for lack of jurisdiction where (as here) the motion does not dispute the alleged facts and the denial of a motion to dismiss for failure to state a claim. *Roman v. United States*, 61 F.4th 1366, 1370 (Fed. Cir. 2023); *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

## II

We first address whether the Communications Act displaces the Claims Court's jurisdiction under the Tucker

Act. We next evaluate whether Ligado alleged authorized government conduct. We then address the issue of whether Ligado has a property interest against the challenged actions of the non-FCC entities, concluding that the issue has not been developed with sufficient specificity to justify a resolution of the issue by this court at present. Finally, we conclude that the physical-taking issue should return to the Claims Court along with the property-right issue without a decision of the issue by us in this interlocutory appeal.

A

The Tucker Act, 28 U.S.C. § 1491, provides the Claims Court jurisdiction to adjudicate a takings claim against the United States. *See Knick v. Township of Scott, Pennsylvania*, 588 U.S. 180, 189–90, 194, 200 (2019); *Horne v. Department of Agriculture*, 569 U.S. 513, 527 (2013); *Acceptance Insurance Companies Inc. v. United* States, 503 F.3d 1328, 1336 (Fed. Cir. 2007). But that jurisdiction is displaced if Congress has otherwise provided, specifically by creating a separate remedial regime that is properly understood as withdrawing the Tucker Act grant. *See Maine Community Health Options v. United States*, 590 U.S. 296, 323–24 (2020); *Horne*, 569 U.S. at 527; *United States v. Bormes*, 568 U.S. 6, 11–13 (2012). The government argues that this is such a case, relying on our decisions in *Alpine PCS, Inc. v. United States*, 878 F.3d 1086 (Fed. Cir. 2018), and *Sandwich Isles Communications, Inc. v. United States*, 992 F.3d 1355 (Fed. Cir. 2021).

Like the Claims Court, we conclude that the present case does not come within the purview of *Alpine PCS* or *Sandwich Isles* or, therefore, the displacement principle. In both of those decisions, we held that Tucker Act jurisdiction over taking claims was displaced by the Communications Act because the plaintiff was actually challenging decisions of the Commission, for which Congress had specified review mechanisms in the Communications Act, 47 U.S.C. § 402(a), (b)—through which, we observed, the

challenger could have raised a takings claim. *Alpine PCS*, 878 F.3d at 1095, 1097–98; *Sandwich Isles*, 992 F.3d at 1360–65.[1] Here, in contrast, consistent with Ligado's insistence that it is not challenging any Commission action, Ligado Response Br. at 21–23, we do not see anything in its takings claim that depends on a challenge to a Commission action. Ligado's claim accepts without challenge the terms of the Commission's license grant, including the conditions placed on commencing service and the absence of any pertinent binding command to the non-FCC federal agencies. The essential requirement for finding displacement of Tucker Act jurisdiction in *Alpine PCS* and *Sandwich Isles* is therefore missing here, and we affirm the Claims Court's ruling that it had jurisdiction in this case.

## B

In seeking reversal of the Claims Court's denial of its motion to dismiss, the government invokes a necessary condition for takings liability: "For takings liability to attach, the Government action at issue must be authorized." Government Opening Br. at 44 (citing, *e.g.*, *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998)). It adds that a government action cannot be deemed a taking "*because* the Government acted unlawfully." *Id.* (emphasis in original). We see no basis for disturbing the Claims Court's rejection of the government's argument in this respect. *See* J.A. 10–11.

---

[1] This court drew a similar conclusion about a breach-of-contract claim under the Tucker Act in *Folden v. United States*, 379 F.3d 1344 (Fed. Cir. 2004), stressing the Communications Act's "comprehensive statutory and regulatory regime governing *orders* of the Commission." *Id.* at 1357 (emphasis added). No takings claim was presented to this court in *Folden*. *Id.* at 1352 n.6.

The government points to language in Ligado's complaint that could be read as asserting the illegality of some of the challenged actions by the non-FCC federal agencies—even, perhaps, asserting such illegality as a reason for finding a taking. Government Opening Br. at 45. But we do not read the complaint as *depending on* any assertion of illegality by DoD or other non-FCC agencies in the challenged actions. We read the complaint at least implicitly to plead authorization as required by its takings claim, and in any event, an amended complaint could and would readily do so, in light of the decision of this court in *Darby Development Co. v. United States*, 112 F.4th 1017 (Fed. Cir. 2024). We therefore do not agree with the government's contention that the case had to be dismissed on the ground that Ligado's takings claim rests on an assertion that there is a taking "*because* the Government acted unlawfully." *Id.* at 44 (emphasis in original); Government Reply Br. at 25 (emphasis added and capital letters removed).

The government also has not shown that the Claims Court was required to dismiss the case on the ground that the complaint fails to make a plausible allegation sufficient to meet the authorized-conduct requirement for takings liability. In *Darby*, we held that a government action ordinarily is "authorized" for takings-liability purposes if the government actors acted "'within the general scope of their duties.'" 112 F.4th at 1024 (quoting *Del-Rio*, 146 F.3d at 1362). Here, the government makes no persuasive argument that the DoD and NTIA were—what would be implausible—acting outside the general scope of their duties regarding national-security interests or telecommunications policy, *see, e.g.*, 10 U.S.C. § 2281; 47 U.S.C. §§ 901–02, in the actions that are accused of effecting a taking for which the United States must pay.

## C

We now turn to the central issue before us—whether Ligado has a property interest in the license to provide

certain radio services using the spectrum at issue. It contends that it obtained a sole-use property right in the spectrum at issue, protected by the Takings Clause unless and until the grant has been modified in a relevant way by the Commission, which it has not been. Further, Ligado contends, the property right runs even against non-FCC federal agencies and, still more specifically, against the two forms of agency action at issue: DoD use of the spectrum at issue (at least use of the very portion licensed to Ligado, perhaps also adjacent spectrum); and agency (DoD, NTIA, and Commerce) non-cooperation in Ligado's efforts to fulfill the license preconditions to its commencing service. We do not decide this issue. The contention depends on too many insufficiently addressed considerations raised by its several components for us to decide, at present, whether the contention is correct (as Ligado urges) or incorrect (as the government urges). We remand for further development of the analysis required for a sound conclusion.

1

A necessary requirement for finding a taking under the Takings Clause is that what is alleged to have been taken is "property" under the Clause. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1329–30 (Fed. Cir. 2012). The property right—sometimes called a "property interest" here and in other cases (*e.g.*, Complaint at ¶ 137)—must have its source outside the Takings Clause, *e.g.*, in state law, federal law, or traditional property principles. *Tyler v. Hennepin County, Minnesota*, 598 U.S. 631, 638 (2023); *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160–61 (1980); *King v. United States*, 151 F.4th 1348, 1358 (Fed. Cir. 2025); *Members of Peanut Quota Holders Association v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005). Ligado agrees that, if it has a property right in this case, the right must have its source in federal law, namely, the Communications Act

and Commission actions under it.  Specifically, the only potential basis for the property right asserted is the federal government grant—the Commission's *2020 Order*—issued under 47 U.S.C. §§ 307, 309.  *See* Ligado Response Br. at 28 (stating that Ligado claims a property right based on the authority it obtained "from an FCC license granted pursuant to the Communications Act, rather than any pre-existing state-law or common-law right"); *see also id.* at 34 ("[T]he grant of the license gives rise to a property interest within the defined conditions of the license.").

In this respect, the case is different from two of the precedents on which Ligado principally relies—a difference we note without drawing a conclusion about its ultimate legal significance.  Specifically, in neither *International Paper Co. v. United States*, 282 U.S. 399 (1931), nor *United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990), did the asserted property right come simply from a grant by the federal government.  In *International Paper*, the property right was a set of water rights International Paper had received "by conveyance and lease" from a local power company, pursuant to state law.  282 U.S. at 404–05; *see also International Paper Co. v. United States*, 68 Ct. Cl. 414, 418, 422–23 (1929).  It was that set of rights the federal government took when, using language indicating a clear intent to pay, it issued orders that commanded the power company to stop the provision of water to International Paper so the power company could use it for producing power for federally directed war-related purposes.  *International Paper*, 282 U.S. at 405–08; *International Paper*, 68 Ct. Cl. at 426–29.  In *United Nuclear*, the property right consisted specifically of "leases"—creating a "leasehold interest" in mining—entered into by United Nuclear with the Navajo Tribal Council, not with the federal government (though the Secretary of Interior had to approve

them, as he did).  912 F.2d at 1433, 1437.[2]  Ligado does not dispute that, in both cases, the interest taken—the water rights and the leasehold interest—are traditional property rights recognized in property law and protected by the Takings Clause.  *See* Ligado Response Br. at 44, 53.

Long ago, but soon after enactment of the Communications Act of 1934, the Supreme Court wrote: "The policy of the Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license." *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 475 (1940); *see also Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 14–15 (1942) (stating that "[t]he Communications Act of 1934 did not create new private rights" and that the appeal right granted by 47 U.S.C. § 402(b) exists to protect "the public interest," not "the interests of private property").  Several courts of appeals have relied on the *Sanders Brothers* statement.  *See, e.g.*, *Mobile Relay Associates v. FCC*, 457 F.3d 1, 11–12 (D.C. Cir. 2006) (rejecting takings claim because the spectrum-use right given by a license under 47 U.S.C. § 301 "does not constitute a property interest protected by the Fifth Amendment"); *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004) (rejecting takings claim because "broadcast licenses, which are the subject of the Commission's restriction on transferability, are not protected property interests under the Fifth Amendment"); *In re NextWave Personal Communications, Inc.*, 200 F.3d 43, 51 (2d Cir. 1999) ("A license does not convey a property right[.]").

---

[2]  The court addressed investment-backed expectations, but not in its property-right analysis; rather, it did so as part of its regulatory-takings analysis as prescribed by *Penn Central*, 438 U.S. at 127–33, as recited in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224–25 (1986).  *See United Nuclear*, 912 F.2d at 1435.

To overcome the facial breadth of the words used in *Sanders Brothers* and other cases, Ligado argues that such statements mean merely that a licensee has no property right *against the Commission*. Based on that reading, Ligado argues that the statements do not preclude a claim of property right against others—including non-FCC federal agencies. Ligado Response Br. at 39–40. The logical premise of this contention is, in the words of Amicus USTelecom—The Broadband Association, that "some property rights exist only as to certain parties," so "[t]here is nothing unusual about license holders enjoying property rights vis-à-vis other federal agencies even assuming that they may not always enjoy them vis-à-vis the FCC." USTelecom Amicus Br. at 16; *id.* at 15–16; *see also Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1303 (Fed. Cir. 2022) ("regulated financial entities lack the fundamental right to exclude *the government* from their property when the government could place the entities into conservatorship or receivership" (emphasis added) (citing *California Housing Securities, Inc. v. United States*, 959 F.2d 955, 958 (Fed. Cir. 1992), and *Golden Pacific Bancorp v. United States*, 15 F.3d 1066, 1074 (Fed. Cir. 1994))).

Determining whether Ligado has the claimed property right, for takings purposes, calls for a full understanding of the Communications Act and pertinent actions under it (whether of the Commission or of non-FCC federal agencies, such as NTIA, acting under the Act). *Cf. Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1275–79 (Fed. Cir. 2023); *Conti v. United States*, 291 F.3d 1334, 1340–42 (Fed. Cir. 2002).[3] That is so partly, but not only, due to the

---

[3]    Whether a license is "property" for other statutory purposes, such as the tax and bankruptcy purposes at issue in *In re Atlantic Business & Community Development Corp.*, 994 F.2d 1069, 1075 (3d Cir. 1993), does not control

need to evaluate whether this is a case in which a property right for takings purposes does not exist because the alleged interest is in an area subject to "pervasive Government control." *Hearts Bluff*, 669 F.3d at 1330; *see also Washington Federal v. United States*, 26 F.4th 1253, 1266 (Fed. Cir. 2022). More broadly, such an understanding is at the heart of evaluating whether the asserted right has, under the source of law from which it derives, the "'crucial indicia of a property right,' such as the ability to sell, assign, transfer, or exclude," *Hearts Bluff*, 669 F.3d at 1330 (quoting *Conti*, 291 F.3d at 1342), or, stated more briefly, "the right to transfer and the right to exclude," *Peanut Quota Holders*, 421 F.3d at 1331 (relied on by Ligado, *see* Ligado Response Br. at 18, 28–29). What the statute and actions under it say about those matters needs additional scrutiny.

As part of the scrutiny, some doctrinal issues themselves warrant further inquiry. One such issue concerns Ligado's pervasive characterization of its license as "exclusive." Ligado Response Br. at 1, 2, 12, 16, 18, 19, 26, 27, 28, 29–30, 31, 32, 33, 35 n.2, 39, 45, 46, 48, 49, 50, 54. That characterization could mean simply that Ligado is the only licensee for the specified frequency use at present, or that it has some kind of guarantee against other users, whether by FCC license or otherwise. The assertion also might well mean that Ligado has something the Supreme Court has stressed in takings cases—namely, "[t]he right to exclude," "universally held to be a fundamental element of the property right," perhaps even "the *sine qua non* of property." *Cedar Point Nursery*, 594 U.S. at 149–50 (cleaned up) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982); *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 179–80 (1979); *Dolan v. City of Tigard*, 512

---

whether it is property for takings purposes. *See Fishermen's Finest*, 59 F.4th at 1278.

U.S. 374, 384, 393 (1994); *Nollan v. California Coastal Commission*, 483 U.S. 825, 831 (1987); Merrill, Property and the Right to Exclude, 77 Neb. L. Rev. 730, 730, 752 (1998) (making *sine qua non* point)); *see also Fairholme Funds*, 26 F.4th at 1303 ("[T]he right to exclude is an essential element of property ownership[.]").  If a right to exclude is required, a further issue arises—whether the holder of the right to exclude must have a right of action in court, or any other tribunal, to effectuate that right (through some remedy), as a patentee does under 35 U.S.C. § 281 for the expressly defined "right to exclude," 35 U.S.C. § 154.[4]

A further important doctrinal issue concerns whether, and to what extent, a property right is confined to guarantees stated in a license grant or the underlying statute.  In particular, may a legally cognizable property right for Takings Clause purposes be based on an expectancy generated from regular practice involving grants under a statute— such as the "renewal expectancy" recognized as one factor the Commission must consider in making renewal decisions, *see Victor Broadcasting, Inc. v. FCC*, 722 F.2d 756, 760–61 (D.C. Cir. 1983)?  *See also* P. Huber, M. Kellogg & J. Thorne, Federal Telecommunications Law § 10.3.1 (3d ed. 2022) (offering characterization that "[s]pectrum has been privatized—*de facto* property rights have been created—without anyone ever using such politically delicate

---

[4]  Patent law, under which an injunction is not always available, confirms that a right to exclude need not always be enforceable through a remedy that compels cessation of the action violating the right (as opposed to providing compensation).  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).  The Takings Clause requires compensation for various *lawful* actions (as well as "authorized" actions), *see Darby*, 112 F.4th at 1023–27—for which a remedy to stop the actions might not be available.

terms" (emphasis added)).  Such expectations may well be investment-backed, even massively investment-backed, as Ligado asserts to be the case here.  Moreover, congressional and agency policy may well require encouraging (and thus offering some protections for) investments in order for spectrum to be robustly put to public use.  How these considerations bear on the property-right question under takings-law doctrine here warrants more focused analysis than has been presented to us.

Importantly, as already indicated, the required analysis—under Ligado's own theory for confining the reach of the above-quoted statements from and following *Sanders Brothers*—must consider not just whether Ligado has a property right in general.  It must consider whether Ligado has a property right against the particular actors and challenged actions it identifies—namely, the challenged DoD spectrum use and the challenged non-cooperation of DoD and others in ways identified in the *2020 Order*'s conditions on Ligado commencing service.

Although some of the analysis has been done in the briefing before us, not all that is needed has been done. With respect to the statutory context and also with respect to the particulars of the FCC actions, the parties have spoken at too high a level of generality to produce a clear understanding of the legal details that could make an important difference to the answer to the property-right question.  We conclude that it is inadvisable to rule on the property-right issue without a more detail-focused analysis, which might clarify what the answer and rationale should be.  A remand would permit development of the fuller and more concrete analysis required.  Here, we flag certain matters that warrant more attention—without attempting to be comprehensive.  We begin with statutory matters, then turn to more case-specific matters.

2

Many provisions of the Communications Act seem relevant to a full analysis of whether Ligado has a property right against non-FCC federal agencies, as asserted here. In identifying some of them, and sometimes flagging grounds of possible relevance, we do not suggest the insignificance of provisions either not accompanied by explanation or not mentioned at all. We are tentative because briefing on these and other matters has not been adequate to give us confidence that all the material relevant to the legal questions has been identified and carefully explained.

a. *Basic Provision on Spectrum Licenses.* Section 301 declares Congress's purpose "to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority"—immediately adding, "and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license." 47 U.S.C. § 301. It then declares: "No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio . . . [under a broad range of circumstances] except under and in accordance with this chapter [ *id.* §§ 151–646] and with a license in that behalf granted under the provisions of this chapter." *Id.* We note (without intending to be exhaustive) some features of the provisions of seeming relevance to this matter.

First: The referred-to "licenses" are "for the use of [radio] channels," and "no such license shall be construed to *create any right*, beyond the terms, conditions, and periods of the license." *Id.* (emphasis added). That language raises questions: Should the property right asserted by Ligado, which it acknowledges is based on the license, be considered a license-created right beyond the terms, conditions, and periods of Ligado's license? Relatedly, does the language preclude arguments for a property right based on

(investment-backed) expectations that go beyond the license's express provisions? What should be inferred from the Supreme Court's decision in *United States v. Fuller*, 409 U.S. 488 (1973), about similar language? There, the Court considered the Taylor Grazing Act, 43 U.S.C. § 315b, which authorized the federal government to issue permits for livestock grazing on federal lands while stating that the issuance of a permit "shall not create any right, title, interest, or estate in or to the lands," 43 U.S.C. § 315b (quoted at 409 U.S. at 489). The Court held that the language "make[s] clear the congressional intent that no compensable property might be created in the permit lands themselves as a result of the issuance of the permit," 409 U.S. at 494.

Second: Both parties agree that section 301's references to "person(s)" does not apply to the federal government. *See* Ligado Response Br. at 23–24; Oral Arg. at 13:15–46 (government counsel). It is established law that the term "person" in a statute is inapplicable to a sovereign, such as the United States, unless Congress has clearly stated otherwise. *Return Mail, Inc. v. United States Postal Service*, 587 U.S. 618, 626–27 (2019); *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000); *Will v. Michigan Department of State Police*, 491 U.S. 58, 65–66 (1989); *Perrong v. Bradford*, 157 F.4th 251, 260–61 (3d Cir. 2025).[5] Here, the statutory definition of "person" does not provide coverage of sovereigns such as the United States. 47 U.S.C. § 153(39) ("The term 'person' includes an individual, partnership, association, joint-stock company, trust, or corporation."). An

---

[5]   Before the Supreme Court decided *Will*, the Ninth Circuit held that the word "person" in 47 U.S.C. § 401(b) applied to a state public utilities commission. *Hawaiian Telephone Co. v. Public Utilities Commission of State of Hawaii*, 827 F.2d 1264, 1270 (9th Cir. 1987).

immediate implication is that the federal government is not subject to the § 301 bar on using radio channels without a license under the Communications Act (specifically, without a license from the Commission).

b.    *Commission Allocation and Licensing.*    Section 303(y) gives the Commission authority "to allocate electromagnetic spectrum so as to provide flexibility of use," if "the Commission finds, after notice and an opportunity for public comment," that a particular allocation "would be in the public interest," the use "would not deter investment in communications services and systems, or technology development," and the use "would not result in harmful interference among users."  47 U.S.C. § 303(y).  The provision at least suggests the possibility of non-exclusive users of given spectrum and confirms key policies of investment and non-interference, placing the decision in the Commission's hands as an initial matter.  *See* Government Reply Br. at 18–19 (first citing § 303(y), and then citing *AT&T Services, Inc. v. FCC*, 21 F.4th 841, 843 (D.C. Cir. 2021), which does not cite § 303(y) but recognizes non-exclusive use possibility); *see also PSSI Global Services, L.L.C. v. FCC*, 983 F.3d 1, 9 (D.C. Cir. 2020) (citing § 303(y)).

Section 307 provides for the Commission to grant a station license if "public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter [47 U.S.C. §§ 151–646]."  47 U.S.C. § 307(a).  And section 309 provides for grants of license applications.  *Id.* § 309(a).  Those sections provide for grants of a right to use the frequencies specified; they do not define the right granted as an exclusive one or as a right to exclude.  *Compare id.* §§ 307(a), 309(a), *with* 35 U.S.C. § 154(a) (patent right is the "right to exclude").  Section 307(b) directs the Commission to make "a fair, efficient, and equitable distribution of radio service" among States and communities when considering applications for, modifications to, and renewals of licenses.  47 U.S.C. § 307(b).  A license for a "broadcasting station" is for up to 8 years, but it may be

renewed if the Commission finds that doing so would serve the "public interest, convenience, and necessity." *Id.* § 307(c)(1).

Section 304 says that the Commission may not grant a license until the applicant has waived any claim to use of particular frequencies of the spectrum "as against the regulatory power of the United States" based on the applicant's "previous use of the same." *Id.* § 304.

c. *Transfer, Revocation, Modification.* Section 310(d) gives the Commission power over any transfer of a station license: "No . . . station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner . . . to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby." *Id.* § 310(d). That provision indicates that the Commission is not to consider whether there is a better recipient of the license in assessing the proposed transfer, assignment, or disposal. *Id.*

Section 312(a) authorizes the Commission to "revoke any station license," stating the permissible grounds for revocation in seven paragraphs. *Id.* § 312(a). The grounds are generally keyed to knowingly false statements, willful or repeated failures or violations, noncompliance with a cease-and-desist order, and violation of certain criminal laws, *id.*, but one ground is: "because of conditions coming to the attention of the Commission which would warrant it in refusing to grant a license . . . on an original application," *id.* (paragraph 2).

Section 316 confers modification authority on the Commission, providing: "Any station license . . . may be modified by the Commission . . . if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this chapter [*id.* §§ 151–646] . . . will be more fully complied with."

47 U.S.C. § 316(a)(1); *see PSSI Global Services*, 983 F.3d at 7–9 (discussing modification authority).

d. *Federal Use.* Ligado has asserted, as a premise of its argument, that the Commission controls the allocation of spectrum for Federal use (*i.e.*, use by the federal government) as well as for non-Federal use. It asserts that "the FCC has exclusive authority to allocate bands of electromagnetic frequencies, license use of those frequencies, and regulate the activities of commercial and government users." Ligado Response Br. at 6–7 (fist citing 47 U.S.C. § 303(b)–(c), and then citing Complaint at ¶ 22). The Complaint at ¶ 22 makes the same assertion, likewise citing § 303(b) and (c), adding that "NTIA assigns the spectrum designated by the FCC for federal government use to specific federal spectrum users, such as DOD." Complaint at ¶ 22 (citing 47 U.S.C. §§ 305(a), 902(b)(2)(A)). The complaint reiterates that, while the "FCC and NTIA coordinate with each other and with other federal stakeholders through the Interdepartmental Radio Advisory Committee," "the FCC is the only federal agency with the power to grant, modify, or revoke an allocation of spectrum to the federal government *or* a license of commercial spectrum." *Id.* (emphasis added). Through those assertions, Ligado suggests that DoD, with support from NTIA, has been encroaching on an exclusive Commission allocation power, at least through the alleged DoD use of spectrum within the at-issue bands Ligado has been authorized to use.

These assertions by Ligado are assertions about law (which need not be accepted just because they are in the complaint). Here, we do not decide the ultimate correctness of such assertions; nor do we explore the possible relevance of sources not cited to us for this point, *e.g.*, 47 U.S.C. §§ 303(y) (allocation authority), 323 ("[i]nterference between Government and commercial stations"). We merely note that the apparent assertions about the Commission's allocation authority are not supported by the only sources cited.

Section 303 says that "[e]xcept as otherwise provided in this chapter [*id.* §§ 151–646], the Commission from time to time . . . shall . . . (b) [p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within any class; [and] (c) [a]ssign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate[.]"  But section 305(a) states that "[r]adio stations belonging to and operated by the United States shall not be subject to the provisions of sections 301 and 303 of this title [title 47]."[6]  Section 305(a) immediately adds: "All such Government stations shall use such frequencies as shall be assigned to each or to each class *by the President*," *id.* § 305(a) (emphasis added), adding that, with exceptions, "[a]ll such stations. . . shall conform to such rules and regulations designed to prevent interference with other radio stations and the rights of others as the Commission may prescribe," *id.*

The President delegated his authority under that provision initially to the Office of Telecommunications Policy (in the Executive Office of the President) and then to the Secretary of Commerce.  *See id.* § 305 note (quoting and describing reorganization plans and executive orders).  In 1992, Congress enacted chapter 8 of Title 47, §§ 901–42 (as

---

[6]  "The term 'radio station' or 'station' means a station equipped to engage in radio communication or radio transmission of energy."  47 U.S.C. § 153(42).  "The term 'station license', 'radio station license', or 'license' means that instrument of authorization required by this chapter [*id.* §§ 151–646] or the rules and regulations of the Commission made pursuant to this chapter, for the use or operation of apparatus for transmission of energy, or communications, or signals by radio . . . ."  *Id.* § 153(49) (punctuation in original as shown).

later amended) to create the NTIA, headed by an Assistant Secretary of Commerce, within the Department of Commerce. Telecommunications Authorization Act of 1992, Pub. L. No. 102-538, §§ 101–05, 106 Stat. 3533, 3533–40; *see* 47 U.S.C. § 901. In section 902(b)(2), Congress has provided that, subject to certain reassignment authority of the Secretary, the authority to be assigned to the NTIA and its Assistant Secretary is "[t]he authority delegated by the President to the Secretary to assign frequencies to radio stations or classes of radio stations belonging to and operated by the United States, including the authority to amend, modify, or revoke such assignments, but not including the authority to make final disposition of appeals from frequency assignments." 47 U.S.C. § 902(b)(2)(A). Also to be assigned to NTIA and its Assistant Secretary are, among others, the "authority to establish policies concerning spectrum assignments and use by radio stations belonging to and operated by the United States" and the "responsibility to ensure that the views of the executive branch on telecommunications matters are effectively presented to the Commission[.]" *Id.* § 902(b)(2)(K), (J); *see Memorandum of Understanding between the [FCC] and [NTIA]*, (Aug. 1, 2022), Federal Communications Commission, https://docs.fcc.gov/public/attachments/DOC-385867 A1.pdf (explaining that "[t]he FCC is . . . the exclusive regulator of non-Federal spectrum use" and "NTIA is the sole agency responsible for authorizing Federal spectrum use" and setting out agreement to coordinate in various ways).

The presidential authority to assign spectrum for use by the federal government (Federal use) under § 305(a)—now implemented through the NTIA—requires further consideration in the analysis of this case. By way of example, the existence of that authority might undermine, weaken, or complicate Ligado's premise that the Commission had full and final power to provide sole use rights to Ligado. Ligado invokes that premise against the non-FCC federal agencies here—particularly regarding the asserted

DoD use of the spectrum.  An accurate view of the relationship between the Commission and non-FCC agencies in the allocation of spectrum-use rights may bear on the property-right analysis.

e.  *Remedy Provisions*.  Some remedy provisions of the Act are worth noting (there may be others).  Section 402 addresses "[j]udicial review of [the] Commission's orders and decisions."  47 U.S.C. § 402 (title).  Subsection (b) allows an applicant for license, renewal or modification, transfer or other disposition that has been denied, or other person aggrieved or adversely affected by grant or denial of such applications, to appeal to the D.C. Circuit.  *Id.* § 402(b).  Subsection 402(a) provides that any other "proceeding to enjoin, set aside, annul, or suspend" an FCC order is to be brought in the regional courts of appeals under [the Administrative Orders Review Act, known as the Hobbs Act, 28 U.S.C. §§ 2341–51].  *Id.* § 402(a).

Section 401 is titled "[e]nforcement provisions."  *Id.* § 401.  Subsection (a) authorizes district courts to enforce provisions of the Act when asked to do so by the Attorney General at the request of the Commission.  *Id.* § 401(a).  Subsection (b) is the provision Ligado and the government cited to us when asked about whether a licensee of certain spectrum has a private right of action to sue a person that is using that spectrum without a license.  Section 401(b), titled "[o]rders of Commission," states:

> If any ***person*** fails or neglects to obey any ***order*** of the Commission other than for the payment of money, while the same is in effect, the Commission or ***any party injured thereby***, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order.  If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce

obedience to such order by a writ of injunction or
other proper process, mandatory or otherwise, to
restrain such person or the officers, agents, or rep-
resentatives of such person, from further disobedi-
ence of such order, or to enjoin upon it or them
obedience to the same.

47 U.S.C. § 401(b) (emphases added).

Some important limitations of this provision, high-
lighted above, appear relevant to the present case. First:
We have already noted that the United States is not a "per-
son" covered by the Act. That is a sufficient reason a fed-
eral agency could not be sued under section 401(b), which
therefore does not provide a right to exclude a non-FCC
federal agency. *See supra* p. 17 (noting section 301's limit
to "persons," a term that does not cover federal agencies).

Second: As to unlicensed users of spectrum that do
qualify as "persons," the crucial limiting term of sec-
tion 401(b) is "order." *Cf.* 47 U.S.C. § 227(b)(3) (private
right of action under Telephone Consumer Protection Act
for violation of statutory "subsection or the regulations pre-
scribed under" it); *see McLaughlin Chiropractic Associates,
Inc. v. McKesson Corp.*, 606 U.S. 146, 149 (2025). If, as it
appears, the term "order" does not cover the Act itself, then
section 401(b) (unlike section 401(a)) does not authorize an
action to simply enforce a provision of the Act, so it could
not be invoked to sue a "person" for merely violating sec-
tion 301 by using radio frequencies without a license. That
point seems clear notwithstanding that there is uncer-
tainty about what kinds of Commission actions come
within the term "order." Section 154(i) separately author-
izes the Commission to "make such rules and regulations"
and to "issue such orders" "as may be necessary" to carry
out its functions, and there has been disagreement about
whether Commission regulations come within sec-
tion 401(b). *See, e.g.*, *New England Telephone & Telegraph
Co. v. Public Utilities Commission of Maine*, 742 F.2d 1, 4–

7 (1st Cir. 1984) (per Breyer, J.) (concluding that "order" does not cover a "rule" adopted through rulemaking, relying on 5 U.S.C. § 551(6), which makes the same distinction while including "licensing" within "order"); *see also* 5 U.S.C. § 551(8), (9); *Hawaiian Telephone*, 827 F.2d at 1270–72 (disagreeing with *New England Telephone*, citing other circuits' decisions as also doing so, expressly or implicitly, while limiting holding to case where the Commission order was conceded by defendant to bind it); *Mallenbaum v. Adelphia Communications Corp.*, 74 F.3d 465, 468–69 (3d Cir. 1996) (holding that an agency regulation is an "'order' if it requires a defendant to take concrete actions").[7]

We further note that section 503, titled "Forfeitures," 47 U.S.C. § 503 (title), states that:

> Any **person** who is determined **by the Commission**, in accordance with paragraph (3) or (4) of this subsection, to have—
>
> (A) willfully or repeatedly failed to comply substantially with the terms and conditions of any license, permit, certificate, or other instrument or authorization issued by the Commission;
>
> (B) willfully or repeatedly failed to comply with any of the provisions of this chapter [47 U.S.C. §§ 151–646] or of any rule, regulation, or order issued by the Commission under this chapter or under any

---

[7]    In *Ellis v. Tribune Television Co.*, 443 F.3d 71 (2d Cir. 2006), a case under § 401(b), the Second Circuit required a primary-jurisdiction referral to the Commission to address an issue within the Commission's authority—specifically, a waiver of a Commission rule. The government has not invoked the primary-jurisdiction doctrine here.

treaty, convention, or other agreement to which the United States is a party and which is binding upon the United States;

(C) violated any provision of section 317(c) or 509(a) of this title; or

(D) violated any provision of section 1304, 1343, 1464, or 2252 of title 18;

shall be liable to the United States for a forfeiture penalty. A forfeiture penalty under this subsection shall be *in addition to any other penalty provided for by this chapter*; except that this subsection shall not apply to any conduct which is subject to forfeiture under [47 U.S.C. §§ 251–62] or [*id.* §§ 381–86], or section 507 of this title.

47 U.S.C. § 503(b) (emphases added). The Commission's regulations, in turn, contemplate forfeitures for actions including "[u]sing unauthorized frequency," and "[f]ailure to engage in required frequency coordination." 47 C.F.R. § 1.80. The Commission, on its website, explains that it has a Spectrum Enforcement Division (SED) "responsible for taking enforcement actions involving unauthorized or unlicensed operations[.]" *Spectrum Enforcement Division*, Federal Communications Commission, https://www.fcc.gov /enforcement/divisions-offices/sed. Those sources raise additional questions regarding the Commission's role and responsibility in addressing unlicensed use of spectrum; Ligado's ability to initiate and compel enforcement; and what if any recourse is available from the Commission.

### 3

Also required for a complete analysis of the property-right issue is closer attention to the case-specific Commission actions at issue, which have been described to date at too high a level of generality.

Ligado relies on the Commission's *2020 Order* as the source of the asserted property right—which, Ligado repeatedly asserts is an "exclusive" right to use the frequencies at issue. But that Order on its face does not go further than to give Ligado a right to use the spectrum in identified ways subject to various conditions. *2020 Order* ¶¶ 159–64, 35 FCC Rcd. at 3842–43. The word "exclusive" (or a variant) is used only twice in the *2020 Order*, namely, at ¶¶ 115 n.373, 150, 35 FCC Rcd. at 3828, 3840, and neither use refers to Ligado being an exclusive user. Ligado cites nothing in the order guaranteeing exclusive-use status.

To the extent that Ligado is asserting that it is the sole currently authorized user of the spectrum at issue, there is of course a legal question whether that would be enough if true. But even establishing the accuracy of the assertion—accounting, *e.g.*, for activities of the International Maritime Satellite Organization (Inmarsat) of interest to DoD, *see 2020 Order*, ¶¶ 107–11, 35 FCC Rcd. at 3826–27—requires more focused attention than has been given to the issue. A full analysis should also account for the actions and decisions by the Commission that led up to the *2020 Order*. For example, one of the predecessor actions, in addressing a different but overlapping band of frequencies, cited feasibility and build-out reasons for approving just one mobile satellite system (MSS), jointly owned by a plurality of applicants and subject to open-access requirements. *Second Report and Order*, ¶¶ 2–9, FCC 86-552, 2 FCC Rcd. 485, 485–86 (1987); *see also Notice of Proposed Rulemaking*, ¶ 23, FCC 84-558, 50 Fed. Reg. 8149, 8155–56 (1985). And the parties have made suggestions to us that technical-feasibility considerations may limit Ligado's ability to use its license, at least as contemplated, if the license is anything other than exclusive. Oral Arg. at 8:32–38 (Government noting "practical issues . . . in terms of interference"); *id.* at 9:04–09 (Government noting that "technical feasib[ility]" could limit the Commission's ability to license another party to use the spectrum at issue); *id.* at 58:41–47 (Ligado

arguing that "you've got to allocate exclusive use because
of the interference problem"). Whether there are express
guarantees of presumptive exclusivity, or implicit guaran-
tees or protected expectations of the same (subject to au-
thorized alterations) based on technical or economic
considerations, requires careful examination on remand.[8]

––––––––––––––––––––

[8] We note here some of the history. In 1987, the
Commission allocated certain frequencies within the 1000–
2000 MHz range (the so-called L-Band) for shared use by
MSS and aeronautical mobile satellite service (Route)
(AMSS(R)). *Second Report and Order*, FCC 86-552, ¶¶ 1–
2, 2 FCC Rcd. at 485–86. In 1989 it authorized use of rele-
vant spectrum by Inmarsat to establish AMSS(R) opera-
tions, which as relevant here, provide services to DoD,
*Report and Order*, ¶¶ 55, 73, FCC 89-185, 4 FCC Rcd. 6072,
6079, 6082 (1989), and the same year it granted Ligado a
license to provide MSS on the allocated frequencies, *see
Aeronautical Radio, Inc. v. Federal Communications Com-
mission*, 983 F.2d 275, 278–79 & n.8 (D.C. Cir. 1993) (citing
proceedings). After the Commission allocated additional
spectrum in the L-Band to MSS, it authorized Ligado to use
1525–1559 MHz for downlink transmissions and 1626.5–
1660.5 MHz for uplink transmissions. *Report and Order*,
¶ 1, FCC 02-24, 17 FCC Rcd. 2704, 2704 (2002); *see 2020
Order*, ¶¶ 4, 7, 35 FCC Rcd. at 3774, 3777.

In 2003, the Commission permitted certain MSS licen-
sees to integrate an ATC into their MSS networks under
certain conditions. *See Report and Order and Notice of Pro-
posed Rulemaking*, ¶¶ 1–2, 218, FCC 03-15, 18 FCC Rcd.
1962, 1964–65, 2068 n.573 (2003), *modified by Order on
Reconsideration*, FCC 03-162, 18 FCC Rcd. 13590 (2003);
*Memorandum Opinion and Order and Second Order on Re-
consideration*, FCC 05-30, 20 FCC Rcd. 4616 (2005) (*2005
Order*). In 2004, the Commission authorized Ligado to do
so. *Order and Authorization*, ¶ 1, DA 04-3553, 19 FCC Rcd.

---

22144, 22144 & n.1 (2004) (*2004 Order*).  But in 2005, the Commission tightened some of the ATC-use conditions in response to submissions from NTIA and others about interference with other uses, notably GPS services using 1559–1610 MHz frequencies.  *2005 Order*, ¶¶ 15–18, 40, 68–72, 20 FCC Rcd. at 4621–22, 4630–31 & n.95, 4641–43.  Ligado did not (and at times could not) commercially provide ATC services before 2020, given harmful-interference concerns, as expressed by NTIA related to GPS systems and DoD's use of Inmarsat and in legislation.  *See Order and Authorization*, ¶¶ 1–12, 27–32, DA 10-534, 25 FCC Rcd. 3043, 3043–48, 3052–54 (2010); *Order and Authorization*, ¶¶ 1, 39–43, DA 11-133, 26 FCC Rcd. 566, 566–67, 585–87 (2011); Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, § 628, 125 Stat. 786, 927–28 (2012); *Order*, ¶ 1, DA 12-2051, 27 FCC Rcd. 15882, 15882 (2012); *Public Notice*, DA 16-442, 31 FCC Rcd. 3802, 3802–07 (2016); *see 2020 Order*, ¶¶ 6–8, 35 FCC Rcd. at 3776–78.

In late 2015, after reaching agreements with GPS-device manufacturers about proposed modifications, Ligado applied for another license modification.  *See 2020 Order*, ¶ 9, 35 FCC Rcd. at 3778–79.  Ligado submitted studies on the effects of its modifications on interference in 2016–17 and amended its application in 2018 to address the aviation sector's use of GPS.  *Id.* ¶¶ 10, 13–16, 35 FCC Rcd. at 3779, 3780–82.  But in 2019 and 2020, NTIA told the Commission that Ligado had not eliminated its concerns about interference with GPS service.  *Id.* ¶ 17, 35 FCC Rcd. at 3782–83.

The Commission's *2020 Order* followed, setting conditions.  Among them is that Ligado "cooperate directly with any U.S. government agency that anticipates that its GPS devices may be affected by Ligado's ATC operations," including by "working with the affected agenc[ies] to evaluate whether there would be harmful interference from

Also requiring examination is an additional point focused on the specific spectrum at issue—a point related to the statutory issue about the relationship between FCC and NTIA authorities over non-Federal and Federal uses. A post-argument letter from the government, ECF No. 53 (Feb. 13, 2026), directs us to the United States Table of Frequency Allocations in the Code of Federal Regulations, which exhaustively displays frequency bands and their allocations. *See* 47 C.F.R. §§ 2.105, 2.106. Section 2.105 explains that the Table, found at section 2.106, uses column 4 for the "Federal Table" and column 5 for the "non-Federal Table"; that the former is "administered" by NTIA and the latter by the Commission; that "radio spectrum may be allocated to either Federal or non-Federal use exclusively, or for shared use"; and that, in the Table, the two columns "are merged" when "the frequency band is shared between the Federal and non-Federal sectors under the same conditions." 47 C.F.R. § 2.105(a), (b), (d)(2). The portions of the Table showing the frequency bands at issue here show shared Federal and non-Federal use. 47 C.F.R. § 2.106 (entries for 1525–1535 MHz and 1535–1559 MHz at internal page number 34 of Table; entry for 1626.5–1660 MHz at page 35). Ligado filed a response, ECF No. 54 (Feb. 19, 2026) emphasizing that, at present, the primary Federal use of the spectrum is for receivers in the portion of the spectrum for downlink (satellite-to-earth) communications. What to make of this information, as well as what bearing it has on the property-right question, warrants further exploration, in conjunction with the discussion of statutory authority regarding Federal use—especially as to the takings claim based on DoD use of the spectrum at issue.

The other type of challenged action in this matter is failure to cooperate in ways that are necessary in order for

---

Ligado's operations." *Id.* ¶ 144, 35 FCC Rcd. at 3838; *see also id.* ¶¶ 131–55, 35 FCC Rcd. at 3835–41.

Ligado to meet conditions on its commencement of service. We seem not to be presented with a contention that the *2020 Order* legally bound the non-FCC agencies at issue to cooperate in the specified ways. This part of Ligado's case raises questions about whether it had a property right protected against the alleged non-cooperation when the license expressly made its use right conditional on obtaining the identified cooperation without compulsion of the Order. One such question is whether any property right Ligado has in using its spectrum did not vest until Ligado met the conditions for such operation, conditions that were not wholly within its control and whose fulfillment may have been "'contingent and uncertain,' 'speculative or discretionary.'" *McCutchen v. United States*, 14 F.4th 1355, 1368 (Fed. Cir. 2021) (quoting *Bowers v. Whitman*, 671 F.3d 905, 913 (9th Cir. 2012)); *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003) (considering whether there was a "vested property interest").

At oral argument, Ligado suggested that facts concerning the non-cooperation aspect of its taking claim have changed since the district court acted. Specifically, it indicated that Ligado has now met all the cooperation-related conditions of the *2020 Order* except one condition stated in ¶ 138, 35 FCC Rcd. at 3837, which applies only to the 1526–1536 MHz portion of the spectrum at issue. Oral Arg. at 1:13:07–1:17:04. We have not been provided support for that assertion, but according to Ligado, the change means that, as to most of the spectrum at issue, it is only DoD's use of spectrum and not government failure to cooperate that now blocks Ligado's provision of service. *See id.*

Such facts may warrant attention on remand. Perhaps they bear on the issues currently before us. Perhaps they bear only on issues that might arise if, on remand, the case proceeds to further steps in a taking analysis—*e.g.*, causation and the amount of compensation due for either or both of the two kinds of action alleged to have effected a taking. *See Caquelin v. United States*, 959 F.3d 1360, 1371–72

(Fed. Cir. 2020) (discussing causation); *St. Bernard Parish Government v. United States*, 887 F.3d 1354, 1359–60, 1362 (Fed. Cir. 2018) (same); *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 987 (Fed. Cir. 2023) (discussing damages principle that "[j]ust compensation requires putting the property owner in as good a position pecuniarily as if his property had not been taken" and limits on takings damages such as exclusion of consequential damages) (internal quotation marks and citation omitted)); *cf.* Government Opening Br. at 32 n.9 (suggesting DoD's use could not be a taking before Ligado fulfilled the license conditions for offering service).

## D

The remaining issue presented to us is whether, as Ligado asserts, the alleged DoD use of the spectrum covered by Ligado's license comes within the category of "physical takings." *See* Ligado Response Br. at 47–50. That category covers cases of physical invasion of or appropriation of land or other physical things in which the plaintiff has a relevant property right. *See Cedar Point*, 594 U.S. at 147–48; *Horne v. Department of Agriculture*, 576 U.S. 350, 359–62 (2015). It is not clear whether Ligado contends that it may come within this category even if (to date) Ligado would not have been using the spectrum at issue for reasons independent of the DoD use (such as the challenged non-cooperation of non-FCC federal agencies). The Claims Court allowed Ligado's physical-taking claim to proceed.

We do not here address this issue. For one thing, the issue might not have to be addressed on remand if the Claims Court holds that Ligado lacks a property right at all. The same could be said of the "authorization" issue we decide *supra*, but the physical-taking categorization issue presents a harder doctrinal question than the "authorization" issue. In any event, the aptness of the physical-taking categorization of DoD's use of the spectrum at issue could well depend on the specific character of any property

right identified through the closer analysis of the property-right question we require.  At least for those reasons, we do not decide the physical-taking issue raised by the government in challenging the Claims Court's refusal to dismiss Ligado's physical-taking claim.

### III

We affirm the Claims Court's determinations that the Communications Act does not displace the Claims Court's jurisdiction and that dismissal is not warranted for want of an adequate allegation that the government conduct at issue was authorized.  We vacate the Claims Court's decision insofar as it holds that Ligado has pleaded the existence of a property right and that DoD use of the spectrum might qualify as a physical taking.  We have no challenge before us to the Claims Court's dismissal of the legislative-taking claim or to the ruling that, if Ligado has a property right against the non-FCC federal agencies and the challenged conduct is authorized, the "categorical" and "regulatory taking" claims can proceed.  We remand the matter to the Claims Court for proceedings, presumably a new round of Rule 12(b)(6) proceedings, consistent with this opinion.

The parties shall bear their own costs.

**AFFIRMED IN PART, VACATED IN PART,
REMANDED IN PART**